## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
**Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

**Docket Number(s):** 14-3574(L)/14-3581

Caption [use short title]

**Motion for:** Consent Motion to Hold Appeals of Commercial End User and Consumer End User Plaintiffs In Abeyance Pending Supreme Court's Ruling on the Libor Appeal

In re: Aluminum Warehousing Antitrust Litigation

Set forth below precise, complete statement of relief sought:

Appellants and appellees all consent to this request for the Court to hold these appeals in abeyance until the Supreme Court decides the procedural issue presented by this Court's decision in In re LIBOR-Based Fin. Instr. Antitrust Litig., 2013 WL 9557843 (2d Cir. Oct. 30, 2013),cert. granted sub nom Gelboim v. Bank of Am. Corp. because the Supreme Court's decision is likely to determine whether this Court can hear these appeals at this time.

**MOVING PARTY:** The London Metal Exchange

**OPPOSING PARTY:** See Addendum A

☐ Plaintiff ☐ Defendant
☐ Appellant/Petitioner ☑ Appellee/Respondent

**MOVING ATTORNEY:** Margaret M. Zwisler

**OPPOSING ATTORNEY:** See Addendum B

[name of attorney, with firm, address, phone number and e-mail]

Latham & Watkins LLP

555 Eleventh Street, N.W., Suite 1000, Washington, DC 20004

(202) 637-2200 margaret.zwisler@lw.com

Court-Judge/Agency appealed from: Hon. Katherine B. Forrest/S.D.N.Y.

**Please check appropriate boxes:**

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): Opposing counsel consents to the relief requested.

Has request for relief been made below? ☐ Yes ☑ No
Has this relief been previously sought in this Court? ☐ Yes ☑ No
Requested return date and explanation of emergency:

n/a this consent motion is not seeking emergency relief.

Opposing counsel's position on motion:
☑ Unopposed ☐ Opposed ☐ Don't Know
Does opposing counsel intend to file a response?
☐ Yes ☑ No ☐ Don't Know

Is oral argument on motion requested? ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No If yes, enter date:

**Signature of Moving Attorney:**
s/Margaret M. Zwisler **Date:** 10/17/2014 Service by: ☑ CM/ECF ☐ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

**ADDENDUM A**
**OPPOSING PARTIES**

**Plaintiffs-Appellants**

Daniel Javorsky

David J. Kohlenberg

Brick Pizzeria LLC

Big River Outfitters, LLC

D-Tek Manufacturing

F&F Custom Boats, LLC

Master Screens, Inc.

Seating Constructors USA, Inc.

Team Ward, Inc.

Quicksilver Welding Services, Inc.

Lexington Homes, Inc.

Welk-Ko Fabricators, Inc.

**ADDENDUM B**
**COUNSEL FOR OPPOSING PARTIES**

**Counsel for Plaintiffs-Appellants Daniel Javorsky, David Kohlenberg, and Brick Pizzeria LLC (collectively "Consumer End Users Plaintiffs-Appellants")**

Douglas G. Thompson
Rosalee B. C. Thomas
Michael G. McLellan
Eugene J. Benick
**FINKELSTEIN THOMPSON LLP**
1077 30th Street, NW, Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000
dthompson@finkelsteinthompsto.com
rbcthomas@finkelsteinthompsto.com
mmclellan@finkelsteinthompsto.com
ebenick@finkelsteinthompsto.com

Brian R. Strange
Keith L. Butler
John T. Ceglia
**STRANGE & CARPENTER**
12100 Wilshire Bouldevard, Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
lacounsel@earthlink.net
kbutleer@strangeandcarpenter.com
jceglia@strangeandcarpenter.com

**Counsel for Plaintiffs-Appellants Big River Outfitters, LLC, D-Tek Manufacturing, F&F Custom Boats, LLC, Master Screens, Inc., Seating Constructors USA, Inc., Team Ward, Inc., Quicksilver Welding Services, Inc., Lexington Homes, Inc., and Welk-Ko Fabricators, Inc. (collectively "Commercial End Users Plaintiffs-Appellants")**

Joseph H. Meltzer
Terence S. Ziegler
Kimberly A. Justice
Scott M. Lempert
John Q. Kerrigan
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
jmeltzer@ktmc.com
tziegler@ktmc.com
kjustice@ktmc.com
slempert@ktmc.com
qkerrigan@ktmc.com

John A. Kehoe
**GIRARD GIBBS LLP**
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
jak@girardgibbs.com

Daniel C. Girard
Amanda M. Steiner
Adam E. Polk
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
dcg@girardgibbs.com
as@girardgibbs.com
aep@girardgibbs.com

Jonathan W. Cuneo
Joel Davidow
Yifei "Evelyn" Li
**CUNEO GILBERT & LaDUCA, LLP**
507 C Street, N.E.
Washington, D.C. 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
evelyn.li@cuneolaw.com

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
:
IN RE ALUMINUM WAREHOUSING    :     No. 14-3574(L)
ANTITRUST LITIGATION         :     No. 14-3581
:
:     *On Appeal from the*
:     *United States District*
:     *Court for the Southern*
:     *District of New York*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**CONSENT MOTION OF DEFENDANT-APPELLEE THE LONDON**
**METAL EXCHANGE TO HOLD THE APPEALS OF THE COMMERCIAL**
**END USER AND CONSUMER END USER PLAINTIFFS IN ABEYANCE**
**PENDING THE SUPREME COURT'S RULING ON THE *LIBOR* APPEAL**

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1,[1] undersigned counsel state that:

The LME is wholly owned by LME Holdings Limited. LME Holdings Limited's ultimate parent is Hong Kong Exchanges and Clearing Limited. No other publicly held corporation owns 10% or more of the LME's stock.

---

[1] Rule 26.1 provides that any "nongovernmental corporate party" to a proceeding in a court of appeals must file a corporate disclosure statement identifying any parent corporation and any publicly traded entity that owns 10% or more of its stock. The purpose of this rule is to allow judges to ascertain whether or not any judge has an interest in the case that may cause that judge to recuse himself or herself. *See* Advisory Committee Notes, 1998 Amendments. As the Court held below, the LME, although privately held, is an organ of the government of the United Kingdom for purposes of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et. seq. However, its ultimate parent is publicly traded. The LME thus construes Rule 26.1 to require this disclosure.

With the consent of all appellants and appellees, defendant-appellee The London Metal Exchange ("the LME") respectfully moves this Court, pursuant to Rule 27 of the Federal Rules of Appellate Procedure and Local Rule 27.1, to hold the appeals of the Commercial End User and Consumer End User plaintiffs-appellants in abeyance until the Supreme Court decides the issue presented by this Court's decision in *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, Nos. 13-3565, 13-3636, 2013 WL 9557843 (2d Cir. Oct. 30, 2013), cert. granted sub. nom *Gelboim v. Bank of Am. Corp.* No. 13-1174, regarding whether the dismissal of an action that has been consolidated with other suits that are ongoing is immediately appealable.

Procedurally, the appeals at issue here are like the appeals at issue in *Libor* as both involve multidistrict litigations where some plaintiffs had their claims dismissed with prejudice and others did not. Thus, the Supreme Court's forthcoming decision on appellate jurisdiction is likely to determine whether this Court can hear these appeals at this time. The Supreme Court will hear the *Libor* argument on December 9, 2014, so all parties to this appeal believe that a stay of these appeals is appropriate until the Supreme Court rules. *See* Docket for No. 13-1174, *Gelboim v. Bank of Am. Corp.* No. 13-1174.

**ARGUMENT**

**I.** **AS IN *LIBOR*, THE JUDGMENTS AT ISSUE ENDED THE CLAIMS OF PLAINTIFFS-APPELLANTS BUT NOT THE CLAIMS OF ALL PLAINTIFFS IN THE PROCEEDING BELOW**

Commercial End Users and Consumer End Users appeal the judgments entered by the district court on August 29, 2014, dismissing their complaints without leave to replead. No. 1:13-md-02481-KBF, Dkt. 591 (Ex. 1)[2]; No. 1:13-md-02481-KBF, Dkt. 590 (Ex. 2).[3] However, those judgments did not terminate the action in the district court. The proceeding below is a multidistrict litigation transferred to the Southern District of New York "for coordinated or consolidated pretrial proceedings" under 28 U.S.C. § 1407. *See* No. 1:13-md-02481-KBF, Dkt. 1, captioned *In re Aluminum Warehousing Antitrust Litigation*, MDL No. 2481. The case is comprised of the complaints of six groups of plaintiffs: three complaints brought on behalf of three separate putative classes (the First Level Purchasers ("FLPs"), Commercial End Users, and Consumer End Users), and three complaints brought by separate plaintiffs (Mag Instrument, Inc., Agfa Corporation, and Eastman Kodak Company).

The August 29, 2014 judgments did not dispose of, or even relate to, the claims of the FLPs, Mag, Agfa, or Kodak plaintiffs. With respect to the FLP, Mag

---

[2]     "Ex. __" refers to the exhibits to the accompanying Declaration of Margaret M. Zwisler, dated October 15, 2014.

[3]     Exs. 3-6 are the Orders and Opinions cited in the Notices of Appeal.

and Agfa plaintiffs, the district court dismissed their complaints as well, but permitted them to submit motions for leave to file amended complaints. No. 1:13-md-02481-KBF, Dkt. 571 at 4-5 (Ex. 4). They did so on October 9th, together with Kodak, which had filed its original complaint after defendants moved to dismiss the other plaintiffs' complaints. *See* No. 1:13-md-02481-KBF, Dkts. 608, 610. Although Defendants intend to oppose leave to amend, that question has not been fully briefed or decided, and the Kodak action remains pending regardless of whether leave to amend is granted.[4] Thus, the multidistrict litigation from which plaintiffs-appellants take these appeals is still ongoing.

## II. THE COURT SHOULD HOLD THESE APPEALS IN ABEYANCE UNTIL THE SUPREME COURT DECIDES THE *LIBOR* APPEAL

These appeals present the same procedural issue as *In re LIBOR-Based Financial Instruments Antitrust Litigation. Libor* was also a multidistrict litigation transferred to the Southern District of New York "for coordinated or consolidated pretrial proceedings," per 28 U.S.C. § 1407. No. 1:11-md-02262-NRB, Dkt. 1. The district court dismissed certain plaintiffs' complaints with prejudice and entered judgment against them. However, the court allowed the complaints of other plaintiffs to proceed. *Id.* at Dkt. 286. The dismissed plaintiffs did not seek

---

[4]     Kodak filed its complaint after defendants filed their motions to dismiss, and the court has made no rulings with respect to its claims.

entry of a partial final judgment under Rule 54(b) prior to filing their notices of appeal.

This Court *sua sponte* dismissed the appeals, explaining that it "lack[ed] jurisdiction over these appeals because a final order has not been issued by the district court as contemplated by 28 U.S.C. § 1291, and the orders appealed from did not dispose of all claims". *In re LIBOR-Based Fin. Instruments*, 2013 WL 9557843. In June 2014, the Supreme Court granted the dismissed Libor plaintiffs' petition for review of this Court's dismissal of their appeals, and that case is set for argument on December 9, 2014. *See* Docket for No. 13-1174, *Gelboim v. Bank of Am. Corp.* The specific question presented for review that the Supreme Court will resolve is "whether and in what circumstances is the dismissal of an action that has been consolidated with other suits immediately appealable?" *Id.* Because the Supreme Court's forthcoming decision is likely to resolve the question as to whether this Court has jurisdiction to hear these appeals at this time or not, all parties agree that it would be most efficient for this Court to hold these appeals in abeyance until the Supreme Court rules. Exhibit 7 to the accompanying declaration evidences the appellants' consent to the relief requested, and the LME expects that the other appellees will be filing individual motions joining in this request.

5

## CONCLUSION

For the foregoing reasons, the LME respectfully requests that the Court hold the appeals of the Commercial End User plaintiffs and Consumer End User plaintiffs in abeyance until the Supreme Court resolves the *Libor* appeal.

Dated:  New York, New York            Respectfully submitted,
            October 17, 2014

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*) (*margaret.zwisler@lw.com*)
William R. Sherman
(*william.sherman@lw.com*)
Jennifer L. Giordano
(*jennifer.giordano@lw.com*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201

*Attorneys for Defendant-Appellee The London Metal Exchange*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of October 2014, a true and correct copy of the foregoing Motion to Dismiss for Lack of Appellate Jurisdiction was served on counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1 (h)(1) & (2).

*/s/ Margaret M. Zwisler*
Margaret M. Zwisler

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
: 
IN RE ALUMINUM WAREHOUSING  :     No. 14-3574(L)
ANTITRUST LITIGATION  :     No. 14-3581
: 
:     *On Appeal from the*
:     *United States District*
:     *Court for the Southern*
:     *District of New York*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF MARGARET M. ZWISLER IN SUPPORT OF**
**CONSENT MOTION OF DEFENDANT-APPELLEE THE LONDON**
**METAL EXCHANGE TO HOLD THE APPEALS OF THE COMMERCIAL**
**END USER AND CONSUMER END USER PLAINTIFFS IN ABEYANCE**
**PENDING THE SUPREME COURT'S RULING ON THE *LIBOR* APPEAL**

        Pursuant to 28 U.S.C. § 1746, Margaret M. Zwisler declares as follows:

        1.    I am an attorney admitted to practice before this Court and a partner at Latham & Watkins LLP, counsel for Defendant-Appellee The London Metal Exchange in these matters.  I submit this declaration on behalf of The London Metal Exchange in support of its consent motion to hold the appeals of the Commercial End User and Consumer End User plaintiffs in abeyance pending the Supreme Court's ruling on the *Libor* appeal.

2.    Attached to this declaration as Exhibits 1-7 are true and correct

copies of the following documents:

| Exhibit | Document |
|---------|----------|
| 1 | Notice of Appeal filed by Commercial End User plaintiffs in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-02481-KBF (S.D.N.Y. Sept. 24, 2014), Dkt. 591 |
| 2 | Notice of Appeal filed by Consumer End User plaintiffs in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-02481-KBF (S.D.N.Y. Sept. 24, 2014), Dkt. No. 590 |
| 3 | Opinion & Order in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-02481-KBF (S.D.N.Y. Aug. 25, 2014), Dkt. No. 564 |
| 4 | Opinion & Order in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-02481-KBF (S.D.N.Y. Aug. 29, 2014), Dkt. No. 571 |
| 5 | Judgment in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-02481-KBF (S.D.N.Y. Aug. 29, 2014), Dkt. No. 573 |
| 6 | Memorandum Decision & Order in *In re Aluminum Warehousing Antitrust Litigation*, No. 13-md-02481-KBF (S.D.N.Y. Sept. 15, 2014), Dkt. No. 586 |
| 7 | October 17, 2014 e-mails from K. Justice to M. Zwisler and from D. Thompson to M. Zwisler, confirming plaintiffs-appellants' consent to the LME's motion to hold the appeals of the Commercial End User and Consumer End User plaintiffs in abeyance pending the Supreme Court's ruling on the *Libor* appeal |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2014 in Washington, D.C.

/s/ Margaret M. Zwisler
Margaret M. Zwisler

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>**Commercial End User Plaintiffs (14-cv-3121)** | Master Action<br>No. 13-md-02481-KBF |

### COMMERCIAL END USER PLAINTIFFS' NOTICE OF APPEAL

Notice is given that Big River Outfitters, LLC, D-Tek Manufacturing, F&F Custom Boats, LLC, Master Screens, Inc., Seating Constructors USA, Inc., Team Ward, Inc., Quicksilver Welding Services, Inc., Lexington Homes, Inc. and Welk-Ko Fabricators, Inc. (collectively "Commercial End User Plaintiffs"), hereby appeal to the United States Court of Appeals for the Second Circuit from the Judgment entered in this action on August 29, 2014 (Dkt. No. 573). This appeal is taken from the entirely of said Judgment and each and every aspect thereof, including without limitation the Court's August 25, 2014 Opinion and Order (Dkt No. 564), the Courts' August 29, 2014 Opinion and Order (Dkt. No. 571) and the Court's September 15, 2014 Memorandum Decision and Order (Dkt No. 586).

Dated:  September 24, 2014

Respectfully submitted,

_/s/Joseph H. Meltzer_
**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
Joseph H. Meltzer
Terence S. Ziegler
Kimberly A. Justice
Scott M. Lempert
John Q. Kerrigan
280 King of Prussia Road
Radnor, PA  19087

Telephone: (610) 667-7706
Facsimile:  (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
kjustice@ktmc.com
slempert@ktmc.com
qkerrigan@ktmc.com

*Co-Lead Counsel for Commercial End User Plaintiffs*

/s/ John A. Kehoe

**GIRARD GIBBS LLP**
John A. Kehoe
711 Third Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 867-1721
Facsimile: (212) 867-1767
jak@girardgibbs.com

Daniel C. Girard
Amanda M. Steiner
Adam E. Polk
601 California Street, 14th Floor
San Francisco, CA  94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846
dcg@girardgibbs.com
as@girardgibbs.com
aep@girardgibbs.com

*Co-Lead Counsel for Commercial End User Plaintiffs*

/s/ Jonathan W. Cuneo

**CUNEO GILBERT & LaDUCA, LLP**
Jonathan W. Cuneo
Joel Davidow
Yifei "Evelyn" Li
507 C Street, N.E.
Washington, D.C.  20002
Telephone:  (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
evelyn.li@cuneolaw.com

*Co-Lead Counsel for Commercial End User Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 24, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

*/s/Joseph H. Meltzer*

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ALUMINUM WAREHOUSING ANTITRUST LITIGATION | 1:13-MD-02481 (KBF) |
| This Document Relates To: | Hon. Katherine B. Forrest |
| Consumer End User Plaintiffs (1:14-CV-03122) | **NOTICE OF APPEAL IN A CIVIL CASE** |

<u>**NOTICE OF APPEAL**</u>

PLEASE TAKE NOTICE that Daniel Javorsky, David Kohlenberg, and Brick Pizzeria LLC, on behalf of the putative class of Consumer End User Plaintiffs, hereby appeal to the United States Court of Appeals for the Second Circuit from the Judgment of this court entered on August 29, 2014 (D.E. 573) granting defendants' motion to dismiss. The Consumer End User Plaintiffs also hereby appeal the Opinion and Order dated August 25, 2014 (D.E. 564), the Opinion and Order dated August 29, 2014 (D.E. 571), the Order dated September 9, 2014 (D.E. 583), and the Memorandum Decision and Order dated September 15, 2014 (D.E. 586).

Dated: September 24, 2014

Respectfully Submitted,

By: *    /s/ Douglas G. Thompson    *
Douglas G. Thompson (admitted *pro hac vice*)
Rosalee B. C. Thomas (Bar No. RT0440)
Michael G. McLellan
Eugene J. Benick
**Finkelstein Thompson LLP**
1077 30th Street, NW, Suite 150
Washington, DC 20007
Tel.: (202) 337-8000
Fax: (202) 337-8090
dthompson@finkelsteinthompson.com
rbcthomas@finkelsteinthompson.com
mmclellan@finkelsteinthompson.com
ebenick@finkelsteinthompson.com

Brian R. Strange
Keith L. Butler
John T. Ceglia
**STRANGE & CARPENTER**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
Telephone: (310) 207-5055
Facsimile: (310) 826-3210
lacounsel@earthlink.net
kbutler@strangeandcarpenter.com
jceglia@strangeandcarpenter.com

*Attorneys for Consumer End User Plaintiffs*

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 25, 2014
```

------------------------------------------------------------X
                                                          :
                                                          :
                                                          :
IN RE ALUMINUM WAREHOUSING          :          13-md-2481 (KBF)
ANTITRUST LITIGATION                 :          and all related cases
                                                          :
                                                          :          OPINION & ORDER
                                                          :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On August 16, 2013, the first of what would become a large number of

lawsuits alleging federal antitrust and analogous state law claims was filed against

the London Metal Exchange Limited[1] (the "LME"), Glencore Xstrata plc[2]

("Glencore"), the Goldman Sachs Group, Inc. ("Goldman Sachs"), JP Morgan Chase

& Co. ("JP Morgan"), and a variety of commodity trading and metals mining

companies along with several metals warehousing companies.[3]  The United States

Judicial Panel on Multidistrict Litigation issued orders transferring all of these

actions to this Court.  (See ECF Nos. 1, 6, 232, 551.)

Plaintiffs allege a conspiracy to restrain the output of aluminum among the

LME, owners and operators of metal storage warehouses, and metals traders

including Glencore, Goldman Sachs, and JP Morgan.  According to plaintiffs, these

---

[1] Plaintiffs have also sued LME Holdings Limited and Limited Metal Exchange Limited.

[2] Plaintiffs have also sued Glencore Ltd. and Glencore Xstrata Inc.

[3] These defendants include GS Power Holdings LLC; Henry Bath & Son Limited; Henry Bath LLC;
Hong Kong Exchanges and Clearing Limited; Lime Holdings Limited; MCEPF Metro I, Inc.; Metro
International Trade Services, L. L. C.; MITSI Holdings LLC; Nems (USA) Inc.; Pacorini Metals AG;
and Pacorini Metals USA, LLC.

defendants devised a scheme to slow the movement of aluminum out of LME-approved warehouses, which caused aluminum prices to increase in two ways. First, the scheme constrained the overall supply of aluminum, which, as dictated by the law of supply and demand, led directly to an increase in its price. Second, the scheme caused LME-warehoused aluminum to be stored for longer periods of time, which increased its storage costs, thereby increasing the Midwest Premium, a typical pricing component of aluminum in, <u>inter alia</u>, the United States. Plaintiffs allege that they were therefore forced to purchase aluminum at inflated prices.

All defendants have moved to dismiss all claims, and all plaintiffs have opposed. The instant decision concerns only one of the many pending motions,[4] specifically, the LME's motion to dismiss all claims against it on the basis that it is immune under the Foreign Sovereign Immunities Act ("FSIA"), and therefore this Court lacks subject-matter jurisdiction as to claims against it. The instant motion does not address the merits of plaintiffs' claims, and has nothing to do with, for instance, whether plaintiffs have stated or could state an antitrust claim against the LME.

Instead, the issue before this Court is a narrow one: whether the LME is an "organ" of the United Kingdom, even though it is privately owned by Hong Kong Exchanges and Clearing Limited and was previously owned by, <u>inter alia</u>, various investment banks and trading companies. If it is, the Court must then determine

---

[4] The Court will address the other pending motions separately.

whether the LME's alleged conduct falls within the "commercial exception" of the FSIA.

For the reasons set forth below, the Court GRANTS the LME's motion to dismiss based on sovereign immunity.  The Court itself initially found this result somewhat surprising and counterintuitive.  Nevertheless, it is dictated by the prevailing case law.

## I.    RELEVANT FACTS

The facts relevant to this motion include not only those alleged in the second corrected consolidated amended complaint (ECF No. 271 ("CAC")),[5] but also those the parties have submitted in connection with this motion.  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").  The Court takes all uncontroverted facts in the complaint as true and draws all reasonable inferences in favor of the plaintiff.  See Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

---

[5] There are a number of complaints asserted against the LME in these consolidated and coordinated actions.  (See ECF Nos. 226 (Amended Complaint relating to Mag Instrument, Inc. v. The Goldman Sachs Grp., Inc.), 227 (Consumer End-Users' Consolidated Amended Class Action Complaint), 242 (Commercial End Users' Corrected Consolidated Class Action Complaint), 271 (CAC), 272 (Amended Complaint relating to Agfa Corp. & Agfa Graphics, N.V. v. The Goldman Sachs Grp., Inc.); Eastman Kodak Co. v. The Goldman Sachs Grp., Inc., No. 6:14-cv-06429-MAT (W.D.N.Y.) ECF No. 1 (case transferred to this Court on August 19, 2014, see No. 14-cv-6849 ECF No. 6).)  The LME's motion to dismiss pertains to all of these complaints.  (See ECF No. 320.)  In the instant opinion, the Court resolves the LME's motion to dismiss as to all claims against it.  Because the allegations against the LME are consistent across all of the complaints, the Court will cite to the second corrected consolidated amended complaint for ease of reference.

The LME is headquartered in London, England and "is the world center for trading metals." (CAC ¶¶ 124, 125.) The LME provides a platform for trading industrial metal contracts, and over 80% of the world's non-ferrous metals futures transactions are carried out on the LME's trading platforms. (Id. ¶ 124; Declaration of Mark S. Bradley, ECF No. 387 ¶¶ 2-3 ("Bradley Decl.").)[6] "The LME brings together industrial and financial participants to create a market for buyers and sellers, and provides producers and consumers of metals with a physical market of last resort and the ability to hedge against the risk of rising and falling world metal prices." (CAC ¶ 124.)

The LME groups its members into five categories, each of which corresponds with a different set of responsibilities and obligations. (Bradley Decl. ¶ 4.) Goldman Sachs, Glencore, and JP Morgan each fall into different categories. (Id. ¶¶ 5-7.)

The LME's primary decision-making body is its Board of Directors. (Bradley Decl. ¶ 9.) The Board oversees 25 advisory committees, most of which report directly to the Board or to the LME's Executive Committee ("EXCOM"). (Id. ¶ 8.) Several of the advisory committees oversee the LME's operations; one such committee is the "Warehousing Committee." (Id. ¶ 10.) The responsibilities of the Warehousing Committee include maintaining contact with warehousing industry

---

[6] Mark S. Bradley is the Head of Market Surveillance at the LME. He has been employed by the LME since 2006. Among his job responsibilities are ensuring that the LME is fulfilling its statutory and regulatory obligations to maintain an orderly market and to protect investors on the LME. Bradley is one of the LME's "liaison contacts" with the United Kingdom's Financial Conduct Authority. (Bradley Decl. ¶ 1.)

and trade associations, apprising EXCOM of relevant issues in warehousing, and making recommendations to EXCOM regarding warehousing policy. (Id. ¶11.) Committee decisions are by majority vote. (Id. ¶ 12.) The committee's chairman is appointed by EXCOM, and the committee's other members are employees of LME-approved warehouses. (Id. ¶ 13.) Employees of warehouse companies that are defendants in this action have never comprised a majority of the committee, and none of the non-LME defendants in this litigation have ever had a representative on EXCOM. (Id. ¶¶ 14-15.)

The LME is a "recognized investment exchange" ("RIE"), as defined by the Financial Services and Markets Act 2000, as amended ("FSMA"). (Id. ¶ 16 & exs. B-D.) RIEs are supervised by the Financial Conduct Authority (the "FCA"), which until 1997 was known as the Securities and Investment Board, and from 1997 until the passage of FSMA was known as the Financial Services Authority. (Declaration of Nicholas David Ong-Seng, ECF No. 322 ¶ 6 ("Ong-Seng Decl.").)[7] The FCA is "a statutorily created body that is charged with regulating the financial services industry in the United Kingdom," and it is accountable to the U.K. Parliament through the U.K. Treasury.[8] (Id.)

To maintain its status as an RIE, the LME must meet certain "Recognition Requirements" adopted by the U.K. Treasury and implemented by the FCA. (Id. ¶¶ 8-9; Bradley Decl. ¶ 17 & ex. E.) Under the current Recognition Requirements, the

---

[7] Nicholas David Ong-Seng is LME's Managing Director: Regulation and Compliance. (Id. ¶ 1.)

[8] No party has disputed that the FCA is an arm of the U.K. Government.

LME must maintain an orderly market and afford proper protection to investors, which it achieves by regulating the price-discovery and price convergence functions for metals traded on the exchange. (Bradley Decl. ¶¶ 18-20.) FSMA regulations also require the LME to make satisfactory arrangements for "securing the timely discharge (whether by performance, compromise or otherwise) of the rights and liabilities of the parties to transactions effected on the exchange," and must provide for "the safeguarding and administration of assets belonging to [those parties]." (Id. ex. D sched. 4(2)(d), (g).)

The LME's compliance with the Recognition Requirements is subject to review by the FCA, and if the FCA finds that the LME has failed to satisfy the Recognition Requirements, the FCA may revoke the LME's status as an RIE. (Ong-Seng Decl. ¶ 13.) However, under U.K. law, actions taken by the LME with respect to its regulatory functions are immunized against private suit absent a showing of bad faith. (Id. ex. B § 291.)

The LME maintains a large network of storage units for its traded commodities, including aluminum. (CAC ¶ 126.) This network includes a number of approved warehouses that are located across the United States. (Id.)

A. The LME's Price Discovery Function

The LME is tasked with ensuring efficient price-discovery and price convergence functions for metals traded on the exchange. With regard to price-discovery, contracts for metals traded on the LME are "aimed at providing the metals trade and industry with a global price reference." (Bradley Decl. ¶ 21.) The

LME does not itself trade metals contracts. (Id. ¶ 22.)  LME contracts are based on physical settlement by the transfer of ownership of metal stored in LME-approved warehouses.  (Id. ¶ 29.)

Price convergence "refers to keeping the LME price in line with the physical market price" (also known as the "spot price.")  (Id. ¶ 27.)  The "physical market is the place where metal manufacturers, such as miners, smelters and refiners, sell their metal to purchasers who in turn use that metal to make physical goods for sale."  (Id. ¶ 25.)  This metal is generally, though not always, separate from that which passes through the LME system.  Sellers in the physical market may choose to use the LME price "as a component in the price they wish to achieve when negotiating the sale of their metal to purchasers in the physical market."  (Id. ¶ 26.)  These sellers negotiate with buyers over an "all-in" price that includes the added costs of transport and delivery, which are also subject to negotiation.  (Id.)  The difference between the LME price and the all-in price is called the "premium."  (Id.)  When the costs of storing aluminum in a warehouse increase (as would be the case when aluminum is being stored for longer periods of time), the premium also increases.

When the forward price of aluminum is higher than the current price (which may occur during a construction downturn), the resulting market situation is referred to as a "contango."  (Id. ¶ 85.)  The existence of a contango allows arbitrage traders to profit by exploiting the difference between the current and future price. (Id.)  Contangos typically lead aluminum to be stored for longer periods than would

otherwise be the case while would-be arbitrageurs await the expected eventual

increase in the market price (that is, they are betting that the cost of financing

today's purchase and storage of the aluminum will be less than the proceeds from

its sale in the future).  (See id.)

B.  The Warehouse Arrangements

Metals are typically exchanged on the LME through the exchange of

warrants, which are "bearer document[s] of possession"; each corresponds to a

specific lot of metal at an LME-approved warehouse.  (Id. ¶¶ 37-39.)  LME warrants

are issued by an approved warehouse company after the metal has been delivered to

the warehouse.  (Id. ¶ 39.)

The LME does not itself own or operate warehouses for metals traded on the

exchange, nor does it own the metal stored within those warehouses.  (Id. ¶ 36.)

Instead, the LME has storage contracts with warehouses all over the world.[9]  (Id.

¶¶ 35-37.)  These warehouses issue and cancel warrants, and perform all of the

required load-in and load-out procedures.  (Id. ¶¶ 35-39, 54.)

Warehouses seeking to join the LME's network must apply to the LME.

(Supplemental Declaration of Mark Bradley, ECF No. 432 ¶ 4 ("Bradley Supp.").)

When an entity inquires regarding the application process, it is informed that it will

need to agree to "[t]he terms and conditions applicable to all LME listed warehouse

---

[9] The Terms and Conditions applicable to all LME-approved warehouses provide for the payment of an annual "listing fee" and stock levy to the LME.  (Id. ¶ 81.)  The stock levy is calculated off the percent of LME warranted stock stored at an LME-approved warehouse.  (See id. ¶¶ 81, 83-84.)

companies." (Id. ex. A.)  In addition, LME provides the company with its "current disciplinary procedures handbook."  (Id.)

To become an LME-approved warehouse, an entity must execute a standard form agreement with the LME (the "Warehouse Agreement").  (Id. ¶ 5.)  The first paragraph of the Warehouse Agreement states, "This Agreement is in standard form and is required to be signed in its standard form by all warehouse companies wishing to become or remain listed as LME warehouses."  (Id. ex. B.)  The agreement expressly "incorporates and requires approved warehouses to abide by a set of Terms and Conditions as they may change from time to time."  (Id. ¶ 6.)  None of the terms and conditions is individually negotiated.  (Id.; see also Bradley Decl. ¶ 50 & ex. N.)  The Warehouse Agreement also requires warehouses to report their stock of warranted metal to the LME each business day.  (Bradley Decl. ¶ 51.)

Before the LME makes any material change to the Warehouse Agreement, it publishes a notice consulting the approved warehouses about the proposed change, then receives and considers comments.  (Bradley Supp. ¶ 18; Second Supplemental Declaration of Mark Bradley, ECF No. 463 ¶ 3 ("2d Bradley Supp.").)  Among the types of changes subject to such notice, comment and consideration are changes relating to minimum load-out requirements.  (See id. ¶¶ 4-5, 10.)  If a party objects to a proposed rule change, or to the procedure used to adopt it, the party may challenge the rule in a "judicial review" proceeding in a U.K. court (which is a process of review for public bodies).  (Bradley Decl. ¶ 66; Bradley Supp. ¶ 18.)  If the U.K. court agrees that the LME failed to follow appropriate procedures, it may

quash the rule.  (Bradley Decl. ¶ 66.)  This occurred in 2014 in the case <u>R v. London Metal Exch. ex parte United Co. Rusal PLC</u>, [2014] EWHC (Admin) 890 (Eng.).  (<u>See</u> Bradley Decl. ex. R.)

The LME's Policy Regarding Approval of Warehouses also imposes conditions on LME warehouses.  (<u>Id.</u> ¶ 54 & ex. F.)  These conditions include minimum daily load-out rules.  (<u>Id.</u> ¶ 54 & ex. F § 2.3.4.1.)  They do not, however, include the rent for storage at the warehouses.  Instead, the Warehouse Agreement requires each warehouse annually to set its own rent rate for a period of 12 months commencing April 1 and to notify the LME of the same.  (Bradley Supp. ex. C § 5.1.4.)  The LME "may publish such information concerning stocks and queues at Warehouses as is considered necessary by the [LME], acting reasonably, for the purposes of market transparency or other regulatory purposes."  (<u>Id.</u> § 6.3.3.)  Each LME-approved warehouse must also maintain "effective information barriers" between it and entities that trade on the exchange, "as specified by the [LME] from time-to-time." (<u>Id.</u> § 9.13.)

The Warehouse Agreement further provides that "the terms of the Exchange's handbook on enforcement and disciplinary procedures" are deemed incorporated into the Agreement.  (<u>Id.</u> § 8.)  If a warehouse fails to fulfill its load-in and load-out obligations, the LME reserves the right to investigate and the "Disciplinary Procedures shall apply."  (<u>Id.</u> § 9.3.2.)  If an individual or entity complains that a warehouse has failed to fulfill its obligations, the LME may conduct an investigation, which could lead to disciplinary proceedings.  (Bradley

Decl. ¶¶ 56-59.)  If a warehouse is found to have engaged in the alleged acts, the LME's Disciplinary Committee may impose penalties including fines, or it may withdraw the LME's approval of the warehouse.  (Id. ¶ 60.)  There is a process for appeal.  (Id. ¶ 61.)  A warehouse company can also challenge the fairness of the LME's disciplinary and appeal process through a judicial review procedure in a U.K. court.  (Id. ¶ 62.)  This occurred in 2000, when an LME-approved warehouse challenged sanctions the LME imposed against it.  (See R v. London Metal Exch. ex parte Albatros Warehousing Ltd. BV, (unpublished Mar. 30, 2000), Bradley Decl. ex. Q.)

As an RIE, the LME is overseen by the FCA and must comply with the FCA's Sourcebook.  (See Bradley Supp. ex. E.)  This document requires RIEs to arrange for satisfactory procedures "to ensure that any rights arising in relation to the assets held . . . are held, transferred or acted upon in a timely and accurate manner . . . ." (Id. ex. E ¶ 2.11.3(4).)  Various requirements of the Warehouse Agreements correspond to the LME's obligations pursuant to the Recognition Requirements. (See Bradley Decl. ¶¶ 50-51, 55.)  The Recognition Requirements have been in force since 2001.  (Bradley Supp. ¶ 13.)  The current requirements are more detailed than those in place in 1986 at the time of the Albatros decision, which is discussed below. (Id. ¶ 15.)  The express obligations in the Recognition Requirements form the basis for the LME's position that its regulation of its approved warehouses are part of its public regulatory function.  (Id. ¶ 15.)

11

In connection with this proceeding, the FCA submitted a letter to the LME stating its view that "the LME's regulation of its warehouses, including its regulation of metal load-out, is necessary for the LME to meet its regulatory obligations as an RIE." (Id. ¶ 16 & ex. G.)  In particular, that letter states,

> The LME's arrangements with its network of approved warehouses play an important role in the functioning of the LME's market. Therefore, the FCA, as part of its supervision of the LME, expects LME to ensure that its warehousing arrangements provide effective and efficient services for the receipt, holding, and delivery of metal related to the trading of LME contracts. This is important to enable the LME to meet its regulatory obligations as a RIE.

(Id. ex. G.)  The letter continues,

> Consequently, although the operation of RIE-approved warehouses is not, by itself, a FCA regulated activity, the FCA expects LME to have in place arrangements that ensure those warehouses which it approves operate in a way that ensures LME meets its regulatory obligations.

(Id.)  The FCA letter also indicates that it views its oversight as comprehensive in this regard:

> In its supervisory oversight of the LME, the FCA will therefore continue to fully engage with LME to monitor the impact of all measures announced by LME, including initiatives such as LME's new Linked Load-In and Load-Out rule, to ensure that such changes are consistent with LME's regulatory obligations under the Recognition Requirements.

(Id.)

The LME and FCA have met regularly and frequently since January 2011 regarding warehouse issues.  (Id. ¶ 45.)  They have met more than 50 times since

2011 regarding warehousing issues alone.  (Id. ex. J.)  The LME's load-in and load-
rules were among the topics discussed at these meetings.  (See id. ¶ 45.)  The LME
has provided the FCA with data analyses regarding warehouse queues, load out
rates, stock levels and warrant cancellations.  (Id.)

C.  Warehouse Queues

Plaintiffs allege intentional delays in the defendant warehouses' "loading out"
of aluminum.  (CAC ¶¶ 22-23, 48-49.)  A delay in loading out aluminum or any
metal is known as a "queue."  (Bradley Decl. ¶ 68.)  The LME issued its first rule
regarding minimum load-out rules in 2003.  (Id. ¶ 69.)  That rule remained
unchanged until 2011.  (Id. ¶ 73.)

Between March 2009 and August 2010, the LME received complaints
regarding delays in warehouse load-outs.  (Id. ¶ 70.)  The LME commissioned a
report and then held a consultation process for proposed changes to its minimum
load-out rules.  (Id. ¶¶ 71-72.)  The LME then changed its load-out rules.  (Id. ¶ 79.)
Those changes were challenged by aluminum producer Rusal before a U.K. court,
which quashed the LME's decision to implement its new rule.  Rusal, [2014] EWHC
(Admin) at [104].

On May 14, 2014, the U.K. Court of Appeal granted the LME permission to
appeal the Rusal decision.  (Id. ¶ 80.)  The Court set forth its reasons for granting
the appeal as (1) "[t]he judge's analysis, if correct, places onerous obligations on any
public body conducting a consultation on complex issues in a politically sensitive
area," (2) "[t]he public body must carry out its own preliminary assessment and

winnowing in order to provide proper focus for the consultation exercise, as the LME did in this case," and (3) "the grounds of appeal have a real prospect of success."  (Id. ¶ 80 & ex. BB.)

II.     RULE 12(B)(1) STANDARDS

Determining the existence of subject matter jurisdiction is a threshold inquiry, and a case is properly dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure when the district court lacks the constitutional power to adjudicate the action.  See Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Makarova, 201 F.3d at 113.

"When considering a motion to dismiss for lack of subject matter jurisdiction . . . a court must accept as true all material factual allegations in the complaint." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).  "But, when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  Id.  In addition, for jurisdictional purposes, the Court may resolve disputed factual issues by reference to evidence outside of the pleadings.  See Flores v. S. Peru Copper Corp., 343 F.3d 140, 161 n.30 (2d Cir. 2003) (citing Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998)).

III.   FSIA LEGAL STANDARDS

The LME argues that it is immune from this suit under the FSIA.  The FSIA codifies a "restrictive theory of sovereign immunity."  <u>Verlinden B.V. v. Cent. Bank of Nigeria</u>, 461 U.S. 480, 488 (1983).  The FSIA provides that a "foreign state shall be immune from the jurisdiction of the Courts of the United States" unless one of several statutorily defined exceptions applies.  28 U.S.C. § 1604.  Once a defendant makes a prima facie showing of immunity under § 1604, the burden shifts to the plaintiff to show why one of these statutory exceptions applies.  <u>See</u> <u>Virtual Countries, Inc. v. Republic of South Africa</u>, 300 F.3d 230, 241-42 (2d Cir. 2002); <u>accord</u> <u>Robinson v. Gov't of Malaysia</u>, 269 F.3d 133, 141 (2d Cir. 2001).  If the plaintiff makes a showing that an exception applies, the burden of proof then shifts back to the defendant to show by a preponderance of the evidence that the asserted exception does not apply.  <u>Adler v. Federal Republic of Nigeria</u>, 107 F.3d 720, 728 (9th Cir. 1997).

Thus, to determine that the LME is immune from this suit under the FSIA, the Court must determine (1) that it falls within the definition of a foreign state or, as discussed below, is an "organ" thereof, and (2) that it does <u>not</u> fall within any of the statutory exceptions.  In the case before this Court, the latter question centers on the "commercial activity" exception, codified at 28 U.S.C. § 1605(a)(2).

A.   <u>Definition of an "Organ" of a Foreign State</u>

The LME does not claim to be a foreign state.  Instead, it argues that it is an "organ" of a foreign state.  Under the FSIA, any entity "[w]hich is an organ of a

15

foreign state or political subdivision thereof, or a majority of whose shares or other

ownership interest is owned by a foreign state or political subdivision thereof"

qualifies as an "agency or instrumentality of a foreign state" and is therefore a

"foreign state" presumptively immune from suit.  See id. §§ 1603(a)-(b), 1604.  The

FSIA does not itself define the term "organ."  To determine whether an entity is an

organ of a foreign state, the Court considers the following five factors (which are

known as "Filler factors"):

> (1) whether the foreign state created the entity for a
> national purpose;
>
> (2) whether the foreign state actively supervises the entity;
>
> (3) whether the foreign state requires the hiring of public
> employees and pays their salaries;
>
> (4) whether the entity holds exclusive rights to some right
> in the [foreign] country; and
>
> (5) how the entity is treated under foreign state law.

Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004); see also Kelly v. Syria Shell

Petroleum Dev. B.V., 213 F.3d 841, 846–47 (5th Cir. 2000).

No single Filler factor is dispositive or should be given particular weight.  See

In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 85 (2d Cir. 2008), abrogated

on other grounds by Samantar v. Yousuf, 560 U.S. 305 (2010); Hausler v. JPMorgan

Chase Bank, N.A., 845 F. Supp. 2d 553, 572–73 (S.D.N.Y. 2012).  Thus, a foreign

state need not have any ownership interest in an entity for it to be an "organ" of

that state.  See USX Corp. v. Adriatic Ins., Co., 345 F.3d 190, 209 (3d Cir. 2003)

("[S]ection 1603(b)(2) does not require a foreign state to have any ownership interest in an entity for it to be its organ.").

Courts must be mindful of the fact that the "instrumentality and its related government" frequently possess most of the information needed to establish organ status.  See Hausler, 845 F. Supp. 2d at 572; Weininger v. Castro, 462 F. Supp. 2d 457, 495 (S.D.N.Y. 2006).

    B.  The Commercial Activity Exception

Under the "commercial activity exception" to the FSIA:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Thus, the commercial activity exception may apply to actions based upon either the commercial activity of a foreign state or its organ in the United States, or an act, outside the territory of the United States, in connection with a commercial activity of a foreign state elsewhere, and that causes a direct effect in the United States.

In either instance, the starting point of the analysis is determining whether the action is based on "commercial activity," or whether an action is based on an act in connection with commercial activity.  The FSIA defines "commercial activity" as:

> [E]ither a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

The FSIA does not bar a suit based on the organ of a foreign state participating in the marketplace in the manner of a private citizen or corporation.

Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992). Accordingly:

> [A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods.

Id.

To determine whether an activity is commercial under the FSIA, a court must closely examine the specific acts that form the basis for suit or in connection with which an act was undertaken. For example, in Weltover, the Supreme Court examined whether Argentina's issuance of bonds fell within the commercial activity exception. That case stemmed from a unilateral decision by Argentina to give itself more time to repay bonds, which spurred aggrieved bondholders to sue for breach of contract. Id. at 610-11. Argentina argued that the bonds at issue (which were called "Bonods") differed from ordinary debt instruments in that they were created by the Argentine Government to "fulfill its obligations under a foreign exchange program designed to address a domestic debt credit crisis, and as a component of a

18

program designed to control that nation's critical shortage of foreign exchange."  Id.

at 616.  The Court rejected this argument, finding Argentina's purpose in issuing

the bonds to be "irrelevant."  Id. at 616-17.  Rather, all that mattered was the

nature of Argentina's acts: Argentina had entered the U.S. bond market just as a

private actor would, and so its bond sales in that market were "commercial activity"

within the meaning of the FSIA.  See id. at 617.  Argentina was thus not immune

from suit.  Id.

In a more recent case, the Second Circuit stated,

> The FSIA asks not whether the foreign government is
> acting with a profit motive or instead with the aim of
> fulfilling uniquely sovereign objectives.  Rather, the issue
> is whether the particular actions that the foreign state
> performs (whatever the motive behind them) are the type
> of actions by which a private party engages in 'trade and
> traffic or commerce.'

In re Terrorist Attacks, 538 F.3d at 91-92 (quoting Weltover, 504 U.S. at 614)

(emphasis in original).

In De Letelier v. Republic of Chile, 748 F.2d 790 (2d Cir. 1984), the Second

Circuit reversed a finding of sovereign immunity with regard to LAN, Chile's

nationally owned airline, which had been implicated in the assassination of Chile's

former ambassador to the United States.  The Court noted that while LAN's

"carriage of passengers and packages is an activity in which a private person could

engage," those activities were not the basis for the suit at hand, which concerned

LAN's participation in the assassination plot itself.  See id. at 797.  Because private

individuals cannot lawfully assassinate people, the specific conduct at issue could

19

not be "commercial activity," and therefore LAN remained immune from suit under the FSIA.  Id. at 797-98.

In Kato v. Ishihara, 360 F.3d 106 (2d Cir. 2004), the Second Circuit found that an organ of Japan, the Tokyo Metropolitan Government ("TMG"), was not engaging in commercial activity by providing business assistance, including product promotion, to Japanese businesses seeking to engage in commerce in the United States.  In that case, a Japanese civil servant alleged she had been sexually harassed while employed in TMG's New York office.  Id. at 109.  Plaintiff argued that her suit fell within the commercial activity exception because her job duties were primarily "commercial" in nature, as they prominently included the sale and promotion of Japanese products.  Id.  The Second Circuit looked to the nature of TMG's actions and found that they were only superficially similar to actions typically undertaken by private parties.  See id. at 112.  While a private business might promote its products, promoting those of other businesses or of the Japanese business community more broadly is not something it would ordinarily do.  Id. at 112.  The Second Circuit emphasized that "the fact that a government instrumentality like TMG is engaged in the promotion of commerce does not mean that the instrumentality is thereby engaged in commerce."  Id. (emphasis in original).  Thus, TMG was not involved in a commercial activity, and it retained its immunity under the FSIA.  Id. at 112-13.[10]

---

[10] Similarly, in EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 322 F.3d 635 (9th Cir. 2003), the Ninth Circuit found that the loan collection activities and administration of non-performing loans by the Resolution and Collection Corporation (the "RCC") were not commercial activities.  The Court noted that the RCC was created "expressly to perform a public function,"

Thus far, this Court's discussion of the commercial activity exception has assumed that the conduct at issue occurred in the United States.  However, as set forth above, the third clause of the commercial activity exception provides that an act taken in connection with commercial activity which had a direct effect in the United States may have occurred outside the United States.  For the third clause of the commercial activity exception to apply, two requirements must be met:  "(1) there must be an act outside the United States in connection with commercial activity of the foreign state that causes a direct effect in the United States and (2) the plaintiff's suit must be based upon that act."  Transatl. Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 387 (2d Cir. 2000).  With regard to the first requirement, an effect is direct if it follows as an immediate consequence of the act in connection with the defendant's commercial activity.  Weltover, 504 U.S. at 618; Virtual Countries, 300 F.3d at 236-37; accord Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 894-95 n.10 (5th Cir. 1998) ("[T]he third clause does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States.").  With regard to the second requirement, the term "'based upon' . . . implies a causal relationship," and thus, "at the least, the 'act that caused a direct effect in the United States' . . . must be a 'but for' cause" of the conduct at issue in the suit."  Transatl. Shiffahrtskontor, 204 F.3d at 390.

---

namely the revitalization of the Japanese financial system, and to that end the Japanese government permitted it to perform activities that other loan collectors were not allowed to perform, and fully indemnified it against business losses.  Id. at 640.

IV.   DISCUSSION

This motion has a non-merits-based focus.  At issue is the threshold question of subject matter jurisdiction: can this Court entertain this case against this defendant?  The outcome of this decision does not mean that the LME can or cannot be sued in a U.S. court by another party for another matter—the determination here is limited to the facts currently before this Court.

The record here compels the following determinations: (1) the LME is an organ of the U.K. Government; and (2) the LME was not engaging in commercial activity when it allegedly manipulated the load-out rules for aluminum.

A.  The LME is an Organ of the U.K. Government[11]

When first presented with this question and without the benefit of having carefully studied the case law in this area, the Court's initial reaction was that the LME was an unlikely candidate for an organ of the U.K. Government.  This view was based on the fact that the LME is a privately held and for-profit company and, while subject to extensive governmental regulation, is in that regard simply like many non-governmental entities.  However, the Court's review of the relevant case law provided a different yet certain answer.

As previously stated, because the Court is reviewing a jurisdictional motion, it may appropriately review the extensive record that the parties have submitted on this motion.  See Makarova, 201 F.3d at 113.  With regard to the Filler factors, that

---

[11] Plaintiffs do not contest that the LME is legally separate from the U.K. Government, is not a U.S. citizen, and was not created under the laws of a third country.  Thus, the only issue under § 1603 is whether the LME is an "organ" of the U.K. Government.  The Court focuses this portion of its opinion on that question.

record demonstrates by a preponderance of the evidence that, while not formed by the U.K. Government, the LME is charged by statute with performing the decidedly public function of market regulation (an analogous first factor); that the FCA, a conceded agency of the U.K. Government, actively supervises it (the second factor); and U.K. law treats the LME's activities with regard to warehousing load-out rules and practices as part of its immunized public functions (the fifth factor).   The record is equally clear that the U.K. Government does not require the LME to hire public employees or pay their salaries (the third factor), nor is the LME the only entity that enjoys the right to act as an RIE in the commodities trade (the fourth factor).   Nevertheless, the Court's balancing of these factors tips decidedly in the direction of finding the LME an organ of the U.K. Government.

   With regard to the first <u>Filler</u> factor, market regulation is a public function. <u>See, e.g.</u>, <u>Peninsula Asset Mgmt. (Cayman), Ltd. v. Hankook Tire Co., Ltd.</u>, 476 F.3d 140, 143-44 (2d Cir. 2007) (entity responsible for regulating Korean financial institutions performed "traditional government functions" and was an agency or instrumentality of a foreign state under the FSIA).   The LME undisputedly regulates metals commodities markets—indeed, as an RIE, it is required to do so under the Recognition Requirements, which charge RIEs with protecting the orderly functioning of the market and the interests of investors.   (Bradley Decl. ¶¶ 18-20.)   In fact, were the LME to fail to adequately regulate the market for aluminum warrants, its status as an RIE could be revoked.   (Ong-Seng Decl. ¶ 13.)

With regard to the second <u>Filler</u> factor, the FCA actively supervises the LME—including, in particular, the LME's load-out rules for LME-approved warehouses. (Bradley Supp. ¶ 16 & ex. G.) As set forth above, the FCA has met with the LME over 50 times since 2011 to discuss issues relating to warehousing. (<u>Id.</u> ¶ 45.) Importantly, the FCA itself states that it actively supervises the LME. (Bradley Supp. ex. G.)

Whether an entity is immune under local law is relevant to the fifth <u>Filler</u> factor and therefore whether an entity is immune under the FSIA. <u>See, e.g.</u>, <u>Filler</u>, 378 F.3d at 217 ("how the entity is treated under foreign state law" is relevant to determining organ status); <u>Alperin v. Vatican Bank</u>, 360 F. App'x 847, 849-50 (9th Cir. 2009) (entity's immunity from suit under foreign state law relevant to establishing prima facie case that it was entitled to FSIA immunity). Actions taken by the LME with respect to its regulatory functions are immunized under U.K. law absent a showing of bad faith.[12] (Ong-Seng Decl. ex. B § 291.) Additionally and importantly, the U.K. judiciary, in the <u>Albatros</u> and <u>Rusal</u> decisions, has taken the position that the LME is a public body and that its warehousing rules are subject to judicial oversight. (<u>See</u> Bradley Decl. exs. Q, BB.)

The procedures through which aggrieved parties may complain about the LME's actions further confirm its status as a public body. According to the Exchange's handbook on enforcement and disciplinary procedures, if the LME

---

[12] Whether the LME is alleged to have acted in bad faith is irrelevant to the Court's analysis of the fifth <u>Filler</u> factor. What matters here is not whether the LME would be immune for its alleged conduct under local law, but whether as a general matter it enjoys a similar degree of immunity to that of an arm of the U.K. Government.

disciplines a warehouse, that warehouse has the right to challenge the fairness of the LME's disciplinary and appeal process through judicial review in a U.K. court. (Id. ¶¶ 60-62). Such judicial review is available because the judiciary views the LME as acting as a public body. (See id. ex. Q (Albatros decision).)

Plaintiffs argue that an analysis of the Filler factors should lead to the opposite conclusion. First, plaintiffs argue that the LME was not created "by" the U.K. Government for a national purpose. As a factual matter, they are undoubtedly correct. However, plaintiffs' reading of the first Filler factor is far too literal. In Filler, the Second Circuit presented factors potentially useful to a court's analysis of organ status. It is certainly appropriate, however, for this Court to extend Filler to its logical conclusion. Here, that means that the first Filler factor is satisfied whenever the entity in question is tasked by a foreign state with fulfilling a national purpose—regardless of whether the foreign state did so when the entity was first created or at a later time. Indeed, one can imagine a case in which an entity is created "by" a government to serve a national purpose (for example, a national telecommunications company or a national railway system) but then is transformed into a privately owned for-profit enterprise. In such a case, it would make little sense to determine that the first Filler factor favors organ status.

Plaintiffs also argue that the LME is merely one of many RIEs, and thus it lacks exclusive rights, which argues against organ status under the fourth Filler factor. That is so and the LME has not argued otherwise. However, because Filler requires a careful balancing of multiple factors, the fact that many companies hold

similar rights is not determinative.  Furthermore, it would be odd for a court of the United States to second-guess another country's determinations as to how many entities it may require to serve a particular national interest.

Plaintiffs further argue that the LME is not charged with protecting investors or the orderly function of markets—that is the job of the FCA.  This argument is unpersuasive.  It is true that the FCA is tasked with that function, but that does not mean that the FCA cannot delegate or share that responsibility.  Here, the FCA itself submitted a letter indicating its belief that the LME plays such a role.  (Bradley Supp. ex. G.)

In addition, plaintiffs argue that the mere fact that the LME is regulated cannot be the basis for determining that it serves a national purpose.  Strictly speaking, this is true—otherwise, taken to an extreme, virtually any corporation could lay claim to organ status on the grounds that it must comply with environmental regulations or other regulations that serve a public purpose.  Regulation is only important insofar as it is necessary to ensure that the entity serves its national purpose.  But the regulations to which the LME is subject do just that—they enable it to fulfill its role as a market regulator, which means that they are relevant under Filler.

Plaintiffs also argue that the FCA merely engages in passive oversight, akin to that found insufficient for establishing organ status by the Ninth Circuit in Board of Regents of the University of Texas System v. Nippon Telephone & Telegraph Corp., 478 F.3d 274, 279-80 (9th Cir. 2007).  The facts before the Court

on this motion are far different from those in <u>Nippon</u>.  Here, the record

demonstrates that the FCA actively meets with the LME regarding the very

conduct at issue (specifically, warehousing rules and queues), and there have been

more than 50 such meetings in the past several years alone.  (Bradley Supp. ex. J.)

The FCA has also submitted a letter referring to its active oversight.  (<u>Id.</u> ex. G.).

Finally, plaintiffs point out that following the public revelation of the

warehouse queues that form the basis for their claims in this suit, the FCA stated

on July 11, 2013 that the "LME's warehousing arrangements are not directly

regulated by the FCA."  (<u>See</u> Declaration of Bonny E. Sweeney, ECF No. 368 ex. 16

("Sweeney Decl.").)  The FCA recently repeated this statement in a February 2014

publication.  (<u>See</u> <u>id.</u> ex. 17 at 4 ("The operation of warehouses licensed by RIEs is

not a regulated activity.").)  That position is not inconsistent, however, with active

supervision.  Supervision and oversight are not the same as regulation.  The former

involve the review of an entity's decisions and actions; the latter involves the setting

of rules as to what decisions and actions are permissible in the first place.

Regulation may, but need not, be combined with supervision, and supervision may

occur in the absence of regulation.

Here, the FCA both <u>regulates</u> the LME through the Recognition

Requirements and the FCA Sourcebook, and provides <u>supervisory oversight</u> of the

LME's warehousing arrangements.  Indeed, in the letter the FCA submitted to the

LME in connection with these proceedings, it stated that "the FCA expects LME to

have in place arrangements that ensure those warehouses which it approves

operate in a way that ensures LME meets its regulatory obligations," and that the FCA "monitor[s] the impact of all measures announced by LME . . . such as LME's new Linked Load-In and Load-Out rule, to ensure that such changes are consistent with LME's regulatory obligations under the Recognition Requirements." (Bradley Supp. ex. G.)  Plaintiffs' argument that the FCA has publicly disclaimed any responsibility for regulating or actively supervising the LME is therefore without merit.  This general oversight and regulation renders a particular focus on whether the FCA specifically regulates the warehouse rules themselves irrelevant.

Based on the Court's balancing of the <u>Filler</u> factors, as well as the principles underlying those factors, the Court finds that the LME is an organ of the U.K. Government.

### B. The Commercial Activity Exception

What is the conduct in which the LME is alleged to have engaged that gives rise to plaintiffs' claims?  That answer is clear:  it is alleged to have entered into a conspiracy with a variety of entities to manipulate its own warehouse load-out rules in order to restrain aluminum output and increase the price of aluminum.[13]

The Court's determination of whether such alleged activity constitutes "commercial" activity begins with the language of § 1603.  The statute requires that the Court look to the nature of the activity—not its purpose.  Thus, the LME's

---

[13] Plaintiffs do not specifically allege where the conduct that forms the basis for their claims against the LME occurs, but they clearly allege that this conduct had direct effects on the aluminum market in the United States.  Therefore, regardless of where the LME decided to enter the conspiracy or set warehouse rules, one of the commercial activity exception's clauses will be satisfied, and the result will be the same.  Accordingly, the Court need only discuss whether the LME's setting of warehouse rules is commercial activity within the meaning of § 1603.

motivations for engaging in such behavior are of no concern to this Court.[14]  Put bluntly, under both the statute and Supreme Court precedent, whether the LME manipulated its load-out rules to make more money is irrelevant to whether its doing so was a "commercial" activity as defined by § 1603.

As set forth above, it is clear that the LME's warehouse rules serve a vital and necessary role in enabling the LME to regulate the aluminum market.  They store the aluminum, issue and cancel warrants, and perform the required load-in and load-out procedures.  (Bradley Decl. ¶¶ 35-39, 54.)  These activities are governed by the Warehouse Agreement, and failure to comply with the obligations therein can lead to a fine or delisting.  (Id. ¶ 60.)  The load-out rules—the manipulation of which plaintiffs allege is the means by which the antitrust conspiracy was effected—are a form of market regulation implemented by the LME, and are therefore regulatory, not commercial, in nature.

Further evidence of the regulatory nature of the alleged activity is the fact that the LME must announce any changes to such rules and allow for comment before implementation.  (Bradley Supp. ¶ 18; 2d Bradley Supp. ¶ 3.)  In the event a party feels aggrieved by a rule change, that party may appeal to a court of law (Bradley Decl. ¶ 66; Bradley Supp. ¶ 18), a process reserved for contesting rulemaking by public (versus private) bodies (see Rusal, Bradley Decl. ex. R).

---

[14] For this reason, whether the LME is alleged to have engage in the conduct at issue in bad faith is irrelevant to determining whether this conduct constitutes commercial activity under § 1603.

Plaintiffs argue that when the LME and defendants allegedly conspired to restrain output and thereby raise aluminum prices, they were not acting as a market regulator.  Defendant LME counters that this is an inappropriate inquiry into "why" the alleged conduct was undertaken, that is, its "purpose," and the proper inquiry is into whether the nature of the alleged act was that of a private actor or market regulator.  As set forth above, this Court agrees with the LME.

It is persuasive to this Court that there is an elaborate process that can and, in Rusal was, undertaken to raise complaints regarding load-out rules.  In the context of this particular motion, it would be odd indeed for this Court to find that it had subject-matter jurisdiction and proceed with a legal determination as to the legality of practices regarding load-out obligations, when a U.K. court or the FCA may—on the basis that the LME is a public body—be conducting its own, independent review.  Indeed, as the FCA stated in the letter it submitted in connection with this motion, it continues to monitor the situation.

Plaintiffs also argue that the LME's arrangements vis-à-vis warehouses are quintessentially commercial in nature.  They argue that such arrangements are contractual and therefore necessarily commercial.  This Court again disagrees.  It is true that the arrangements are contractual—but not all contractual arrangements are commercial in nature.  There are numerous instances in which a public organ might use a contractual arrangement to fulfill its public function.  Here the contractual provisions at issue—specifically, those relating to load-out

30

requirements[15]—serve a regulatory purpose.  Indeed, these contractual provisions were not negotiated at arms-length, but rather were offered on a mandatory, "take it or leave it" basis, which further confirms that they are regulatory and not commercial in nature.

V.     CONCLUSION

For the reasons set forth above, the LME's motion to dismiss on sovereign immunity grounds is GRANTED.  Leave to replead is denied. The basis for the Court's decision is both legal and factual, and the factual record here has been amply developed.  No amendment could change this Court's determination.

The Clerk of Court is directed to close the motion at ECF No. 320.

SO ORDERED.

Dated:       New York, New York
             August 25, 2014

_____
KATHERINE B. FORREST
United States District Judge

---

[15] Plaintiffs do not allege that the setting of rental rates gives rise to their claims.  Rather, their claims are based on the assertion that increases in the duration of aluminum storage at LME-approved warehouses caused output constraints and also unnecessarily increased the "all-in" price for aluminum.  Accordingly, the contractual provisions concerning rental rates are not directly at issue.

# EXHIBIT 4

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 29, 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                    :
                                                    :
                                                    :
                                                    :
IN RE ALUMINUM WAREHOUSING            :          13-md-2481 (KBF)
ANTITRUST LITIGATION                          :          and all related cases
                                                    :
                                                    :          OPINION & ORDER
                                                    :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

Before the Court are 13 motions to dismiss the antitrust and state law claims brought by purchasers of aluminum and aluminum products.  Plaintiffs allege that defendants, a commodities exchange, traders and warehouse owners have engaged in a horizontal conspiracy to restrain the output of aluminum.  According to plaintiffs, defendants together arranged to stockpile aluminum in warehouses in the Midwestern portion of the United States and delayed load-outs of such aluminum, causing storage costs to increase.  This led to an increase in the Midwest Premium, a price component that incorporates a number of inputs including storage costs.  Plaintiffs allege that their purchases of aluminum are priced with reference to the Midwest Premium, and that they therefore paid inflated prices.[1]

Plaintiffs are not themselves aluminum producers, traders or warehouse owners.  Plaintiffs are not, in short, competitors of defendants in any market.  Nor are they consumers of their products (warrants or trading instruments with regard

---

[1] In addition to these allegations, as discussed below, certain plaintiffs also allege that the warehouses raised prices for storage and took actions that impacted a regional premium in the Netherlands.  These allegations are not particularly developed.  Separately, plaintiffs also assert state law claims based on the conduct underlying the federal antitrust claims.

to the traders) or services (warehouse storage).  They are purchasers at different

levels of the supply/distribution chain of semi-fabricated and fabricated aluminum.

The following plaintiffs have filed complaints: the First Level Purchasers ("FLPs")

(ECF No. 271 ("FLP Compl.")); Commercial End Users (ECF No. 242 ("Comm.

Compl.")); Consumer End Users (ECF No. 227 ("Cons. Compl.")); Mag Instrument,

Inc. ("Mag") (ECF No. 226 ("Mag Compl."); Agfa Corp. & Agfa Graphics, N.V.

("Agfa") (ECF No. 272 ("Agfa Compl.")).[2]

The motions to dismiss as to each of the operative complaints raise a variety

of common issues: antitrust standing, plausibility and sufficiency of allegations

supporting claims alleging violations of sections 1 and 2 of the Sherman Act, failure

adequately to allege a relevant antitrust market, and an absence of viable state law

claims.  In addition, individual motions argue a lack of personal jurisdiction (ECF

Nos. 327-28, 447-48, 503-05, 511-13), or specific allegations tying specific

defendants to the challenged conduct (ECF Nos. 309-10, 327-29, 331-32, 338-39,

447-48, 503-05, 511-13, 520-21).  Plaintiffs have, in general, submitted joint briefs

opposing the motions, though in certain instances they have filed separate briefs.

(ECF Nos. 390, 393-95, 397, 399, 401-03, 481, 531, 534, 540, 542, 544, 550.)

Together, the filings on these motions to dismiss consist of more than 2,600 pages of

notices of motion, legal memoranda, declarations, and exhibits, as well as many

---

[2]  There were originally over twenty complaints filed and transferred to or consolidated with others
in this Court.  A number of plaintiffs agreed to consolidate their actions.  Thereafter, consolidated
and/or amended complaints were filed.  Recently, Eastman Kodak Co. ("Kodak") also filed a
complaint.  (Eastman Kodak Co. v. The Goldman Sachs Grp., Inc., No. 14-cv-6849 ECF No. 1.)
However, defendants have not yet moved as to that complaint.  Accordingly, this Opinion & Order
does not address that complaint directly.  However, where there are similarities, any future Court
ruling on that complaint would follow the rationale and determinations herein.

more pages of additional letter submissions.  The Court held oral argument on the motions on June 20, 2014.  (ECF No. 494.)

Prior to oral argument, the Court requested—and the parties kindly provided—a factual tutorial on the structure of the industry.  This was explicitly (according to the ground rules set by the Court, ECF No. 302) of no evidentiary significance.  Instead, it was to provide the Court with a basic understanding of industry players and their respective roles, normative supply/demand dynamics, pricing structure, and aluminum fabrication, distribution and sale.

The Court has spent significant time in consideration of the motions before it.  The complaints allege, and on this motion the Court accepts as true, that between 2009 and 2012 (which is what the FLPs' and Consumer End Users' complaints refer to as the "Class Period") (FLP Compl. ¶ 1 (May 1, 2009 forward); Cons. Compl. ¶ 1 (May 1, 2009 forward)), inefficiencies developed in aluminum pricing.[3]  Traders became the primary purchasers of LME warrants and futures contracts for aluminum.  LME stored aluminum in the Detroit area determines the level of the Midwest Premium.  As trader rather than user dynamics took root in the LME warehouses, the level of the Premium became driven by trading dynamics rather than actual supply and demand of aluminum users.  These dynamics included the arbitrage opportunity presented by decreased demand due to the severe market downturn, followed by the expectation of higher prices in the future.  This "buy low now to sell higher later" view of LME traded aluminum is alleged to have led

---

[3] The Commercial End Users allege a class period that spans the period from February 1, 2010 forward. (Comm. Compl. ¶ 204.)

defendants to take actions designed to maximize their profits—including obtaining and retaining large inventories of aluminum traded by warrants and futures contracts (the plaintiffs do not allege that any defendant was a user of aluminum), and creating load-out queues and delays. A direct result of this was to increase storage duration, thus storage costs, thereby increasing the Midwest Premium.

The economics of this arbitrage opportunity as alleged by plaintiffs are self-evident. That warehouses which make money from storage found longer storage durations desirable is only sensible. Why, indeed, would they want anything else? That traders, who would close out of a position to lock in arbitrage profits were benefitted by holding to a temporal point when such opportunity was maximized, is also self-evident. But why traders or warehouse operators would care to, or want to, increase the Midwest Premium which impacts contractual prices users might pay, is not at all clear.[4] That the combined actions of traders and warehouses to maximize their profits negatively impacted downstream purchasers through a rise in the Midwest Premium is clear—but as cast in the complaints, this was an unintended consequence of rational profit maximizing behavior rather than the product of conspiratorial design.

For the reasons set forth below, the Court finds that the Commercial and Consumer End Users lack antitrust standing, and their actions are therefore dismissed and leave to replead is denied as futile. The actions by the FLPs, Mag,

---

[4] There may well be an economically necessary interaction between the value of trading positions in aluminum and actual usage. However, none of the allegations in the various complaints describe if, how or why that exists. In the absence of such allegations, there is a break in the chain between the actions of the defendants here and the plaintiff users.

4

and Agfa are dismissed with leave to submit a proposed amended complaint not later than 21 days from the date of this order.  If defendants object to the proposed filing, they shall have 21 days within which to submit memoranda setting forth any reasons; plaintiffs shall thereafter have 21 days to oppose; and defendants shall have 14 days thereafter for any reply.

I.      FACTUAL ALLEGATIONS

On these motions to dismiss, the Court accepts the factual allegations in the complaints as true.  Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).  The Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), nor will it give effect to "legal conclusions couched as factual allegations," Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007). Unless otherwise stated, each factual allegation set forth below is contained in one form or another in each of the operative complaints.[5]

In deciding a Rule 12(b)(6) motion, the Court may consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000), as well as documents that are integral to the complaint and relied upon in it, even if not attached or incorporated by reference, Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005). The Court may also properly consider matters of public record of which it may take

---

[5] There are certain instances in which allegations are of necessity limited to the particular level of the supply/distribution chain referenced in a particular complaint.  For instance, allegations relating to the roles and businesses of the Commercial End Users and Consumer End Users are found only in their respective complaints.

judicial notice.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322
(2007) (court may consider "matters of which a court may take judicial notice" on a
Rule 12(b)(6) motion to dismiss); Blue Tree Hotels. Inv. (Canada), Ltd. v. Starwood
Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also
look to public records . . . in deciding a motion to dismiss.").

    A.     The U.S. Aluminum Market

         1.     Overview

Aluminum is the most abundant metal on earth.  (FLP Compl. ¶ 9; Cons.
Compl. ¶ 40.)  It is used in a variety of industries such as construction and
manufacturing, and it is a component of many household and consumer products.
(Agfa Compl. ¶ 3; Mag Compl. ¶ 3; Cons. Compl. ¶¶ 40-43; see Comm. Compl. ¶¶ 9,
49.)  Aluminum enters the stream of commerce when large, integrated producers of
aluminum (such as Alcoa and Rio Tinto Alcan) mine the mineral-rich rock bauxite,
extract alumina from it, and then refine the extracted alumina into aluminum.
(Agfa Compl. ¶ 31; Comm Compl. ¶ 46; Cons. Compl. ¶ 40; Mag Compl. ¶ 30.)   This
"primary aluminum" may then be bought by independent mills, cable companies,
and extruders, who then roll, draw, or extrude it into sheets, rods, and other forms,
which they then sell.  (Agfa Comp. ¶ 32; Comm. Compl. ¶ 48; Mag Compl. ¶ 31.)
But producers are not the only sellers of primary aluminum; American companies
that use aluminum may acquire it from a producer, an independent mill, a trader or
distributor, or warehouses that hold aluminum stock.  (Agfa Comp. ¶ 31; Mag
Compl. ¶ 32.)

Since 2008, global aluminum production has fluctuated between approximately 37.5 million and 51 million tonnes[6] per year. (Agfa Compl. ¶¶ 34-36; Mag Compl. ¶¶ 33-35.) Annual production is typically in the vicinity of 44 million tonnes. (See Agfa Compl. ¶ 36; Mag Compl. ¶ 35.) In each of these years, global production of aluminum has exceeded global consumption, resulting in a surplus of aluminum. (Agfa Comp. ¶ 36; Mag Compl. ¶ 35.) According to the FLPs, the United States actually consumes three times more aluminum than it produces. (FLP Compl. ¶ 303.) In 2011, the U.S. produced approximately 2 million tonnes and consumed about 4 million tonnes. (Agfa Compl. ¶¶ 34-35; Mag Compl. ¶¶ 33-34.)

The United States is, accordingly, a net importer of aluminum. None of the complaints, however, describe the extent to which aluminum in any particular geography is or could be obtained from another; the extent to which the price, supply, and demand of aluminum are elastic; the extent to which the plaintiffs are contractually obligated to pay prices incorporating the Midwest Premium; or whether they have other commercial options. It is unclear, for instance, whether aluminum produced and/or fabricated overseas would be subject to the Midwest Premium, or whether its acquisition by United States purchasers would be economically feasible.

2. Aluminum Pricing

The price of aluminum is usually set via a formula rather than a price certain negotiated by the buyer and seller. (Agfa Comp. ¶ 4; Mag Compl. ¶ 4.) In the

---

[6] A "tonne" is a metric ton (1000 kilograms). It is approximately 110.2% of an American ton.

Midwest and other parts of the United States, plaintiffs have paid a common, standardized benchmark price for aluminum consisting of the cash price of aluminum purchased on the LME (the LME "Cash Price") plus the "Midwest Premium" (also referred to as the "Platts Premium").  (FLP Compl. ¶ 12; see also Comm. Compl. ¶ 6; Cons. Compl. ¶ 118.)  The LME Cash Price is derived from the LME "Official Price," defined as the "last bid and offer price quoted during the second Ring session"[7] of the LME and which is quoted for cash (i.e., spot purchase), three and fifteen month "prompts," and three forward December "prompts."[8]  (Mag Compl. ¶ 38; see also Agfa Compl. ¶ 4 n.5; Comm. Compl. ¶ 113 n.4.)  The LME Official Price is used as a global benchmark for physical contracts for the delivery of aluminum.  (Agfa Compl. ¶ 39; Mag Compl. ¶ 38; see also Comm. Compl. ¶ 6; Cons. Compl. ¶ 65.)  The LME Cash Price is simply the LME Official Price quoted for cash.  (See Agfa Compl. ¶ 39; Mag Compl. ¶ 38.)  The process of pricing aluminum through LME trading is referred to as "price discovery."  (Agfa Compl. ¶ 41; Mag Compl. ¶ 40; see FLP Compl. ¶ 151.)  Notably, this pricing does not include the costs of delivery from seller to purchaser.  (Agfa Compl. ¶ 41; Mag Compl. ¶ 40; see FLP Compl. ¶ 11.)

The Midwest Premium consists of the accumulated transport and storage costs associated with the delivery of aluminum to the Midwestern United States.

---

[7] The LME's open-outcry trading floor is referred to as the "Ring."  There are two trading sessions daily.  (Agfa Compl. ¶ 39 n.15; Comm. Compl. ¶ 113 n.4; Mag Compl. ¶ 38 n.19.)

[8] On the LME, the "prompt date" is the "date by which an LME warrant must be delivered by the seller and paid for by the buyer of a futures contract," and is also known as the "settlement date." Contract Types, London Metal Exch., https://www.lme.com/trading/contract-types/ (last visited Aug. 21, 2014).

(Agfa Compl. ¶¶ 4, 40; Comm. Compl. ¶ 6; Cons. Compl. ¶ 120; Mag Compl. ¶¶ 4, 39.)  The Midwest Premium fluctuates based on the dynamics of supply and demand and changes in transport and storage costs.  (Agfa Compl. ¶ 40; Mag Compl. ¶ 39; see also Comm. Compl. ¶ 104; Cons. Compl. ¶¶ 5(c), 65-66.)  A private publishing company, Platts, publishes a measure of the Midwest Premium based on data it collects from buyers and sellers of aluminum.  (Agfa Compl. ¶ 40; Comm. Compl. ¶ 57; FLP Compl. ¶ 155; Mag Compl. ¶ 39.)  The Midwest Premium reflects current offers for immediately available aluminum for delivery from both U.S. and foreign producers, traders, and holders of warehoused aluminum; these offers incorporate the fluctuating delivery, storage, finance and insurance costs incurred by purchasers.  (Agfa Compl. ¶ 42; Mag Compl. ¶ 41; see also Comm. Compl. ¶ 6 n.2.)  The price any particular purchaser pays for aluminum may also reflect the addition of fabrication or "shaping" premiums.  (Agfa Compl. ¶ 4; Mag Compl. ¶ 4.)

The Midwest Premium began to increase in 2009.  (Agfa. Compl. ¶ 72; FLP Compl. ¶ 16; Mag Compl. ¶ 71; see also Comm. Compl. ¶ 112; Cons. Compl. ¶¶ 68-69.)  It was significantly less than $115 per ton in 2010, but it subsequently increased to $250 or more per ton.  (Cons. Compl. ¶ 101; FLP Compl. ¶ 217.)  Put another way, since 2008 it has increased from 3% to over 14% of the LME Cash Price.  (Agfa Compl. ¶ 72; Mag Compl. ¶ 71.)

3.      Inventory Increases During the Great Recession

From the fall of 2007 through 2009, the United States experienced the worst recession and housing downturn since the Great Depression.[9]  (See Agfa Compl. ¶ 71; Cons. Compl. ¶ 109; Mag. Compl. ¶ 70.)  In 2008, stocks of aluminum began increasing sharply as a result of this recession. (See Agfa Compl. ¶ 53; Comm. Compl. ¶ 117; FLP Compl. ¶ 14(c); Mag Compl. ¶ 52.)  The availability of financing for commodities transactions also decreased, leading producers and others in the aluminum supply/distribution chain to convert their available inventories of aluminum into cash by selling them, often to traders.  (Agfa Compl. ¶ 53; Mag Compl. ¶ 52.)  Aluminum warehouses in the greater Detroit area affiliated with the London Metal Exchange saw their inventory levels increase to "all-time record levels," rising sharply in 2008 and maintaining a steady incline through 2012, with some minor ups and downs along the way.  (FLP Compl. ¶¶ 20-21; see also Comm. Compl. ¶ 97; Cons. Compl. ¶ 97; Mag. Compl. ¶ 50.)  However, there were no material spikes in these inventories between February 2010 and September 2012. (See FLP Compl. ¶ 21; see also Agfa Compl. ¶ 51; Comm. Compl. ¶ 97; Cons. Compl. ¶ 97; Mag. Compl. ¶ 50.).

4.      The London Metal Exchange

The London Metal Exchange ("LME") is the world's largest non-ferrous metals market.  (Agfa Compl. ¶ 25(a); Mag Compl. ¶ 24(a).)  More than 80% of the world's non-ferrous metals futures business is transacted through the LME's

---

[9] See Stanley Fischer, The Great Recession: Moving Ahead (Aug. 11, 2014) (speech), available at http://www.federalreserve.gov/newsevents/speech/fischer20140811a.htm (last update Aug. 11, 2014).

10

trading platforms and the LME handles total combined trading volumes for all metals of approximately $61 billion per day.[10]  (Agfa Compl. ¶ 25(a); Comm. Compl. ¶ 27;  FLP Compl. ¶ 126; Mag Compl. ¶ 24 (a).)  It is the sole venue for exchange-traded aluminum futures or aluminum forward contracts in the United States. (Comm. Compl. ¶ 27; Cons. Compl. ¶ 46; FLP Compl. ¶ 9.)

Until December 6, 2012, LME Holdings Limited ("LME Holdings") owned the LME.  (Comm. Compl. ¶ 28; Cons. Compl. ¶ 34; FLP Compl. ¶ 127.)  On that day, the LME was purchased by Hong Kong Exchanges and Clearing Limited, which owns the HKEx Group, an integrated trading exchange based in Hong Kong for in excess of $2 billion.  (Agfa Comp. ¶25(a); Comm. Compl. ¶ 28; Cons. Compl. ¶ 34; FLP Compl. ¶¶ 27, 127-29; Mag Compl. ¶ 24.)  Until the LME was acquired by the HKEx Group at the end of 2012, it had been owned by its members.  (Agfa Compl. ¶ 25(b); Cons. Compl. ¶ 48; FLP Compl. ¶ 406; Mag Compl. ¶ 24(b).)  Among its previous owner-members were several subsidiaries of defendants here, Goldman Sachs International (a subsidiary of the Goldman Sachs Group Inc. ("Goldman Sachs")), J.P. Morgan Securities PLC (a subsidiary of JP Morgan Chase & Co. ("JP Morgan")), and Glencore (UK) Ltd. (a subsidiary of Glencore Xstrata plc ("Glencore")).  (Agfa Compl. ¶ 25(b); FLP Compl. ¶ 406; Mag Compl. ¶ 24(b).)  As a result of the sale of their interests in the LME, Goldman Sachs was paid $208 million and JP Morgan was paid $260 million.  (FLP Compl. ¶ 27, see also Comm. Compl. ¶ 86; Cons. Compl. ¶ 102.)

---

[10] The LME trades in aluminum, aluminum alloy, copper, tin, nickel, zinc, lead, NASAAC, cobalt and molybdeneum.  (Agfa Compl. ¶ 25(a); Mag Compl. ¶ 24 (a).)

The LME groups its members into five categories.  (See Agfa Compl. ¶ 25(b);

Cons. Compl. ¶ 49; Mag Compl. ¶ 24(b).)  Goldman Sachs, Glencore, and JP Morgan

each fall into different categories.  (Agfa Comp. ¶ 25(b); Cons. Compl. ¶ 49; Mag

Compl. ¶ 24(b).)  Much of the work of the LME is done through various committees

composed of, inter alia, members and/or their affiliates.  (Agfa Compl. ¶ 25(c); FLP

Compl. ¶ 360; Mag Compl. ¶ 24 (c); see also Comm. Compl. ¶ 227.)

Aluminum is traded on the LME through the purchase and sale of futures (or

forward) contracts.  (FLP Compl. ¶ 145; see also Cons. Compl. ¶ 163.)  An LME

futures contract represents a promise by the seller to deliver a quantity of

aluminum to a buyer on a certain future date.  (See Agfa Compl. ¶ 45; FLP Compl. ¶

146; Mag Compl. ¶ 44; see also Comm. Compl. ¶ 53; Cons. Compl. ¶ 54.)  The

delivery by the seller (or "short") of a "warrant" to the buyer (or "long") represents

delivery of the corresponding quantity of physical aluminum.  (See Agfa Compl. ¶

45; Comm. Compl. ¶ 53; Cons. Compl. ¶ 54; FLP Compl. ¶¶ 146, 148; Mag Compl. ¶

44.)  A "warrant" is a standard, bearer document of title, corresponding with a

particular lot of metal in the warehouse; it specifies the lot's brand, type of metal,

warehouse, and location.  (Agfa Compl. ¶ 45; FLP Compl. ¶ 146; Mag Compl. ¶ 44;

see also Comm. Compl. ¶ 53; Cons. Compl. ¶ 53.)  Warrants are not interchangeable

(Comm. Compl. ¶ 53; Cons. Compl. ¶ 53; FLP Compl. ¶ 146), but they are

standardized, which makes them fungible and therefore freely tradeable (Agfa

Compl. ¶ 45; Mag Compl. ¶ 44; see also Comm. Compl. ¶ 53).  As a result, there is

an ongoing swapping and trading of warrants for aluminum in different

warehouses.  (See Agfa Compl. ¶ 45; Mag Compl. ¶ 44.)  Yet the vast majority of

aluminum traded on the LME is never physically transferred to a user; instead,

when a futures contract comes due on its prompt date, it is "settled" with an off-

setting trade.  (FLP Compl. ¶ 149.)[11]  More than 99% of the LME aluminum

contracts are satisfied or liquidated by offsetting trades.  (Comm. Compl. ¶ 54; FLP

Compl. ¶ 149.)  It is through this trading process that price discovery on the LME

occurs.  (FLP Compl. ¶ 151.)

    In the remaining 1% of LME futures transactions (those not settled through

offsetting trades), if the seller owns more than a single warrant (as typically will be

the case), it has the choice of which warrant (and therefore which corresponding lot

of aluminum) it wants to deliver on the prompt date.  (FLP Compl. ¶ 152.)  Since

the seller has the ability to choose which warrant to settle, the price of LME

forward contracts is influenced by the least valuable warrant in all of the LME

warehouses globally.  (FLP Compl. ¶¶ 152-53.)  LME aluminum futures contracts

are determined by many other factors as well, including the fundamentals of supply

and demand, trading perceptions in the market, and other factors including, inter

alia, strategic bidding by traders.  (FLP Compl. ¶ 154.)  In the United States, 97% to

99% of all aluminum futures contract trading is conducted on the LME.  (Comm.

Compl. ¶ 52; Cons. Compl. ¶ 163; FLP Compl. ¶ 154.)  The vast majority of

aluminum trading activity on the LME takes place among banks, hedge funds and

traders, rather than users of aluminum.  (Agfa Comp. ¶ 25(a); Mag Compl. ¶ 24(a).)

---

[11] A large amount of the inventory in Detroit area warehouses is owned by hedge funds, banks, and
traders.  (Agfa Compl. ¶ 59; FLP Compl. ¶ 383; Mag Compl. ¶ 58.)

In conjunction with its operation of the aluminum futures trading platform, the LME approves and lists a global network of more than 700 warehouses worldwide ("LME warehouses" or "LME-approved warehouses"). (Agfa Compl. ¶¶ 6, 25(e); Comm. Compl. ¶ 27;  Mag Compl. ¶¶ 6, 24(e); see also Cons. Compl. ¶¶ 51-52.)  The LME has agreements with the owners of these warehouses.  (Comm. Compl. ¶ 189; FLP Compl. ¶ 285.)  Approximately 200 of those warehouses are located in the United States, including the Midwest.  (Agfa Compl. ¶ 43; Mag Compl. ¶ 42; see FLP Compl. ¶¶ 19-20.)  The LME's storage network holds over five million tonnes of aluminum in LME warehouses worldwide, more than the total amount of aluminum consumed in the United States in a year.  (Agfa Compl. ¶ 6; Mag Compl. ¶ 6.)  LME warehouses are suppliers of last resort to users of physical aluminum.  (Agfa Compl. ¶ 46; Comm. Compl. ¶ 115; FLP Compl. ¶ 17; Mag Compl. ¶ 45.)

Only LME warehouses may deliver and cancel warrants for LME-traded aluminum.  (Agfa Compl. ¶ 45; FLP Compl. ¶ 380; Mag Compl. ¶ 44.)  The LME certifies, approves and enters into agreements with LME warehouse operators. (Cons. Compl. ¶ 83; FLP Compl. ¶ 156.)  It had such agreements with Metro International Trade Services LLC ("Metro") during the Class Period.  (FLP Compl. ¶ 156.)  The LME's agreements with Metro were reflected in two key documents: (1) the LME Warehouse Notice Terms and Conditions, and (2) the LME Warehouse Notice Disciplinary Handbook.  (Cons. Compl. ¶ 86; FLP Compl. ¶ 158.)

An LME warehouse may only issue a warrant once a specific lot of aluminum has been delivered or "checked into" the warehouse.  (See Agfa Compl. ¶ 45; Mag Comp. ¶ 44)  The cancellation of a warrant leads to the lot being earmarked for delivery out of the warehouse.  (Agfa Compl. ¶ 45; FLP Compl. ¶ 147; Mag Compl. ¶ 44.)  Once the warrant is cancelled, the load-out process begins (FLP Compl. ¶ 170), and the lot is placed in line to be loaded out of the warehouse and transported to its owner's chosen destination (see FLP Compl. ¶¶ 215, 252).

Warehouses earn revenues from storage fees; thus, increased inventory leads to increased revenue, and increasing the average duration of storage increases revenues.  (See Comm. Compl. ¶ 67; FLP Compl. ¶¶ 22-23.)  The LME shares in the storage revenues of its approved warehouses.  (See Comm. Compl. ¶ 67; Cons. Compl. ¶ 51; FLP Compl. ¶ 24.)

B.    The Parties

1.    Defendants[12]

Defendants consist of LME Holdings,[13] a group of financial and trading entities (the "trader defendants"), and companies that own and operate certain LME warehouses (the "warehouse defendants").[14]

---

[12] In their complaints, plaintiffs frequently make allegations regarding affiliated entities under a single name.  For instance, plaintiffs sometimes refer to "Goldman" when it is clear that Metro is the legal entity whose actions are described.  (See, e.g., FLP Compl. ¶ 158.)  As there are no allegations suggesting any lack of attention to corporate formalities, the grouping of entities in this manner is without support and is therefore conclusory.  Grouping entities without providing factual support for doing so (other than the mere fact of common ownership) cannot support specific references to specific entities, which are necessary for the Court to evaluate the sufficiency of the allegations.  Thus, where possible, the Court references the specific entity that is the subject of the factual allegations.

[13] The London Metal Exchange Limited ("LME Ltd.") has also filed a motion to dismiss all complaints on the merits.  (ECF No. 333.)  On August 25, 2014, the Court granted LME Ltd.'s motion

15

a)        The Trader Defendants

Goldman Sachs is a global investment banking, securities, and investment management firm.  (Comm. Compl. ¶ 29; Cons. Compl. ¶ 20; FLP Compl. ¶ 116.)  It was a shareholder of the LME during the Class Period until the HKex Group acquired the LME in December 2012.  (Agfa Compl. ¶ 25(b); Comm. Compl. ¶ 29; Cons. Compl. ¶ 20; FLP Compl. ¶ 117; Mag Compl. ¶ 24(b).)

Glencore[15] is a commodities trading and mining company that engages in the production, storage, transportation, marketing, and trading of aluminum and other metals.  (Agfa Compl. ¶ 22; Comm. Compl. ¶ 35; Cons. Compl. ¶ 28; FLP Compl. ¶ 132; Mag Compl. ¶ 21.)[16]

JP Morgan is an investment bank and financial services firm incorporated in Delaware with its principal place of business in New York.  (Cons. Compl. ¶ 24; FLP Compl. ¶ 137; see also Agfa Compl. ¶ 20; Comm. Compl. ¶ 32; Mag Compl. ¶ 19.)  Blythe Masters, the head of JP Morgan's commodities business, is alleged to have stated, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . .  We need to be active in the underlying

---

to dismiss on sovereign immunity grounds.  (ECF No. 564.)  Accordingly, the LME's motion to dismiss all complaints on the merits is DENIED AS MOOT.

[14] The FLPs also allege that one or more Jane Doe defendants may have been participants in the unlawful conspiracy, and/or that plaintiffs may have purchased aluminum from such entities.  (See FLP Compl. ¶¶ 142-44.)  But the allegations are unspecific as to the Jane Doe defendants' position in the supply/distribution chain, or even what kinds of entities they are.

[15] Glencore Ltd. is a wholly owned subsidiary of Glencore based in Connecticut.  (Cons. Compl. ¶ 29; FLP Compl. ¶ 135.)

[16] Glencore Xstrata plc was created by a merger of Glencore International, PLC and Xstrata in May 2013.  (FLP Compl. ¶¶ 131-32; see also Agfa Compl. ¶ 22; Cons. Compl. ¶ 28; Mag Compl. ¶ 21.)

physical commodity market in order to understand <u>and make prices</u>." (Agfa Compl. ¶ 56; Comm. Compl. ¶ 66; Cons. Compl. ¶ 72; FLP Compl. ¶ 379; Mag Compl. ¶ 55 (emphasis in original).)

Although the Class Period is from 2009 forward, Goldman Sachs, JP Morgan, and Glencore did not purchase LME warehouses until 2010. (<u>See</u> Agfa Compl. ¶55; FLP Compl. ¶¶ 134, 138, 157; Mag Compl. ¶ 54.)

b)      The Warehouse Defendants

Metro is a global LME warehouse operator. (FLP Compl. ¶ 122.) In February 2010, it was acquired by subsidiaries of Goldman Sachs, which was a shareholder in the LME. (FLP Compl. ¶¶ 117, 157; <u>see also</u> Agfa Compl. ¶ 55; Comm. Compl. ¶ 106; Cons. Compl. ¶ 22; Mag Compl. ¶ 54.) GS Power Holdings LLC ("GS Power") is a subsidiary of Goldman Sachs. (Comm. Compl. ¶ 31; Cons. Compl. ¶ 22; FLP Compl. ¶ 118.) MCEPF Metro I, Inc. ("MCEPF Metro") is also a wholly owned subsidiary of Goldman Sachs. (FLP Compl. ¶ 119.) GS Power and MCEPF Metro together jointly own Mitsi Holdings LLC ("Mitsi"). (Cons. Compl. ¶ 22; FLP Compl. ¶ 120.) Mitsi directly owns Metro. (Cons. Compl. ¶ 22; FLP Compl. ¶ 121.) Together, plaintiffs refer to this group of Goldman-related entities as the "Goldman defendants." (Comm. Compl. intro.; Cons. Compl. ¶ 23; FLP Compl. ¶ 123.)

Defendant Pacorini Metals AG ("PMAG") has its principal place of business in Switzerland. (Cons. Compl. ¶ 30; FLP Compl. ¶ 133.) It was acquired by Glencore in September 2010. (FLP Compl. ¶ 134; <u>see also</u> Agfa Compl. ¶ 22; Mag Compl. ¶ 21.) PMAG owns and operates a U.S.-based subsidiary, Pacorini Metals

USA, LLC ("PMUSA"), which owns and operates LME warehouses that store aluminum in Baltimore, Chicago, Detroit, Los Angeles, Mobile and New Orleans. (Agfa Compl. ¶ 23; Comm. Compl. ¶ 36; FLP Compl. ¶ 134; Mag Compl. ¶ 22; see also Cons. Compl. ¶ 30.)

In February 2010, JP Morgan acquired Henry Bath & Son Limited ("Henry Bath"), a U.K.-based metals warehousing company that owns and operates 93 metals warehouses and storage facilities around the world. (Comm. Compl. ¶ 33; FLP Compl. ¶¶ 138-39; see also Agfa Compl. ¶¶ 20-21; Mag Compl. ¶¶ 19-20.) Henry Bath is the corporate parent of defendant Henry Bath LLC, an international logistics provider specializing in the storage and shipping of exchange-traded metals. (Comm. Compl. ¶ 34; FLP Compl. ¶¶ 139-40; see also Agfa Compl. ¶ 21; Cons. Compl. ¶ 25; Mag Compl. ¶ 20.)

There are 37 LME warehouses in the greater Detroit area, of which 29 are owned by Metro, which together account for 80% of LME warehouse space in the greater Detroit area. (FLP Compl. ¶ 159.) There are no allegations that Henry Bath owns any warehouses in the Detroit area; PMUSA is alleged to own warehouses there (see, e.g., Agfa Compl. ¶ 23; Comm. Compl. ¶ 36; Mag Compl. ¶ 22), but it is not alleged to have had warehouses with any significant increase in load-out delays or queues during the period from 2009 forward in the Detroit area.

2.    <u>Plaintiffs</u>

a)    "First-Level Purchasers"

Plaintiffs Ampal, Inc., Admiral Beverage Corp., Central Aluminum Company
("Central Aluminum"), Claridge Products and Equipment, Inc., Custom Aluminum
Products, Inc., Extruded Aluminum Corporation, International Extrusions, Inc.
("International Extrusions"), Talan Products Inc. ("Talan") and Thule, Inc. are
manufacturers that use aluminum to make, <u>inter alia</u>, aluminum powder,
aluminum extrusions, bottled beverages, or consumer products like bike carriers,
cabinets, and strollers.  (FLP Compl. ¶¶ 105-15.)  They are based in states as
diverse as Arkansas, Connecticut, Ohio, and Wyoming.  (<u>See</u> FLP Compl. ¶¶ 105-
15.)

These plaintiffs allege that they made "first level direct purchases" of
primary aluminum products pursuant to written contracts in which the purchase
price was based on the Midwest Premium.  (FLP Compl. ¶¶ 105-11, 113, 115.)  All
but Central Aluminum, International Extrusions, and Talan allege that they may
also have purchased aluminum directly from a Jane Doe defendant during the Class
Period.  (<u>See</u> FLP Compl. ¶¶ 105-15.)

The FLPs allege seven causes of action:  Count One alleges a violation of
Section 1 of the Sherman Act against the LME, Goldman Sachs, and Jane Doe
defendants; Count Two alleges a violation of Section 2 of the Sherman Act against
the LME, Goldman Sachs, and Jane Doe defendants; Count Three alleges a
violation of Section 1 of the Sherman Act against all defendants; Count Four alleges

19

a violation of Section 2 of the Sherman Act against all defendants; and Counts Five through Eight are state law equivalent claims under the laws of 34 states and the District of Columbia.  (FLP Compl. ¶¶ 328-431.)

> b)    Mag and Agfa

Mag designs, manufactures and sells durable flashlights.  (Mag Compl. ¶ 16.) All mag flashlights are manufactured in the United States using aluminum.  (Mag Compl.)  Mag purchased aluminum pursuant to a long-standing supply contract, the price of which was calculated according to a fixed cost-plus formula that relied in part on the Midwest Premium.  (Mag Compl. ¶ 16(a).)

Mag purchased its aluminum from Norsk Hydro North America, Inc. ("Hydro"), an aluminum producer and extruder.  (Mag Compl. ¶ 16(a).)  Hydro was a member of the LME.  (Mag Compl. ¶ 16(b).)[17]  Thus, until the LME was sold to Hong Kong Exchanges and Clearing Limited in December 2012, Hydro was a part-owner of the LME, along with defendants Goldman Sachs, JP Morgan and Glencore. (Mag Compl. ¶ 16(b).)  Hydro's corporate parent sits on the LME's Aluminum Committee, along with defendants Glencore and JP Morgan.  (Mag Compl. ¶ 16 (c).)

Agfa develops, produces, and distributes equipment and supplies such as lithographic printing plates for the newspaper, commercial printing, and graphics communication industries.  (Agfa Compl. ¶ 17.)  It has a production facility in the United States, and its U.S. headquarters are located in New Jersey.  (Mag Compl. ¶ 17.)  Agfa purchased aluminum from integrated producers such as Alcoa and Hydro

---

[17] Hydro is not a defendant in any of these coordinated and consolidated lawsuits.

at all times material to its complaint.  (Mag Compl. ¶ 17.)  The price Agfa paid for such aluminum purchases was based upon the Midwest Premium.  (Mag Compl. ¶ 17.)

Mag and Agfa have filed mirror complaints.  (Compare Agfa Compl., with Mag Compl.)  They are coordinated with the other plaintiffs for pre-trial purposes but have elected not to consolidate into one of the other complaints.  Each asserts a violation of Section 1 of the Sherman Act against all defendants as its First Claim for Relief (Agfa Compl. ¶¶ 123-29; Mag Compl. ¶¶ 113-19), a violation of California's Cartwright Act as its Second Claim for Relief (Agfa Compl. ¶¶ 130-36; Mag Compl. ¶¶ 120-26.)  Mag also asserts various related claims under California state law. (Mag Compl. ¶¶ 127-49.)

c)    End Users

The Consumer End User plaintiffs are two residents of California (Daniel Javorsky and David Kohlenberg), and a pizzeria (Brick Pizzeria LLC), who indirectly purchased aluminum consumer products for end use (that is, not for resale.)  (Cons. Compl. ¶¶ 17-19.)

The Commercial End User plaintiffs are businesses[18] who manufacture various products for resale and who purchased processed aluminum in connection therewith.  (Comm. Compl. ¶¶ 18-26.)  For instance, plaintiffs manufacture boats, machinery, pre-fabricated housing, patio and swimming pool enclosures, fabricated

---

[18] The Commercial End User plaintiffs include: Big River Outfitters, LLC d/b/a SeaArk Boats ("SeaArk Boats"); D-Tek Manufacturing; F & F Custom Boats, LLC ("F & F"); Lexington Homes, Inc.; Master Screens, Inc. d/b/a Tropical Enclosures; Quicksilver Welding Services, Inc.; Seating Constructors USA, Inc.; Team Ward, Inc. d/b/a War Eagle Boats; and Welk-ko Fabricators, Inc. (Comm. Compl. ¶¶ 18-26.)

home railings and artworks, seating bleachers, cabinets, consoles, and rack panels. (Comm. Compl.)

The Commercial and Consumer End Users have alleged claims solely for injunctive relief under federal antitrust laws, and damages under state law. (Comm. Compl.; Cons. Compl.)

Both the Commercial and Consumer End User plaintiffs have asserted violations of Section 1 of the Sherman Act against all defendants as their First Claims for Relief and violations of Section 2 of the Sherman Act as their Second Claims for Relief. (Comm. Compl. ¶¶ 216-35; Cons. Compl. ¶¶ 195-210.) The Consumer End User plaintiffs also include a claim for attempted monopolization (their Third Claim), and violations of state antitrust and unfair competition laws (their Fourth through Eleventh Claims). (Cons. Compl. ¶¶ 211-326.) The Commercial End Users also allege violations of state antitrust, consumer protection, and unfair competition statutes (their Third through Fifth Claims.) (Comm. Compl. ¶¶ 272-309.)

    C.    <u>Defendants' Allegedly Unlawful Conduct</u>

        1.    <u>Exploitation of inefficient loading-out.</u>

Plaintiffs allege that between 2009 and March 31, 2012, defendants conspired to load-out aluminum inefficiently. (Comm. Compl. ¶ 76; FLP Compl. ¶ 31; <u>see</u> Cons. Compl. ¶ 92) That is, they allege that during the Class Period, the 37 LME warehouses in the Detroit area used the LME's 1500 ton per day minimum load-out requirement as a <u>de facto</u> maximum. (Agfa Compl. ¶ 67; Comm. Compl. ¶¶ 77-78;

Cons. Compl. ¶ 92; FLP Compl. ¶¶ 31, 32(f); Mag Compl. ¶ 66.)  This increased the average duration of storage for lots of aluminum stored in LME warehouses, increasing overall storage costs and leading to an increase in the Midwest Premium. (See FLP Compl. ¶ 33.)

Between 2009 and March 31, 2012, companies that owned LME warehouses were required to load-out 1,500 tons of aluminum per city per day.  (See Agfa Compl. ¶¶ 67-68; Cons. Compl. ¶ 59; FLP Compl. ¶¶ 31, 44, 164; Mag Compl. ¶¶ 66-67; see also Comm. Compl. ¶ 77.)  Because this minimum load-out rule applied on a per-city basis, if a single warehouse operated more than one warehouse in a city, it could satisfy its obligation by loading-out from a single warehouse.  (Cons. Compl. ¶ 62; FLP Compl. ¶ 165.)  The 1,500-ton load-out rule did not net out load-ins.  (Cons. Compl. ¶ 88; FLP Compl. ¶ 164; see also Comm. Compl. ¶ 187.)  Accordingly, a warehouse could end up with more aluminum in its inventory at the end of a day than at the beginning.  Plaintiffs allege that a low minimum load-out obligation, the absence of a per-warehouse load-out requirement, combined with a lack of any rule requiring the netting out of load-ins, resulted in an unreasonable restraint of trade. (Cons. Compl. ¶¶ 88-89; FLP Compl. ¶ 165.)  There is no allegation as to when the "minimum load-out," "per city," or "no net load-in" rules were adopted or implemented, by which committee or who constituted the membership of that committee at the time.[19]

---

[19] The timing could materially affect the plausibility of plaintiffs' claims.

Starting in the latter part of 2009, the inventories of Metro's warehouses began to exhibit an unusual and historically anomalous pattern: warrants would steadily and substantially accumulate, with spikes of multiple cancellations of warrants.  (FLP Compl. ¶ 161.)  This pattern continued to occur after Goldman Sachs' subsidiaries acquired Metro in February 2010.  (See FLP Compl. ¶ 162.) According to Agfa's and Mag's complaints, such cancellations were intended to create additional bottlenecks and thereby increase delays of load-outs, and to allow them to shuttle aluminum between warehouses.  (See Agfa Compl. ¶¶ 88-93; Mag Compl. ¶¶ 87-92.)

During 2010, Metro allegedly began treating the LME's 1,500-ton-daily minimum load-out rule as a de facto maximum daily load-out limit.  (See FLP Compl. ¶ 168.)  Plaintiffs allege that the LME has "continuously acquiesced, consented, and otherwise agreed to this 'maximum' interpretation of the [rule] since 2010."  (FLP Compl. ¶ 169; see also Comm. Compl. ¶ 78; Cons. Compl. ¶ 139.)

Since load-outs only occur with respect to metal corresponding to cancelled warrants (see FLP Compl. ¶ 147; see also Agfa Compl. ¶ 45; Comm. Compl. ¶ 69; Cons. Compl. ¶ 53; Mag Compl. ¶ 44), the first step in queue development is warrant cancellation.  Plaintiffs allege that in order to increase their aluminum inventories, the warehouse defendants would cancel warrants, transfer the stock to themselves or their affiliates, and then simply reinstate the warrant at the next warehouse.  (Agfa Compl. ¶ 59; FLP Compl. ¶¶ 382-83; Mag Compl. ¶ 58; see also Comm. Compl. ¶¶ 88, 187, 193; Cons. Compl. ¶ 4.)  Warrant cancellation activity

increased once Goldman Sachs, JP Morgan and Glencore entered the aluminum warehousing industry by way of acquisition. (Agfa Compl. ¶ 60; FLP Compl. ¶ 382; Mag Compl. ¶ 59.)

Sometime in 2009 or 2010, the delivery of aluminum at LME warehouses began to be handled by skeleton crews, approval became required for overtime work, and warehouse employees were no longer permitted to work Saturdays, as they previously had done. (FLP Compl. ¶ 173.) These factors contributed to the creation of queues.

Metro also allegedly began loading-out aluminum from one Detroit-area warehouse only to transport it to another of its warehouses in the same area. (Agfa Compl. ¶ 91; FLP Compl. ¶ 174; Mag Compl. ¶ 90; see also Comm. Compl. ¶ 81, Cons. Compl. ¶ 95.) Plaintiffs allege that this "shuttling" of aluminum also contributed to load-out queues. (See FLP Compl. ¶ 175; see also Agfa Compl. ¶ 92; Mag Compl. ¶ 91.) These delays have resulted in longer durations of storage and therefore higher storage fees. (See generally FLP Compl.)

By 2011, load-out queues at the LME warehouses in the Detroit area were approximately 180 days long. (FLP Compl. ¶ 179.) From January to June 2011, Metro's Detroit area warehouses took in approximately 364,000 tons of aluminum but delivered out only approximately 171,000 tons. (Agfa Compl. ¶ 62; Cons. Compl. ¶ 134; FLP Compl. ¶ 180; Mag Compl. ¶ 61.)

By 2011, there were public complaints regarding load-out delays in the Detroit area. (See Agfa Compl. ¶¶ 94-95; Comm. Compl. ¶ 150; Cons. Compl. ¶ 167;

FLP Compl. ¶ 182; Mag Compl. ¶¶ 93-94.) In 2011, the chief procurement officer for the world's largest aluminum can manufacturer estimated that the Detroit delays caused a $20 to $40 increase in the U.S. benchmark price per ton. (Comm. Compl. ¶154; Cons. Compl. ¶ 133; FLP Compl. ¶¶ 184-86.) In 2011, Coca-Cola Co. lodged a complaint with the LME. (Agfa Compl. ¶ 95; Comm. Compl. ¶ 153; Cons. Compl. ¶ 136; FLP Compl. ¶ 190; Mag Compl. ¶ 94.) In response to these complaints, the LME hired consultancy Europe Economics to study the queues and delays in Detroit-area warehouse load-outs. (Agfa Compl. ¶ 76; Comm. Compl. ¶ 155; Cons. Compl. ¶ 116; FLP Compl. ¶ 193; Mag Compl. ¶ 75.) That firm recommended that the minimum load-out rule be changed to scale with inventories. (FLP Compl. ¶ 196; see also Agfa Compl. ¶ 80; Cons. Compl. ¶ 116; Mag Compl. ¶ 79.)

Plaintiffs also allege that Goldman or Metro International Trade Services, L.L.C. ("Metro"; together, "Goldman/Metro")[20] increased its inventories by offering incentive payments to aluminum producers. (Comm. Compl. ¶¶ 61, 140; Cons. Compl. ¶ 5(g); FLP Compl. ¶¶ 212-13; see also Agfa Compl. ¶¶ 64-65; Mag Compl. ¶¶ 63-64.) According to plaintiffs, this diverted aluminum from productive uses to long-term storage. (FLP Compl. ¶ 213; see Agfa Comp. ¶ 59; Comm. Compl. ¶ 11; Mag Compl. ¶ 58; see also Cons. Compl. ¶ 101.) Goldman/Metro offered to pay as much as $250 or more per ton in such up-front "incentive payments." (Comm. Compl. ¶ 193; Cons. Compl. ¶ 5(g); FLP Compl. ¶ 214.) According to plaintiffs,

---

[20] Plaintiffs' allegations with regard to incentive payments are cast in terms of "Goldman." However, the other allegations of the complaints only support Metro as the operational arm of the Goldman-affiliated warehousing operations. There are also no allegations in any complaint regarding how, who, when, or why any "Goldman" personnel would, could, or did communicate with Metro personnel with respect to warehouse operations.

Goldman's incentive payments created a positive feedback loop in which the more aluminum it could divert into its warehouses and the more inefficient it could be in loading-out, the more it earned and therefore the more it could afford to pay in incentive payments.  (Cons. Compl. ¶ 101; FLP Compl. ¶ 216.)

Plaintiffs allege that defendants had no incentive to decrease queues during the period 2012-13 because they were in the process of trying to sell the LME, and therefore it was in their mutual self-interest to maintain high storage revenues. (Cons. Compl. ¶ 5(h); FLP Compl. ¶ 197.)  Defendants allegedly agreed not to implement the recommendations of "their own paid consultants' proposed solution to the problem."  (FLP Compl. ¶ 198; see also Agfa Compl. ¶ 82; Comm. Compl. ¶ 155; Cons. Compl. ¶ 117; Mag Compl. ¶ 81.)[21]

In total, LME warehouses' inventories of aluminum rose from 1290 tonnes in 2008, to 2200 tonnes in 2009, to 2230 tonnes in 2010, to 2360 tonnes in 2011, ultimately decreasing to 2300 in 2012.  (Agfa Compl. ¶ 51; Mag Compl. ¶ 50.)

Effective April 1, 2012, the LME adopted a rule agreeing to change the minimum load-out requirement for LME warehouses in the greater Detroit area to 3000 tons per day.  (Comm. Compl. ¶ 88; Cons. Compl. ¶ 60; FLP Compl. ¶ 199; see also Agfa Compl. ¶ 67; Mag Comp. ¶ 66.)  A company named Rusal objected to and

---

[21] Notably, the FLPs do not allege how the LME's retention of Europe Economics was transformed into the "defendants'" paid consultant, rather than merely that of the LME specifically.  (Compare FLP Compl. ¶ 193, with FLP Compl. ¶ 198.)  Presumably this allegation is based on the assumption that by virtue of their combined minority ownership interest in the LME's parent, defendants could both control the consultant such that it was "theirs" and exert sufficient influence to determine whether its recommendations would or would not be adopted.  However, such an assumption is without support in any allegation.

challenged this change; a U.K. court has stayed its implementation.  R v. London Metal Exch. ex parte United Co. Rusal PLC, [2014] EWHC (Admin) 890 (Eng.).[22]

In November 2012, the European Union announced that it was investigating the LME's warehousing arrangements.  (Comm. Compl ¶ 159; Cons. Compl. ¶ 127; FLP Compl. ¶ 240.)  In 2013, the U.S. Senate Banking, Housing and Urban Affairs Committee began an investigation into the warehousing queues.  (Comm. Compl. ¶ 163; FLP Compl. ¶ 251; see also Cons. Compl. ¶ 114.)

In August 2013, the U.S. Commodity Futures Trading Commission sent subpoenas to Goldman Sachs, JP Morgan, Glencore, PMUSA, and "perhaps others" as part of an inquiry into metals prices.  (FLP Compl. ¶ 271; see also Agfa Compl. ¶ 99; Comm. Compl. ¶ 161; Cons. Compl. ¶ 129; Mag Compl. ¶ 98.)  The Department of Justice also launched a preliminary investigation that same month.  (Cons. Compl. ¶ 129; FLP Compl. ¶ 272; see also Agfa Compl. ¶¶ 2, 99; Comm. Compl. ¶ 162; Mag. Compl. ¶¶ 2, 98.)

The amount of stored aluminum inventory in the Detroit-area LME warehouses continued to increase between 2012 and 2014.  (FLP Compl. ¶ 206.)  By 2013, queues in the Detroit-area LME warehouses had grown to 469 calendar days.  (Comm. Compl. ¶ 90; Cons. Compl. ¶ 145; FLP Compl. ¶ 248.)  As the economic recovery progressed, however, aluminum supplies in non-Detroit-area warehouses

---

[22] The FLPs also allege the LME agreed with Goldman Sachs to increase storage rates.  (FLP Compl. ¶ 203.)  The LME's public documents indicate that storage rates are set by the warehouses themselves and reported to the LME.  See London Metal Exch., Terms and Conditions Applicable to All LME Listed Warehouse Companies § 5.1.4 (2013), available at http://www.lme.com/~/media/Files/Warehousing/Warehouse%20consultation/Warehousing%20Agreement.pdf.  While on these 12(b)(6) motions the Court does not find facts but construes allegations in plaintiffs' favor, allegations directly contradicted by the public record impact plausibility.

declined substantially.  (Comm. Compl. ¶ 98; Cons. Compl. ¶ 5(d); FLP Compl. ¶ 207.)

        2.    Monopoly allegations.[23]

Plaintiffs allege that Goldman has a monopoly over "LME-approved warehousing space for deliveries on LME aluminum and other metals contracts in LME Detroit Warehousing." (Comm. Compl. ¶ 191; FLP Compl. ¶ 287.)  During the Class Period, Goldman is alleged to have purchased warehouses with more than 80% of the storage space in the Detroit area.[24]  (Comm. Compl. ¶ 191; Cons. Compl. ¶ 85; FLP Compl. ¶ 289.)  Goldman is alleged to have stores of over 50% of the aluminum stored in warehouses located in those parts of the United States that transact based on the Midwest Premium or Platts MW Premium.  (Comm. Compl. ¶ 191; Cons. Compl. ¶ 158; FLP Compl. ¶ 290.)  Together, Goldman and Glencore are alleged to have monopoly power to set prices, to set storage rates, and to control output in their LME warehouses.  (FLP Compl. ¶ 291.)

The FLPs and Commercial End Users allege that LME warehousing in the greater Detroit area is an essential facility, because access to aluminum stored in warehouses in that area is crucial for plaintiffs and class members to be able to successfully conduct business in the United States.  (FLP Compl. ¶ 303; see also Comm. Compl. ¶ 12.)

---

[23] Mag and Agfa do not allege a monopoly claim.

[24] The Class Period is alleged to commence in 2009, but affiliates of Goldman Sachs are not alleged to have purchased Metro International and its warehouses until February 2010.  It is therefore unclear whether the allegations at paragraph 289 in the FLPs' complaint refer to LME warehouses in the greater Detroit area or other warehouses that Goldman acquired, as to which there are no specific allegations in the complaint.

Those plaintiffs who allege a "relevant market" (or several alternative "relevant markets") for their antitrust claims[25] define them as follows:

(1) The market for providing exchange-traded aluminum forward or futures contracts, including to LME warehouses in the United States (Comm. Compl. ¶ 197(b); FLP Compl. ¶ 306);

(2) The market for providing exchange-traded aluminum forward or futures contracts in the United States, including the approval and regulation of warehouses to store the exchange-traded aluminum (Cons. Compl. ¶ 158);

(3) The market for warehouse storage of aluminum in the United States in LME warehouses (FLP Compl. ¶ 306; see Comm. Compl. ¶ 197(a));

(4) The market for warehouse storage of aluminum in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium (FLP Compl. ¶ 306);

(5) The market for warehouse storage of aluminum in the United States and other areas in which aluminum is purchased and sold based on the Midwest Premium (Comm. Compl. ¶ 198);

(6) The market for warehousing LME aluminum in the greater Detroit area (FLP Compl. ¶ 307);

(7) The market for warehousing aluminum in the greater Detroit area (FLP Compl. ¶ 307);

---

[25] Agfa and Mag do not explicitly allege a relevant market.  (See Agfa Compl.; Mag Compl.)

(8) The market for warehousing aluminum in the United States (<u>see</u> Comm. Compl. ¶ 198(b));

(9) The market for warehousing aluminum in the contiguous area of Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, and other areas in which aluminum is purchased or sold based on the Midwest Premium (FLP Compl. ¶ 307);

(10)   The market in the Detroit area in which aluminum is bought and sold based on the Midwest Premium for storage in or delivery from warehouses (Cons. Compl. ¶ 158);

(11)   The market in the United States in which aluminum is bought and sold based on the Midwest Premium for storage in or delivery from warehouses (Cons. Compl. ¶ 158);

(12)   The market in the United States in which aluminum is purchased by manufacturers of aluminum consumer products at prices based on, related to, or influenced by the Midwest Premium (Cons. Compl. ¶ 158);

(13)   The market in the United States for the sale of aluminum consumer products to consumers for end-use and not for resale and all relevant sub-markets (Cons. Compl. ¶ 158);

(14)   The market for aluminum in the United States.  (Comm. Compl. ¶ 198(a).)

All told, individually or collectively, plaintiffs allege fourteen potential markets. None are accompanied by allegations regarding product interchangeability, elasticities, or geographic boundaries.

## II.    LEGAL STANDARD ON MOTION TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must raise plaintiffs' right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In other words, a complaint must allege enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In applying that standard, a court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. Similarly, a court need not accept "legal conclusions couched as factual allegations." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Port Dock, 507 F.3d at 121).

If the Court can infer no more than "the mere possibility of misconduct" from the factual averments—that is, if the well-pleaded allegations of the complaint have not "nudged [plaintiffs'] claims . . . across the line from conceivable to plausible"— dismissal is appropriate. Iqbal, 556 U.S. at 679-80 (quoting Twombly, 550 U.S. at 570).

The "plausibility" requirement should not, however, be misunderstood as a "probability" standard. Twombly, 550 U.S. at 556; Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." Anderson News, 680 F.3d at 184. On a Rule 12(b)(6) motion, the Court may not choose between two plausible inferences that may both be drawn from the factual allegations. Id. at 185. This is so even if a court finds one of the two versions more plausible. Id.

## III.    ANTITRUST STANDING[26]

In an antitrust case, a plaintiff must have constitutional standing under Article III, as well as antitrust standing. See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983); see also Port Dock, 507 F.3d at 121. A plaintiff has Article III standing only if they have suffered an injury in fact. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("The irreducible constitutional minimum of standing [requires] . . . injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical . . . ." (citations and quotations omitted)). Plaintiffs' Article III standing is not in dispute. Defendants vigorously contest that plaintiffs have or could plead antitrust standing.

---

[26] Neither § 1 nor § 2 of the Sherman Act provides for a private right of action. That is accomplished by § 4 and § 16 of the Clayton Act. Section 4 provides for a treble damages action and states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages. 15 U.S.C. § 15. Section 16 provides for an action for injunctive relief and states that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26.

Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." Gatt Commc'ns Inc. v. PMC Assocs. L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (quoting NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc)); see also Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc., 467 F.3d 283, 290-95 (2d Cir. 2006) (dismissing a complaint under Rule 12(b)(6) for lack of antitrust standing).

Establishing antitrust standing requires more than alleging an injury causally related to unlawful conduct. A plaintiff must allege plausible facts that he suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Thus, although causally related to an antitrust violation, injury does not constitute "antitrust injury" unless it is attributable to an anticompetitive aspect of the challenged conduct. Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990). This requirement is derived from the principle that the antitrust laws were enacted for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 319 (1962); see also Gatt, 711 F.3d at 75 ("Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition.").

The Supreme Court decided two cases in back-to-back terms addressing antitrust standing in the context of private damages actions: <u>Blue Shield of Virginia v. McCready</u>, 457 U.S. 465 (1982), and <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u> ("<u>AGC</u>"), 459 U.S. 519 (1983).

<u>McCready</u> was a 5-4 decision in which Chief Justice Burger and Justices Rehnquist, O'Connor, and Stevens dissented.  There, the Court held that while plaintiff was not a competitor of the alleged conspirators, "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict."  457 U.S. at 484.  In that case, plaintiff McCready alleged that her health insurer Blue Shield of Virginia and an organization of psychiatrists conspired to exclude psychologists from eligibility for compensation under Blue Shield's insurance plans. <u>Id.</u> at 469-70.  McCready sought reimbursement from Blue Shield for treatment by a psychologist.  <u>Id.</u> at 467-69.  However, Blue Shield only allowed her and other subscribers to choose between "visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment of a provider of their choice."  <u>Id.</u> at 483.  The Court found that McCready's injury "flow[ed] from that which makes defendants' acts unlawful" under the antitrust laws, and accordingly there was no persuasive rationale to deny McCready redress.  <u>Id.</u> at 484-85.

In <u>AGC</u>, an 8 to 1 decision in which Justice Marshall was the lone dissenter, the Court set forth a framework for defining the boundaries of antitrust standing. There, a union sought redress on behalf of its membership for alleged antitrust violations.  459 U.S. at 520.  In tension with the broad language of <u>McCready</u>, the

Court found that the union lacked antitrust standing.  Id. at 545-36.  In doing so, the Court identified several factors court should consider in determining whether a plaintiff has antitrust standing:  (1) the causal connection between the violation and the harm; (2) the presence of an improper motive; (3) the type of injury and whether it was one Congress sought to address; (4) the directness of the injury, (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex damage apportionment.  Id. at 537-44.  Applying these factors, the Court concluded: (1) the causal chain consisted of several "somewhat vaguely defined" links; (2) motive was not a significant issue in the case; (3) the type of injury was not one Congress sought to address because the union was "neither a consumer nor a competitor in the market in which trade was restrained"; (4) the union's alleged injury was too indirect; (4)-(5) the injury was speculative because the effects of the conspiracy were indirect and could have been caused by independent factors; and (6) there was an alternative class of plaintiffs better situated to pursue the claims, which created a risk of duplicative damages.  Id. at 539-45 & n.37.

The Second Circuit has "distilled" the AGC factors "into two imperatives": first, that a plaintiff plausibly allege that he suffered antitrust injury, and, second, that he plausibly allege facts that support his suitability as a plaintiff to pursue the alleged antitrust violation—and that he would therefore be an "efficient enforcer" of the antitrust laws.  Gatt, 711 F.3d at 76; see also Port Dock, 507 F.3d at 121; Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 443 (2d Cir. 2005).

The Second Circuit employs a three-step process for determining whether a plaintiff has plausibly alleged antitrust injury. Gatt, 711 F.3d at 76. The plaintiff must first identify the practice complained of and the reasons why such practice is or might be anticompetitive. Id. Next, a court must identify the actual injury that plaintiff alleges and inquire how plaintiff is in a worse position as a consequence of the conduct. Id. Finally, a court must compare the "anticompetitive effect of the practice at issue" to the "actual injury the plaintiff alleges." Id. (quoting Port Dock, 507 F.3d at 122). This multi-step inquiry assures that a causal link is not the sole basis for determining there has been an "antitrust injury."

Whether a plaintiff would be an "efficient enforcer" depends on a balancing of the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Gatt, 711 F.3d at 76 (quoting Paycom, 467 F.3d at 290-91); see also Port Dock, 507 F.3d at 121; Daniel, 428 F.3d at 443.

Neither AGC nor McCready addressed the extent to which their holdings apply in actions where plaintiffs do not seek damages, but rather only seek injunctive relief. Two of the actions here, brought by the Consumer End Users and Commercial End Users, seek only injunctive relief with regard to their federal

antitrust claims.[27]  However, in neither <u>AGC</u> nor <u>McCready</u> did the Court indicate that its holding or rationale is limited to actions for monetary damages.

The <u>AGC</u> factors relating to complex, speculative and/or duplicative damages beg the question of whether and how that analysis changes in the context of actions in which only injunctive relief is sought.  However, the principles behind those factors drive this Court's analysis.  In this regard, issues with complex and speculative damages concern the fact and nature of harm (that is, damage) as much as a calculation of dollars and cents.  Is determining the fact of damage complex?  Does remedying plaintiff's injury through injunctive relief present complex issues?

Similarly, to assess the potential for duplicative recovery, the Court must reasonably ask not only whether there is another plaintiff who will recover a quantum that would account for monetary damage, but also whether the relief one plaintiff seeks more generally (such as injunctive relief), is being adequately pursued by another, better-situated party.  Thus, the <u>AGC</u> factors are reasonably applicable to actions in which only injunctive relief is sought.  Finally, in all cases the court is cautioned to be mindful the manageability of litigation.  That is, allowing actions to proceed in which plaintiffs seek overlapping relief and in which their presence provides no additional benefit may well add to manageability issues. <u>Cf.</u> <u>Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers</u>, 888 F.2d 604, 608-09 (9th Cir. 1989).

---

[27] These plaintiffs seek damages for state law competition and other claims.

A.     Role in the Market

In most antitrust cases, the applicability of the <u>AGC</u> factors is relatively straightforward because private plaintiffs are typically either competitors or consumers in the relevant market.  As <u>McCready</u> demonstrates, however, this is not invariably or even necessarily the case.  457 U.S. at 483-84 (plaintiff was customer, not competitor, of defendant); <u>see also</u> <u>Crimpers</u>, 724 F.2d at 294 (plaintiff was trade show organizer, not participant in market for cable programming); <u>Province v. Cleveland Press Publ'g Co.</u>, 787 F.2d 1047, 1052 (6th Cir. 1986) (plaintiffs were former employees, not competitors, of defendants).  In the absence of a market role as a competitor or consumer, a plaintiff may also show that his injury is "inextricably intertwined" with the injury inflicted on the relevant market. <u>McCready</u>, 457 U.S. at 484; <u>Province</u>, 787 F.2d at 1052.  "To be inextricably intertwined with the injury to competition, the plaintiffs must have been 'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'" <u>Province</u>, 787 F.2d at 1052 (quoting <u>Southaven Land Co. v. Malone & Hyde, Inc.</u>, 715 F.2d 1079, 1086 (6th Cir. 1983)) (finding plaintiffs' injury was not inextricably intertwined because their injury was "a result of—rather than a means or the cause of—the harm").  In all cases in which the court found standing on this basis, either defendants alleged a relevant market, or neither party raised the issue. This Court is unaware of any case in which plaintiffs were neither competitors nor

consumers and failed to allege a defined market yet were found to have antitrust standing.

The parties here have focused on the facts and language of certain cases with regard to the antitrust standing analysis.  In particular and in addition to those decisions already discussed, the parties have extensively briefed the following decisions: Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290 (2d Cir. 1983) (Friendly, J.); Reading Industries, Inc. v. Kennecott Copper Corp., 631 F.2d 10 (2d Cir. 1980); Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc., 253 F. Supp. 2d 262 (D. Conn. 2003); and Loeb Industries, Inc. v. Sumitomo Corp.

In Crimpers, which was decided shortly after the Supreme Court handed down its decision in AGC, the Second Circuit held that a company organized to hold a television trade show had antitrust standing to assert a claim under § 4 of the Clayton Act against HBO and Showtime.  These entities were alleged to have orchestrated a successful boycott of the trade show to further cement their dominance in the market for cable programming.  724 F.2d at 290.  Plaintiff Crimpers was a company organized to hold a television trade show in Las Vegas that sought to bring together cable television programmers; Crimpers was not itself a cable programmer, nor did it otherwise participate directly in the market for cable programming.  See id. at 291.  Relying on McCready, the Court determined that plaintiff had antitrust standing because the defendants' scheme would not have been profitable had it not directly used plaintiff, and thus plaintiff's injury was "inextricably intertwined with the injury the defendants sough to inflict on

40

producers and television stations in the cable television programming market." Id. at 294-95. Then, after assessing each of the AGC factors, the Court concluded that plaintiffs had adequately established antitrust standing. See id. at 296-97.

Finally, Loeb represents the Seventh Circuit's interpretation of where to draw the lines set forth in AGC and McCready. There, copper purchasers at different levels of the supply/distribution chain sued Sumitomo, alleging it had conspired to fix the price of copper futures at artificially high levels on the LME and Comex exchanges. 306 F.3d at 474. Copper prices were directly linked to the LME and Comex prices for copper futures, and various forms of physical copper were quoted using formulas relating to these prices. Id. at 476. The Seventh Circuit found that copper scrap dealers ("Scrap Dealers") lacked antitrust standing but that others (namely, Viacom, Inc. and Emerson Electric Co.) who turn copper cathode into wire for resale, were not too remote from the allegedly anticompetitive conduct, and thus had antitrust standing. Id. at 475, 484-86, 492.

According to the Seventh Circuit, even if the Scrap Dealers could establish that their injuries flowed directly from defendants' alleged market manipulations, that injury was nevertheless indirect. Id. at 484. The Scrap Dealers were several layers down the supply/distribution chain—after an integrated producer who refined the copper and a manufacturer who turned the refined copper into a product, possibly generating scrap in the process. Id. at 484-85. The Court noted that under AGC, the directness inquiry focuses on the presence of more immediate victims of the antitrust violation who are better positioned to maintain an action.

Id. at 484.   The Court identified several other groups of entities in such a better

position, including traders who had already filed and settled claims with

defendants.   Id. at 484-85.   In addition, the Court found that the Scrap Dealers'

damages were speculative.   Id. at 485.   Finally, the Court noted that the Scrap

Dealers' claim presented a real risk of duplicative recovery and complex damage

apportionment, as physical copper could be sold and resold many times.   Id. at 485-

86.   The Court resolved this issue by restricting the right to recover to those more

directly affected by defendants' actions.   Id.

    In contrast to the Scrap Dealers, however, the Court found that Viacom,

which purchased copper directly based on inflated Comex prices, was directly

injured.   Id. at 489.   Despite the defendants' argument to the contrary, the Court

found that Viacom's injury "d[id] not depend on the speculative actions of

innumerable market decision makers," but "flowed instead directly from the

contracts between Viacom and its suppliers."   Id. at 488-489.   The Court also found

that damage apportionments at this level of the supply/distribution chain could be

easily resolved with basic market and purchasing data.   See Id. at 490-91.

    In Reading, the Second Circuit held that a copper scrap refiner did not have

antitrust standing to assert a claim of a price-fixing conspiracy because plaintiff's

theory of injury "depend[ed] upon a complicated series of market interactions"

between the refined copper market, in which the defendants acted, and the copper

scrap market, where plaintiff was allegedly injured.   631 F.2d at 13.   Plaintiff's

"attenuated economic causality" and the possibility that other market variables

intervened to affect the prices plaintiff paid for copper scrap weighed against finding that plaintiff had antitrust standing.  See id. at 14.

In Ice Cream, the District of Connecticut concluded that an ice cream company had antitrust standing to sue dairy cooperatives that allegedly conspired to fix the prices of milk, cream, and butter.  254 F. Supp. 2d at 266-67.  There, the allegedly anticompetitive conduct took place in the market for butter on the Chicago Mercantile Exchange ("CME"), not the physical markets for butter, cream, or milk.  Id. at 268-69.  However, because plaintiffs alleged that the prices in the physical market were closely tied to those in the CME butter market, the link between the conduct and plaintiffs' alleged injuries was sufficiently direct.  See id. at 273-74.  Of note, defendants in Ice Cream both traded in the CME butter market and directly sold dairy products to defendants in the physical market.  See id. at 268-70.

Taken together, these cases demonstrate that the determination of whether a plaintiff has antitrust standing is based on a careful examination of the specific factual allegations in the complaints at issue.  The court must first determine the type of injury alleged, and then examine plaintiff's proximity and relationship to that injury.

B.    Discussion of Plaintiffs' Antitrust Standing

There are 6 coordinated cases with 13 motions to dismiss pending before this Court.  Defendants assert that none of the plaintiff groups could possibly allege sufficient plausible facts to support antitrust standing.  This Court has considered the sufficiency of each complaint individually, according to its allegations.

As set forth above, the Court's initial evaluation of standing relates to whether plaintiffs have adequately alleged antitrust injury. Here, plaintiffs uniformly allege that by paying a price for aluminum which incorporated an inflated Midwest Premium, they have alleged classic antitrust injury. This argument has an obvious, immediate appeal: coordinated action that inflates price is a classic form of antitrust injury. Of course, this most frequently occurs in the context of direct competitors or consumers of the defendants, and therefore whose participation in a relevant market is plain. Not so here. Here, plaintiffs proceed along the "inextricably intertwined" theory—a la <u>McCready</u>, <u>Crimpers</u> and the other cases discussed above. That framework necessarily requires understanding the market in which the actual antitrust injury is alleged to have occurred and to whom; this, of course, requires some clear reference to a product market and the competitors within that market. This is not a requirement for the specificity of market allegations necessary for a § 2 claim (described below), but rather is a recognition that one cannot determine that which constitutes "antitrust" injury in the absence of knowing the type of competitive process alleged to have been interfered with. This flows from the fundamental principle that the antitrust laws were designed to protect "competition, not competitors." <u>Brown Shoe</u>, 370 U.S. at 319.

By failing clearly or adequately allege a market in which antitrust injury is experienced and by whom, plaintiffs fail to support their own antitrust injury. That they were harmed by paying higher prices they have alleged—and they have done

44

so clearly. But how that impacted competition and in which market is not. None of the complaints clearly refers to a market where antitrust injury is directly experienced or how. To support a McCready- or Crimpers-type analysis, plaintiffs must allege where the antitrust injury is experienced, the impact it has on the competitive process, to whom, and how their injury is "inextricably intertwined."

This threshold issue is, perhaps, a problem of choosing one among several horses (i.e., markets) to ride. Plaintiffs may, of course, choose to ride a number of horses—but they must specify precisely what each horse looks like and what is involved in riding each. Without such clarity, this Court cannot determine whether plaintiffs' injury is "inextricably intertwined" with anticompetitive injury.

For this analysis the Court asks, were plaintiffs manipulated or utilized by the defendants as a "fulcrum, conduit or market force" to injure competitors or participants in the relevant product or geographic market? Province, 787 F.2d at 1052 (quotation omitted). Are plaintiffs here situated as in McCready, where plaintiff was a consumer of services from an individual psychologist that defendants sought to exclude? See 457 U.S. at 368. Or as in Crimpers, where plaintiff was a trade show that sought to bring together producers and television stations in the cable television programming market? 724 F.2d at 294-95. Here, the markets are unclear and frankly confused: if the relevant market is LME warehouse services in the Detroit area, was the anticompetitive conduct aimed at causing storage fees to rise? Who was targeted and who therefore suffered the initial injury—the warrant holders or parties to aluminum futures contracts? Or, is the relevant market the

LME futures and forward contracts market?  If so, was the anticompetitive conduct to raise the price of aluminum to the detriment of other traders in those instruments?  In order for plaintiffs to proceed on an "inextricably intertwined" theory, they must allege with clarity what the relevant market is, what precise anticompetitive conduct occurred <u>in that market</u>, and how their injury was inextricably intertwined with <u>that</u> injury.  In the absence of such allegations, plaintiffs have failed to adequately allege that they have antitrust standing.

Plaintiffs' allegations regarding the market structure in which defendants' challenged conduct occurred highlights the particular complexities of the antitrust injury question here.  According to plaintiffs, the vast majority of aluminum trading activity on the LME takes place among banks, hedge funds and traders, rather than users of aluminum.  A contango—which exists when the forward price of aluminum is higher than the current price—provides these traders with an arbitrage opportunity.  Such arbitrage definitionally requires traders to retain warrants for some period of time.  Because futures trading is a zero-sum game (as each "dollar gained by a long trader is lost by a short trader on the other side of the contract," <u>de Atucha v. Commodity Exch., Inc.</u>, 608 F.Supp. 510, 516 (S.D.N.Y. 1985)), defendants could not have completed their scheme unless another trader purchased an offsetting position.  As cast in the complaints, this scheme therefore required traders on different sides of the futures contract making opposing bets, with one losing.  This scheme does not directly require any participation by plaintiffs.[28]  But

---

[28] This case is unlike others in which plaintiffs who are neither competitors nor consumers have been found to have standing.  In each of those cases, plaintiffs were necessary to the completion of the

it may be that plaintiffs are indirectly necessary.  For instance, it may be that the price of aluminum futures contracts is necessarily impacted by the actual expected usage of aluminum by manufacturers.  That is, without usage of aluminum and therefore without purchases of aluminum at some point along the chain, the traders would not have a market opportunity.  The factual allegations of the current complaints are, however, insufficient to support such a view.

For these reasons, plaintiffs have failed adequately to support allegations of antitrust injury.

A.  Are Plaintiffs Efficient Enforcers?

Even if plaintiffs can adequately allege antitrust injury, as currently pled their claims nonetheless fail: they have a separate obligation to support their role as efficient enforcers of the antitrust laws with specific allegations.  Gatt, 711 F.3d at 76; Port Dock, 507 F.3d at 121.  They have failed to do so.  Each complaint contains its own set of allegations regarding the role of the plaintiffs therein in the supply/distribution chain.  The Court has reviewed each of the complaints against their respective and individualized allegations.  Nevertheless, the complaints share certain deficiencies.

All allegations refer to roles which are more than one level down in the supply/distribution chain.[29]  None of the complaints alleges that plaintiffs in fact

---

scheme.  See, e.g., McCready, 457 U.S. at 479 (only if insureds such as McCready ceased using psychologists would the scheme achieve its purpose); Ice Cream, 253 F. Supp. 2d at 269-70 (plaintiffs needed to buy milk and cream from defendants at inflated prices for scheme to work effectively).

[29] Mag and Agfa allege that they purchased some aluminum directly from producers (Alcoa and Hyrdo); but it is unclear to what extent that would have incorporated the Midwest Premium, and the extent to which those purchases were in the U.S. or elsewhere, or whether that matters.

themselves purchase any aluminum directly out of the LME-approved warehouses.
Instead, all plaintiffs are one or more levels down the supply/distribution chain
from such purchases.[30]  The Commercial End Users' and Consumer End Users'
aluminum purchases are the furthest down the chain and definitionally indirect.
As they allege, their purchases incorporating the inflated Midwest Premium
occurred several layers down the supply/distribution chain.  For instance, the
Commercial End Users include several boat manufacturers, such as SeaArk Boats
and F & F, who do not allege that they purchased the aluminum directly from a
warehouse, or even directly from an entity that did.  Indeed, they characterize
themselves as "<u>End</u> Users."  Similarly, the Consumer End Users—including
individual consumers and a pizzeria—may simply have bought canned soft drinks
or other consumer products incorporating the inflated Midwest Premium.  Well
before any of these purchases, the aluminum had been purchased, delivered from a
warehouse to some initial buyer, and then another buyer and so on, down the
supply/distribution chain, with each step potentially involving additional
fabrication or services.

  The injury suffered by these plaintiffs is therefore indirect.  Their injury is
paying a price for a product partially made from aluminum that partially
incorporates the Midwest Premium.  While these plaintiffs are not seeking
monetary damages for their antitrust claims, the question of whether they are

---

[30] Of the FLP plaintiffs, only two, International Extrusions and Talan, specifically assert that they in fact purchased and took delivery of aluminum that was formerly warranted in an LME warehouse. (See FLP Compl. ¶¶ 105-15.)  But it is unclear as to whether this aluminum was warranted in LME warehouses in Detroit or elsewhere, and these plaintiffs do not allege that they purchased it directly from an LME warehouse.

efficient enforcers as to those claims remains.  In this regard, the type of relief requested is only one factor; the questions of how to assess their injury and how to determine causation are others.  Given their own allegations regarding their position in the supply/distribution chain, isolating their particular damage from other potential causal factors would present a highly complex task.  For instance, did labor costs, transportation costs or bottling costs lead to an increase in prices?  These issues do not simply disappear because these plaintiffs are not seeking a monetary recovery.

In terms of injunctive relief (and putting to one side for the moment the question of the adequacy of allegations for obtaining injunctive relief), all plaintiffs would presumably seek similar injunctive terms.  But upstream plaintiffs would be more closely positioned to industry dynamics and therefore arrive at relief that might better address any unlawful conduct, and in the process, prevent harm from flowing downstream.  Thus, the Commercial End Users and Consumer End Users are pursuing duplicative relief, even if in the form of an injunction.  Their roles as plaintiffs thus compounds manageability issues without providing any clear benefit.

There are numerous other plaintiffs further up the supply/distribution chain (as demonstrated in the remaining complaints) who would be better positioned to enforce the antitrust laws.  As a result, Supreme Court precedent dictates that these plaintiffs do not have antitrust standing to maintain an action under § 4 of

the Clayton Act. [31]  Given their own allegations regarding their positions in the

supply/distribution chain, they cannot plead around this issue.

The FLPs, Mag, and Agfa plaintiffs are, however, situated further up the

supply/distribution chain.  Nevertheless, based on deficiencies in their allegations,

the Court is led to a similar result.  In short, none of these plaintiffs have set forth

sufficient allegations regarding from which level in the supply/distribution chain

they purchased aluminum in order to be able assess their role vis-à-vis other

potential plaintiffs.  The Court understands from the allegations that plaintiffs do

not purchase aluminum from the LME warehouses directly, but it is unable to

ascertain how far down the chain their purchases occur.

For instance, Mag and Agfa both allege direct purchases from integrated

producers such as Alcoa and Hydro, but they do not allege whether they made such

purchases before or after any LME warehousing (or, whether the prices they paid

for aluminum were dependent on the Midwest Premium).  They allege that they

manufacture products (such as flashlights and lithographic printing plates) that use

aluminum.  However, there are insufficient facts from which this Court can

determine whether the aluminum purchased by these plaintiffs has been fabricated

by one or more companies before these purchases have been made.  The number of

steps in their supply/distribution chains plainly implicate the directness of their

injury, and whether any damages might be duplicative.  Moreover, the Court cannot

---

[31] While these plaintiffs do not assert claims for damages under the federal antitrust laws, and instead assert only a claim for injunctive relief, plaintiffs must also demonstrate antitrust standing to assert such a claim.  Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 484, 491 (1986) (applying antitrust standing requirement to claims for injunctive relief); Daniel, 428 F.3d at 437; Paycom, 467 F.3d at 290.

adequately analyze whether damages would be speculative without additional, specific allegations.

The FLPs present similar issues.[32]  While they have characterized themselves as "first level" purchasers, it is not clear from whom they buy aluminum, what form they buy it in, or exactly how they use it once it is bought.  In this regard, the Court notes that some of these plaintiffs may have purchased aluminum from others who themselves purchased the aluminum from a trader or broker.  Thus, while their complaint certainly alleges that they purchase aluminum, it is not clear from the complaint whether they are truly "first level" purchasers.  It may be that they are one or more levels below a true first level.  As with Mag and Agfa the answers to these questions are necessary to any assessment of the directness of their injury, the speculative nature of their damages, the danger of duplicative recovery, or whether they would be efficient enforcers.  Supreme Court and Second Circuit precedent requires additional specificity to support the FLPs' standing under the federal antitrust laws.

In sum, as pled, the complaints of Mag, Agfa and the FLPs do not support antitrust standing.  The allegations instead present a complex market structure with many participants who are not necessarily involved in this lawsuit.  In such a complicated structure, to perform an <u>AGC</u> analysis, the identity and role of market

---

[32] To the extent that the FLPs purchase aluminum from traders or others who were themselves paying higher than reasonable storage fees; it may be that those traders would not be incented to pursue claims.  Traders may stand to gain more from the arbitrage opportunity than they lose in increased storage costs.  Econometric modelling could presumably predict when the arbitrage opportunity would exceed expected costs.  In this scenario, the FLPs could potentially be the most efficient enforcers.  However, to support this scenario, plaintiffs would need additional allegations relating to trading dynamics, etc.

participants must be set forth in the pleadings.  A less complicated market structure would present fewer complex issues.

IV.     SECTION 1 CONSPIRACY

All plaintiffs here have alleged violations of Section 1 of the Sherman Act. That is, they have alleged that defendants engaged in a conspiracy to restrain trade.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . ."  15 U.S.C. § 1.  While this language casts a wide net, case law has established that only "unreasonable" restraints of trade are unlawful.  Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 61 (2d Cir. 2012).  A unilateral or independent business decision that results in a restraint of trade is not a violation of § 1.  Copperweld Corp. v. Ind. Tube Corp., 467 U.S. 752, 775 (1984).  To run afoul of § 1, the unreasonable restraint must result from agreement between two or more entities.  See Twombly, 550 U.S. at 553-54; Theatre Enters., Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540 (1954); Anderson News, 680 F.3d at 182. Accordingly, plaintiffs must plausibly allege that two or more defendants conspired to unreasonably restrain trade.  It is not enough that trade was impacted by unilateral business decisions.

In analyzing restraints of trade, courts have typically examined the participants' respective market roles: are they competitors, or are they in a supplier/distributor relationship?  Market roles may be suggestive of whether

coordinated conduct is designed to interfere with the competitive process or when competitors have dispensed with normal independent decision making.

In this regard, agreements that fall within the scope of § 1 are descriptive of such roles and characterized as either "horizontal" or "vertical."  See United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972); Anderson News, 680 F.3d at 182.  A horizontal agreement is an "agreement between competitors at the same level of the market structure," while a vertical agreement is a "combination[] of persons at different levels of the market structure."  Topco, 405 U.S. at 608.

A.     Per Se or Rule of Reason Analysis

Plaintiffs allege that defendants have engaged in per se violations of § 1 of the Sherman Act.   It is unnecessary for a plaintiff to make detailed allegations regarding a relevant market when the violation is "per se" unlawful.  Put bluntly, the pleading burden as to market definition is lower for per se violations of § 1. Courts analyze the legality of restraints under two frameworks: the "per se" rule or the "rule of reason."  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); see also Paycom, 467 F.3d at 289.[33]  Both the per se rule and the rule of reason are used to assist a court or fact-finder in forming a judgment about the competitive significance of a challenged restraint.  NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 103 (1984).

---

[33] Plaintiffs argue that it is premature and unnecessary for this Court to resolve whether a rule of reason or per se analysis should be applied in these cases.  That is undoubtedly true.  But resolution of the issue for fact-finding purposes is separate from ensuring that there are sufficient allegations to support the claims themselves.  In this regard, when a rule of reason analysis is potentially (and, here, likely) required, plaintiffs have an obligation to allege a relevant market.  This of course allows the parties to conduct appropriate discovery.

Most antitrust claims are evaluated under the rule of reason.  <u>Paycom</u>, 467 F.3d at 289.  Most vertical agreements and mixed agreements (those with both horizontal and vertical aspects) are analyzed in this manner.  The "rule of reason" is the standard used to assess whether restraints not unlawful per se nonetheless violate § 1 of the Sherman Act.  <u>See</u> <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 885-86 (2007).  A rule of reason analysis requires a court to weigh all of the circumstances surrounding the challenged conduct to determine whether the alleged restraint is unreasonable, taking into account the nature of the specific business, the industry, the restraint's history, and whether the defendant has market power.  <u>Id.</u>; <u>see also</u> <u>Gatt</u>, 711 F.3d at 75 n.8.[34]

The purpose of a rule of reason analysis is to enable a finder of fact to first determine whether a restraint imposes an unreasonable restraint on competition.  <u>State Oil</u>, 522 U.S. at 10; <u>Paycom</u>, 467 F.3d at 290.  As a threshold matter, a plaintiff must allege the plausible existence of a combination that causes an unreasonable restraint of trade.  The burden shifts to defendant to present the procompetitive value of the practice; if defendant carries that burden, then the burden shifts back to plaintiff, who must show that the same procompetitive effect could have been achieved by less restrictive means.  <u>Virgin Atl. Airways Ltd., v. British Airways PLC</u>, 257 F.3d 256, 264 (2d Cir. 2001).  Under a rule of reason

---

[34] "In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim."  <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 206 (2d Cir. 2001); <u>K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.</u>, 61 F.3d 123, 129 (2d Cir. 1995) ("If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further showing of market power.").

analysis, plaintiff can only recover if the challenged conduct reduced competition, thereby harming consumers.  Id.

In contrast to the typical analysis of vertical, and mixed horizontal and vertical agreements, horizontal agreements between competitors are considered the most potentially pernicious and are generally treated as "per se" unlawful.  See, e.g., Topco, 405 U.S. at 608, 611 (noting that horizontal agreements to engage in price fixing or market allocation are per se illegal under § 1 of the Sherman Act). The per se rule is a presumption of unreasonableness based on "'business certainty and litigation efficiency.'"  Atl. Richfield, 495 U.S. at 342 (quoting Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982)).  "It represents a 'longstanding judgment that the prohibited practices by their nature have a substantial potential for impact on competition.'"  Id. (quoting FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 433 (1990) (internal quotation marks omitted).  Horizontal price fixing—that is, price fixing by competitors in the same market—is per se illegal.  United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223-24 (1940); Todd, 275 F.3d at 198.

To apply the per se rule, a court generally must have experience with the type of restraint at issue in order to predict with confidence that it would be condemned under the rule of reason; only when such predictability is present should the court apply the per se rule.  Maricopa County Med. Soc'y, 457 U.S. at 344.  The importance of this requirement cannot be overstated.  The point of choosing between a per se or rule of reason framework is, in large part, driven by a desire to

maximize litigation efficiencies and reduce litigation and evidentiary burdens where clearly appropriate. It simply takes less time and fewer resources to analyze antitrust claims under a per se framework. Applying a per se framework is an acknowledgement of a court's familiarity with a type of restraint—such familiarity that it is assumed that no business rationale would counterbalance its anticompetitive nature. The rule of reason applies when a court does not have or should not have such confidence in its assessment of the challenged restraint. The rule of reason is a judicial recognition that businesses change and entire industries transform in unforeseen ways that call for new answers to old questions. As time goes on, the roles of market participants may become fluid, and predictability may consequently diminish. In order not to unduly interfere with the functioning of an efficient market, the natural development of an industry, and healthy competitive processes, courts should apply the per se rule only when truly certain of that it applies to the conduct at hand. Without that certainty, courts risk providing a solution in search of a problem, and might "fix" problems that Congress never intended to be remedied by the federal antitrust laws.

A vertical restraint is not generally illegal per se unless it includes some agreement on price or price levels. Bus. Elecs., 485 U.S. at 735-36. "Vertical restraints that do not involve price-fixing are generally judged under the 'rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition.'" Anderson News, 680 F.3d at 183 (quoting Monsanto Co. v. Spray-Rite

Serv. Corp., 465 U.S. 752, 761 (1984)).  "Any combination which tampers with price structures is engaged in an unlawful activity."  Socony-Vacuum, 310 U.S. at 221. Group efforts to raise, lower, or stabilize prices directly interfere with the free play of market forces and constitute unlawful price fixing.  Id.  "Where the means for price fixing are purchases or sales of the commodity in a market operation or, as here, purchases of a part of the supply of the commodity for the purpose of keeping it from having a depressive effect on the markets, such power may be found to exist though the combination does not control a substantial part of the commodity."  Id. at 224.

B.    Allegations of Concerted Action

In order for plaintiffs plausibly to allege coordinated conduct in violation of § 1, they must allege plausible allegations of concerted action.  Allegations merely consistent with unilateral action are insufficient.  See Twombly, 550 U.S. at 556-57; Monsanto, 465 U.S. at 761; Copperweld, 467 U.S. at 768; Anderson News, 680 F.3d at 183.  "[T]here is a basic distinction between concerted and independent action . . . ."  Monsanto, 465 U.S. at 761.  Allegations must support a unity of purpose, common design and understanding, or a meeting of the minds in an unlawful agreement.  Cf. Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946).

Plaintiffs need not, however, plead direct evidence of conspiracy.  See Anderson News, 680 F.3d at 183.  Conspiracies are rarely evidenced by explicit agreements—they must nearly always be proven through "'inferences that may fairly be drawn from the behavior of the alleged conspirators.'"  Id. (quoting

Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir.

1976); see also Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136-37

(2d Cir. 2013) (in many antitrust cases, "smoking gun" evidence can be hard to come

by, and thus a complaint must set forth sufficient circumstantial facts supporting

an inference of conspiracy).

At the pleading stage, plaintiffs here must allege sufficient facts to support

(not "prove" or even "demonstrate") a plausible inference that defendants reached

an agreement; a complaint merely alleging parallel conduct alone is not sustainable.

Twombly, 550 U.S. at 556; see also Mayor & City Council of Balt., 709 F.3d at 135-

36 ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage.");

Anderson News, 680 F.3d at 184.  In cases in which there is obvious parallel

conduct and the question is whether it is the product of coordinated or unilateral

decision making, a plaintiff must allege additional facts that point toward a meeting

of the minds.  Twombly, 550 U.S. at 557.

Even conscious parallelism in pricing among competitors is not itself

unlawful.  Id. at 553-54; In re Publ'n Paper, 690 F.3d at 62.  By engaging in

conscious parallelism, firms in a concentrated market may lawfully recognize

shared economic interests and, in effect, lawfully market power by setting their

prices at a profit maximizing, supra-competitive level.  Brooke Grp. Ltd. v. Brown &

Williamson Tobacco Corp., 509 U.S. 209, 227-28 (1993).  Conscious parallelism

alone is consistent with both lawful independent conduct and an unlawful

conspiracy; the mere fact of even conscious parallelism is, therefore, insufficient to

establish an antitrust violation.  In re Publ'n Paper, 690 F.3d at 62.  "The

inadequacy of showing parallel conduct or interdependence, without more, mirrors

the ambiguity of the behavior: consistent with conspiracy, but just as much in line

with a wide swath of rational and competitive business strategy unilaterally

prompted by common perceptions of the market."  Twombly, 550 U.S. at 554.

   "Plus-factors" may provide the additional circumstances necessary to permit

a fact-finder to infer a conspiracy.  Examples of plus-factors are a common motive to

conspire, actions taken against economic self-interest, and a high level of inter-firm

communications.  In re Publ'n Paper, 690 F.3d at 62; Apex Oil Co. v. DiMauro, 822

F.2d 246, 253-54 (2d Cir. 1987) (suggesting that allegations that are consistent only

with market actors who are aware of and anticipate similar actions by competitors

would be insufficient to support the existence of a tacit agreement).

   Twombly is a particularly instructive case.  There, plaintiffs alleged that the

parallel conduct of defendant telecommunications companies evidenced an unlawful

conspiracy.  550 U.S. at 548-51.  The Supreme Court found that defendants' parallel

conduct, even when plainly unfavorable to competition, did not state an antitrust

claim; that is, such conduct, absent some factual context suggesting agreement, as

distinct from identical, independent action, was insufficient to state a claim.  Id. at

548-49.  The Court stated:

> Without more, parallel conduct does not suggest
> conspiracy, and a conclusory allegation of agreement at
> some unidentified point does not supply facts adequate to
> show illegality.  Hence, when allegations of parallel
> conduct are set out in order to make a § 1 claim, they
> must be placed in a context that raises a suggestion of a

> preceding agreement, not merely parallel conduct that
> could just as well be independent action.

Id. at 556-57.

In Twombly, plaintiffs alleged that the incumbent telephone companies had engaged in parallel conduct and agreed to refrain from competing against one another. Id. at 550. Plaintiffs argued that such an agreement could be inferred from defendants' failure meaningfully to pursue "attractive business opportunit[ies]" in markets where they possessed "substantial competitive advantages." Id. at 551 (alteration in original). In sum, plaintiffs' allegations amounted to "some illegal agreement may have taken place between unspecified persons at different [incumbent telephone companies] . . . at some point over seven years . . . ." Id. at 560 n.6. Plaintiffs' pleadings also "mentioned no specific time, place, or person involved in the alleged conspiracies." Id. at 565 n.10.

Anderson News presents a contrasting set of allegations. A magazine wholesaler sued defendants for a violation of § 1, on the basis that they had conspired to divide the market and drive it out of business. 680 F.3d at 170-72. There, plaintiff alleged that ten specific executives engaged in meetings and communications at specific dates and times to plan an illegal concerted boycott. Id. at 187-89. Plaintiff also alleged that some of the executives made statements that "may plausibly be interpreted as evincing their agreement to attempt to eliminate [plaintiffs] as wholesalers in the single-copy magazine market and to divide that market . . . ." Id. at 187. Plaintiff also recited specific telephone calls and emails circumstantially supporting a conspiratorial agreement. Id. at 188.

More recently, in <u>Mayor & City Council of Baltimore</u>, the Second Circuit reviewed whether allegations of certain parallel conduct in the auction rate securities market were sufficient to support a § 1 conspiracy.  Plaintiffs alleged that defendant banks conspired with each other to simultaneously stop buying auction rate securities for their own proprietary accounts, causing auctions to fail and the market to collapse.  709 F.3d at 131-32.  The Court found that the allegations supported only parallel conduct.  <u>Id.</u> at 138.

The Court began by noting that the crucial question in a Section 1 case is whether the challenged conduct stems from an agreement, and that the existence of such an agreement is a legal conclusion to be determined by the court—and not a factual allegation.  <u>Id.</u> at 135-36 (citing <u>Starr</u>, 592 F.3d at 319 n.2 (2d Cir. 2010)).  The Court further stated that plaintiffs must allege additional circumstances supporting an inference of conspiracy; merely alleging that parallel conduct occurred is insufficient to overcome a motion to dismiss because it would "risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy."  <u>Id.</u> at 136-37.  The Court found that defendants' alleged actions—an en masse flight from a collapsing market in which they had significant downside exposure—made perfect sense in light of their business interests.  <u>Id.</u> at 138.  This made the case different from <u>Starr</u>, in which specific allegations supporting an inference that defendants' parallel conduct was against their own economic self-interest led the Second Circuit to conclude that plaintiffs

had plausibly alleged an antitrust conspiracy.  See id. at 138-39 (citing Starr, 592

F.3d at 327.)  Accordingly, the Court affirmed defendants' motion to dismiss.  Id. at

140.

C.     Discussion of Plaintiffs' § 1 Claims

In order to make out their § 1 conspiracy claim, plaintiffs must plausibly

allege facts that support (1) an agreement amongst the warehouse defendants to

restrain load-outs of aluminum (not the price of aluminum), and (2) an agreement

between the trader defendants and the warehouse defendants to effectuate this

scheme.  Plaintiffs have failed to do so.

Certain facts alleged in all of the complaints underpin plaintiffs' § 1

conspiracy claim:  over just a few years, stocks of aluminum in the Detroit area

increased and load-outs in that area decreased substantially, causally increasing

storage costs and the Midwest Premium.  Plaintiffs, whose purchases of aluminum

in some way incorporated the Midwest Premium, thus paid more than they

otherwise would have.  Put simply, according to plaintiffs, the owners of aluminum

stocks conspired to obtain and increase already high levels of inventory, and the

warehouses assisted by delaying load-outs and not increasing load-out rates.

Plaintiffs further allege that the trader defendants enhanced delays with high

levels of warrant cancellations.  The LME's role was to allow all of this to happen,

obtaining greater revenues from storage fees as a result (also, in part, leading to an

inflated value for the LME itself).  Plaintiffs allege that defendants' behavior

constituted an output restraint which led directly to an increase in the Midwest Premium, the classic example of anticompetitive conduct that is illegal per se.

The simplicity of this narrative masks the complexity of the market structures plaintiffs also allege, and that in light of those structures, efficient market behavior supports defendants' actions as logically independent and unilateral.  Frankly put, the economics of the alleged conspiracy as pled do not work.  The allegations, measured against fundamental economic theory, do not contain sufficient "factual content that allows the court to draw the reasonable inference" that defendants engaged in an anticompetitive conspiracy.  Iqbal, 556 U.S. at 678.  In light of these economics, the factual allegations suggest only "the mere possibility of misconduct," Iqbal, 556 U.S. at 679, and do not "nudge[] [plaintiffs'] claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570.

In this regard, the Court is not choosing between competing plausible inferences.  Rather, the Court's examination of each of the complaints leads to the following: all plaintiffs have set forth sufficient facts to support that the Midwest Premium increased; they have alleged that this occurred as a result of load-out delays; and they have alleged that they have paid more as a result.  But the allegations tell a story consistent with market-driven behavior by traders and warehouses rather than unlawful conspiracy.  It does not make economic sense— that is, it is not economically plausible without more—for defendants to have

conspired to achieve an end that the law of supply and demand, combined with the passage of time, would have itself achieved in the absence of a conspiracy.

This is particularly so when it is entirely unclear how the rise in the Midwest Premium—a price component added after defendants' involvement has ceased—could or would have benefitted defendants. Defendants do not compete on the price of aluminum, because they do not sell it; rather, they trade warrants or sell storage space, and compete on the rates they charge for aluminum storage, or on load-out efficiency, or on location—none of which have anything to do with the Midwest Premium.

This breaks into the following pieces:

Plaintiffs have plausibly recited the overall mechanics of raising the Midwest Premium: stockpiling aluminum and then using the built-up inventory to delay load-outs, thereby raising the storage costs that are a component of the Midwest Premium. For this to be a plausible outcome of an unlawful conspiracy, defendants must somehow have benefitted—otherwise it does not make sense. That is, defendants must have stood to benefit in some way from collective action.

Plaintiffs allege that defendants bought, stockpiled and held in order to take advantage of an arbitrage opportunity. (FLP Compl. ¶ 355.) That is, plaintiffs acknowledge that there was an economic advantage to buying and holding due to the "contango" that resulted from the economic recession. (Id. ¶¶ 390-92.) But plaintiffs also acknowledge the vast majority of trading activity relating to aluminum stored in LME warehouses takes place among financial entities, rather

than users of aluminum.  (See Mag Compl. ¶ 24(a).)  Thus, plaintiffs have not alleged any facts suggesting that the defendant <u>traders</u> would have had any rational business motive to sell to <u>users</u> of aluminum before or after the expected price rise had occurred.  There are no alleged customer relationships between the traders and the aluminum users.  Accordingly, even if the alleged conspiracy results in harm to aluminum users, it is therefore not in actuality "in restraint of trade."

Based on plaintiffs' own factual allegations, the arbitrage opportunity resulted from market forces:  it made sense for traders to obtain a futures contract at a low price now, with the bet that the price would increase as the country recovered from the recession.  The defendant traders are alleged to have taken one side of a trading position—which means that someone else took the other.  But plaintiffs do not allege that they ever took the other side of such a trade.

In this context, a buy/hold strategy is perfectly consistent with letting market forces—particularly in the context of an anticipated economic recovery—do the work of creating higher prices.  Higher prices, in this context, equating with a higher futures price of aluminum.  In such an economic context, supply and demand are sufficient to accomplish this.  In this regard, too, a profit-driven desire to own more of a good that is cheap now and anticipated to become more expensive later is consistent with lawful competitive behavior.  Thus far, profit-maximizing behavior would suggest precisely that which is alleged to have occurred here: a trading firms' accumulation of ownership positions in aluminum, and holding that aluminum to increase expected profits.

Important to the economics are plaintiffs' allegations that stocks of aluminum and load-out delays were already increasing and the Midwest Premium was already rising before the acquisitions of the warehouses by the trader defendants in 2010. (See FLP Compl. ¶¶ 14(c), 16, 31, 161; Mag Compl. ¶¶ 52, 71).  Therefore, if plaintiffs allege the conspiracy existed before 2010, the warehouse defendants would have had to have separately conspired with each other to create load-out delays.  But if the warehouse defendants were creating such load-out delays, what reasonable motivation would Goldman, JP Morgan, and Glencore have had to acquire them?  To get them to agree to do that which they were already doing?  And at significant cost?  Acquiring the warehouse defendants would make more sense if they were not prior participants and had to be acquired in order to ensure their participation.  Plaintiffs' allegations of a conspiracy between the trader defendants and the warehouse defendants simply do not square with the increases in aluminum stocks, load-out delays, and the Midwest Premium before 2010.

But who conspired with whom is an issue that extends beyond this temporal issue.  Based on plaintiffs' allegations, the number of conspiring entities is significant—and given the identity of those entities, the number of employees and potentially active co-conspirators within this group is large and geographically dispersed.  Notably, plaintiffs also do not allege that the warehouse defendants, the LME or the trader defendants compete in a particular market.  While the law does not require particularized allegations of the "who, what, when and where" of a conspiracy, it does require more than generalized statements that a conspiracy

existed or that the defendants agreed to engage in it.  See Starr, 592 F.3d at 321,

325; Port Dock, 507 F.3d at 121.

The conspiracy plaintiffs allege consists of three groups of actors, none of

which are alleged to compete with one another:  the LME, the trader defendants,

and the warehouse defendants.  Plaintiffs allege that at least some of the

defendants were on one or more LME committees; presumably this is the basis for

some amount of the allegedly conspiratorial communication (one of plaintiffs'

alleged plus-factors).  But it is unclear who was on any such committee when, and

how the composition or decision-making changed when the trader defendants

acquired the warehouses in 2010.  This is particularly significant in light of the pre-

existing facts (pre-conspiracy) of increasing aluminum stocks, delays and Midwest

Premium. Thus, generalized allegations of participation on LME committees are

alone insufficient.

Further, plaintiffs allege that the trader defendants were legally separate

from the warehouse defendants.  (See, e.g., FLP Compl. ¶¶ 116-23, 131-41).[35]  There

is no basis for an assumption that the mere fact of affiliation necessarily means that

individuals employed by Goldman Sachs would have communicated with

individuals employed by Metro to effect a conspiratorial agreement, nor is there any

allegation that such communication occurred.  That is also true with respect to JP

Morgan and Henry Bath,[36] and for Glencore and PMUSA.  Similarly, that

---

[35] This legal separateness is supported by the defendants' Rule 7.1 corporate disclosure statements.
(See ECF Nos. 55, 120, 123, 124, 261, 262, 324, 507, 519.)

Goldman, JP Morgan and Glencore may have had an ownership interest in the LME does not lead to a plausible inference of communication between them, or between them and the warehouse defendants before or after 2010.

In addition, however, plaintiffs allege that the LME oversees certain aspects of the warehouses. The LME does not itself own any aluminum or warehouses, but instead oversees a global network of warehouses. (Mag Compl. ¶ 24(e).) The LME has agreements with the owners of these warehouses. (FLP Compl. ¶ 285). This is a vertical relationship: the LME has contracted with the warehouses for services. Separately, the warehouses would have had to have conspired with one another, and somehow, the trader defendants would have needed to have conspired with them. It is unclear whether plaintiffs are alleging that by virtue of common ownership, Goldman and Metro can be assumed to have conspired, but if that is so, did the conspiracy between unaffiliated firms occur between the trading arms (that is, did Goldman and its affiliates conspire with JP Morgan and Glencore and their affiliates?) or did the warehouse defendants conspire and bring along the trading arm of the financial-firm defendant with which they were affiliated?

        1.   <u>Rule of Reason or Per Se</u>

Plaintiffs claim to have alleged a horizontal conspiracy in restraint of trade, but they do not allege that defendant warehouses, the LME or the trader

---

[36] The statement by Blythe Masters cited by plaintiffs in their briefs (Agfa Compl. ¶ 56; Comm. Compl. ¶ 66; Cons. Compl. ¶ 72; FLP Compl. ¶ 379; Mag Compl. ¶ 55) suggests only that JP Morgan's ownership of Henry Bath gave it access to more information and data on the physical aluminum market. Standing alone, it does not provide evidence of anticompetitive conduct in the warehouse storage market, nor does it provide any evidence of communications between Henry Bath and JP Morgan for the purpose of effectuating a conspiratorial agreement.

defendants are horizontal competitors.  In the absence of the latter, the former cannot be correct.  Further, while the allegedly anticompetitive conduct affected the price of aluminum, that conduct only affected one of several components of the price of primary aluminum (specifically, the Midwest Premium).  Moreover, the defendants are not sellers of primary aluminum. Accordingly, their conduct cannot amount to "price fixing."  The alleged restraint of trade is therefore not one with which this Court has experience, and it would be inappropriate to apply the per se rule.

A rule of reason analysis requires an inquiry into market conditions.  Leegin, 551 U.S. at 885-86.  Plaintiffs must therefore allege a plausible market in which defendants restrained trade.  But plaintiffs have failed to allege such facts.

Rather, plaintiffs have alleged numerous potential "relevant markets." However, there are no allegations supporting who the players are in such markets or how defendants' conduct caused unreasonable restraints of trade in those specific markets.  How does the defendants' conduct restrain trade—and what trade?  How does it decrease competition and in what market?  Does it decrease competition in a market for LME-warehoused aluminum or in a market for warrants and futures contracts in LME-warehoused aluminum, both or neither?

2.    Parallel Conduct

Plaintiffs argue that they have alleged a plausible horizontal conspiracy supported by allegations of parallel conduct and plus-factors.  This Court disagrees.

Defendants allege that plaintiffs engaged in the following parallel conduct: that the trader defendants cancelled warrants in parallel (leading to increased aluminum inventories at LME warehouses), and the warehouse defendants delayed load-outs in parallel.[37]  But even conscious parallelism is insufficient to support allegations of conspiracy.  <u>Twombly</u>, 550 U.S. at 553-54; <u>In re Publ'n Paper</u>, 690 F.3d at 62.  And while plus-factors such as a common motive to conspire, actions taken against economic self-interest, or a high level of inter-firm communications may provide the additional circumstances necessary to permit a fact-finder to infer a conspiracy, <u>In re Publ'n Paper</u>, 690 F.3d at 62, plaintiffs have failed to allege such plus-factors here.

Plaintiffs allege as a plus-factor that defendants' alleged conduct was against their self-interest.  Economically, this is incorrect.  In fact, it was entirely consistent with their self-interest.  Plaintiffs' allegations regarding the recession, the contango, and the resulting arbitrage opportunity support sensible parallelism—whether conscious or not —by the trader defendants.  The way that defendants acquired, held, and cancelled warrants simply furthered this arbitrage opportunity, on which it was in each's individual economic self-interest to capitalize.

Similarly, to the extent the warehouse defendants could have sped up load-outs and did not, or even delayed them, plaintiffs again allege that this led to higher storage revenues.  But the warehouse plaintiffs were, after all, in the business of collecting rent for storage; and the longer the storage, the higher the rent.  In this

---

[37] Plaintiffs do not allege why the cancellation of warrants would not alone lead to delays in load-outs as the warehouses struggled to keep up.

sense it would be in the warehouse defendants' economic self-interest to turn a minimum load-out rule into a maximum, so long as they were not losing business due to their slow load-out times. Indeed, this point is further supported by plaintiffs' allegations that warehouse inventories began increasing in 2009, before the trader defendants even acquired the warehouse defendants, as these allegations suggest that the warehouse defendants were motivated to act in this manner of their own accord.

Plaintiffs also cite Metro's incentive payments to aluminum producers along with the fact that the warehouses abided by what the plaintiffs themselves acknowledge was a per-city—as opposed to a per warehouse—rule, and a "no net load-in" rule, as further evidence of plus-factors. Yet these actions are, on their face, perfectly consistent with the warehouses acting in their economic self-interest. There is no allegation that any of the rules were imposed during a period or in a manner suggestive of conspiracy. Further, abiding by these rules in a manner which maximized stocks and storage duration was clearly within the warehouse defendants' economic self-interest. There is also no allegation that the incentive payments were not recovered in expected storage fees; indeed, plaintiffs' allegations regarding the duration of storage supports the opposite conclusion.

Finally, there are insufficient allegations to support inter-firm communications. Committee membership and part-ownership of the LME is, standing alone, not enough. It is no more than suggestive of potential opportunity to communicate, and the Second Circuit has held that "[t]he mere opportunity to

conspire does not by itself support the inference that . . . an illegal combination actually occurred." <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 545 (2d Cir. 1993).  And there are no particular facts as to who was on a particular LME committee at a particular time that a rule change was announced or at which suspect action by committee members or others within their control occurred.  The FLPs allege that certain defendants had representatives on the Warehouse Committee—but that committee is not alleged to have standalone decision-making abilities, or even to be particularly influential.  Plaintiffs allege only that it advised the executive committee (<u>see</u> FLP Compl. ¶ 5(b)), and there is no allegation that any defendant was ever a member of the executive committee. Here, plaintiffs' allegations again amount only to a potentially opportunity to communicate, which is nothing more than a bare assertion incapable of supporting a plus-factor on its own.

Finally, plaintiffs allege the existence of various inquiries and investigations into defendants' conduct.  In <u>Starr</u>, such investigations were found supportive of conspiracy in the context of specific additional facts and circumstances separately supporting conspiracy.  <u>See</u> 592 F.3d at 323-25.  But there was no suggestion in <u>Starr</u> that inquiries or investigations alone can plausibly support an alleged § 1 conspiracy, nor has there been in any other binding case law.

Plaintiffs allege that defendants conspired and agreed to effect an anti-competitive output restraint that caused artificially inflated prices.  As discussed

above, in the absence of sufficient allegations, these are conclusory statements insufficient to support plaintiffs' claims.

V.    MONOPOLIZATION CLAIMS

Section 2 of the Sherman Act addresses both the actions of a single firm to monopolize or to attempt to monopolize, and conspiracies and combinations to monopolize.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454 (1993).  The conduct of a single firm violates § 2 only when the firm acts to maintain a monopoly or threatens actual monopolization; unilateral conduct does not otherwise violate § 2.  See id. at 454-55.

To state a claim under § 2, a plaintiff must allege plausible facts that defendant possesses market power (sometimes referred to as "monopoly power") in a relevant market, and the willful acquisition or maintenance of such power as "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).  A firm possesses market power when it has the ability to raise price by restricting output.  PepsiCo., 315 F.3d at 107.

In the absence of direct measurements of a defendant's ability to control prices or exclude competition, its market power is determined by reference to the "area of effective competition," which is determined with reference to a specific market.  Id. at 108.  For this reason, monopolization claims generally start with defining relevant product and geographic markets.  See, e.g., id. at 105, 108;

AD/SAT v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999).  "'For a monopoly claim to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the elasticity of demand, and it must be plausible." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) (quotation omitted).

A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); Todd, 275 F.3d at 200.  Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes. PepsiCo, 315 F.3d at 105.  Cases are subject to dismissal when plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way. See Todd, 275 F.3d at 200 nn.3-4 (collecting cases).

For instance, two products may to some degree be interchangeable substitutes and should therefore be included within the same market.  Such a situation occurs when the products have sufficiently high cross-elasticities of demand.  A sufficiently high cross-elasticity of demand exists when consumers would respond to a slight increase in price of one product by switching to another. Todd, 275 F.3d at 201-02; AD/SAT, 181 F.3d at 227.  The question reduces to whether a hypothetical cartel would be unable to increase prices due to the ability

and willingness of consumers to switch to other products.  See Todd, 275 F.3d at 202; AD/SAT, 181 F.3d at 228.

The court must also determine the boundaries of a relevant geographic market, that is, its area of effective competition.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1967); United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir. 1995).  The geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product.  Tampa Elec., 365 U.S. at 327.  A geographic market is determined by "how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location."  Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d Cir. 2006).

Defining a relevant market is not always required to determine the presence or absence of monopoly power, as monopoly power may be proven directly by evidence of the control of prices or the exclusion of competition.  PepsiCo, 315 F.3d at 107; Todd, 275 F.3d at 206 ("If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power."); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998) (market power "may be proven directly by evidence of the control of prices").  Alternatively, monopoly power may be shown by one firm's large percentage share of a defined relevant market.  PepsiCo, 315 F.3d at 107; Tops, 142 F.3d at 98.

However, in most cases this type of direct evidence is absent and defining a relevant market acts as a surrogate for market power.  PepsiCo, 315 F.3d 101 at 107.

While "defining" a relevant market may not always be required, that does not eliminate the requirement that plaintiffs reference a particular market. Heerwagen, 435 F.3d at 229 ("[P]laintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition.").

A.    Attempted Monopolization

To state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant has engaged in predatory or anticompetitive conduct, with a specific intent to monopolize, and a dangerous probability of success.  See Spectrum Sports, 506 U.S. at 456; PepsiCo., 315 F.3d at 105; Tops, 142 F.3d at 99-100.

B.    Essential Facility

The FLPs have asserted that the LME warehouses in the Detroit area are an "essential facility."  (FLP Compl. ¶ 303.)  The Supreme Court has never recognized such a standalone claim.  See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 410-11 (2004).  But certain lower courts—including the Second Circuit—have posited that a party may violate § 2 by denying another party access to an "essential facility."  See, e.g., Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 569-70 (2d Cir. 1990).  To sustain such a claim, plaintiffs must allege plausible allegations that "an alternative to the facility is not feasible."

Id. at 570.  In fact, this is akin to a type of monopoly maintenance claim.  The

Supreme Court also suggested in Trinko that an essential facility claim "should be

denied where a state or federal agency has effective power to compel sharing and to

regulate its scope and terms."  540 U.S. at 411 (quoting P. Areeda & H. Hovenkamp,

Antitrust Law 150 ¶ 773e (2003 Supp.)).

The principle behind prohibiting denial of an essential facility to a competitor

is to prevent a monopolist in a relevant market from using its power to inhibit

competition in another market.  Twin Labs., 900 F.2d at 568.  Most essential

facilities are natural monopolies and the like (such as electric power lines, a

basketball arena, a football stadium, and a ski mountain.)  Id. at 569 (collecting

cases).

C.    Discussion of the § 2 Claims

As set forth above, plaintiffs allege a number of markets.  However, no

plaintiff has alleged the necessary facts to support any plausible product or

geographic markets.  No complaint cites facts regarding the interchangeability of

products.  For instance, if plaintiffs could have switched to a lower-cost polymer

instead of aluminum, they might have avoided the increases in the Midwest

Premium.  The binding nature of bilateral contracts with third parties referencing

the Midwest Premium would be irrelevant to this product market, but might be

relevant to a product market defined to include such contracts.  Simply naming

possible markets, even when combined with general allegations of an ability to

increase prices, is insufficient.

Plaintiffs argue that they need not allege a relevant market since they have alleged direct evidence of monopoly power, namely, defendants' ability to increase price. But in each complaint with a monopoly allegation (that is, all but Mag's and Agfa's), this argument is based on hundreds of paragraphs of allegations that combine the conduct of many separate actors. The law does not recognize a "shared monopoly." See FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019 (2d Cir. 1976) (allegations of a "shared monopoly" amount to no more than a "§ 1 claim under another name"); RxUSA Wholesale Inc. v. Alcon Labs., 391 Fed. App'x 59, 61 (2d Cir. 2010) (same). The only entity as to whom there are allegations of monopoly power that are supported in part would be Metro—but while Metro controlled a certain percentage of warehouse space, it is not alleged to have itself controlled the warrants and futures contracts that determined when aluminum went into and took a place in line to get out of its warehouses. Thus, even Metro's arguable power as alleged does not translate into a power to raise the Midwest Premium.

There are no factually supported allegations that Goldman Sachs (the financial entity) has market power in some cognizable market, or that any of the other financial-firm or warehouse entities do.

Even as to Metro, however, the allegations are insufficient. There is no allegation that Metro owns any aluminum, can control when warrants are cancelled, whether they are moved to an LME-approved warehouse or a non-LME warehouse, or where that warehouse is located. Thus, the plaintiffs' allegations do

not support the ability of Metro alone to raise price.  Accordingly, there are insufficient allegations of direct market power.

This, then, leads to a requirement that plaintiffs allege the necessary elements of a relevant antitrust market, specifically, reasonable interchangeability amongst specific products and a geographic area of effective competition.  Plaintiffs have failed to meet this requirement.  As set forth above in the § 1 rule of reason analysis, simply naming a potential market is only the first step in defining the relevant market.

This exercise is made all the more complicated and necessary by plaintiffs' specific allegations.  Plaintiffs allege that the U.S. is a net importer of aluminum. (See FLP Compl. ¶ 303; Mag Compl. ¶¶ 33-34).  Thus, aluminum regularly comes into the U.S. from overseas.  There are insufficient allegations as to where this product enters the U.S. and its distributional reach for the Court to draw any conclusions as to likely geographic boundaries of the relevant market.

It may also be the case that the product market here is somehow defined with reference not to aluminum itself, but in terms of contractual arrangements referencing the Midwest Premium as a price component.  If that is the case, the product and geographic boundaries of the relevant market might be determined by reference to the terms of these contracts.  But plaintiffs have made no specific allegations to this effect.

In short, plaintiffs' monopolization and attempted monopolization claims as to all defendants fail due to the insufficiency of allegations regarding a relevant market.

Failing to have plausibly alleged a relevant market also requires dismissal of any essential facilities claim. As an initial matter, it is unclear whether plaintiffs intend their use of the term "essential facilities" to constitute a standalone basis for a claim. As alleged, it cannot. The Supreme Court has never recognized such a claim. See Trinko, 540 U.S. at 410-11. In terms of a species of monopolization claim, it similarly requires allegations of a relevant market. In addition, at the most basic level, it also requires allegations supporting why the facility is, in fact, essential. Plaintiffs' claims in this regard are conclusory, and must be rejected.

## VI.    STATE LAW CLAIMS

Plaintiffs' state law claims rely upon the same allegations of conspiracy, monopolization and unfair conduct as their antitrust claims. For the same reasons, none survive.

In addition, plaintiffs' large array of statutory claims fail for the additional reason that plaintiffs have failed to state how defendants' conduct violated any particular statute. Instead, the statutes are listed—and the Court and the defendants are then to determine how and why the alleged conduct violated a particular statute. This is insufficient to meet even the basic requirements of Rule 8. Iqbal, 556 U.S. at 678 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do.").

Further, every state statute requires a direct or indirect allegation supporting proximate cause.  Cf. Lexmark Int't Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1390 (2014) (a court should generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of that statute).  Plaintiffs here have failed to include any specific allegations of proximate cause.

VII.    SEPARATE MOTIONS

In addition to the arguments that plaintiffs lack standing and have failed to state a claim, Henry Bath, Hong Kong Exchanges and Clearing Limited, Glencore, and LME Holdings have separately moved to dismiss for lack of personal jurisdiction.  (ECF Nos. 327, 447, 503, 511.)  In light of the Court's determinations that dismissal is appropriate on the basis of both standing and failure to state a claim, the Court need not and does not reach this additional argument.  If plaintiffs seek to amend, they should take into account the arguments raised regarding personal jurisdiction.  Should any proposed amendment adequately plead standing and a claim, the Court will then reach the personal jurisdiction arguments in light of any amended allegations.   Accordingly, these motions are DENIED as moot.

Rule 8 provides that a defendant is entitled to notice of the claims brought against him; Twombly makes clear that at the pleading stage in this antitrust case, that means that each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.  See Twombly, 550 U.S. at 557-58.  Mere generalizations as to any particular defendant—or even defendants as a

group—are insufficient. See Twombly, 550 U.S. at 555-56. The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company—does not alter this pleading requirement. In the absence of allegations that corporate formalities have been ignored, courts appropriately and routinely adhere to legal separateness. See, e.g., De Letelier v. Republic of Chile, 748 F.2d 790, 794-95 (2d Cir. 1984). Here, this means that grouping defendants who are affiliated together into a single name (e.g. "JP Morgan" or "Glencore" to encompass affiliated trading and warehouse operations) for pleading purposes does not resolve this larger issue. Plaintiffs must be able separately to state a claim against each and every defendant joined in this lawsuit.

As to certain defendants here, that has clearly not occurred. Plaintiffs' allegations as to a number of defendants, including without limitation, LME Holdings, Henry Bath, Henry Bath LLC, Hong Kong Exchanges and Clearing Limited, and Glencore are sparse to the point of near non-existence or are grouped together with specific allegations relating to their affiliated but legally separate entities. A number of defendants (specifically, LME Holdings, JP Morgan, Henry Bath, Henry Bath LLC, Hong Kong Exchanges and Clearing Limited, Glencore, Glencore Ltd., PMAG and PMUSA) have moved to dismiss on the basis that as to them, plaintiffs' claims fail for lack of specificity. (ECF Nos. 309-10, 327-29, 331-32, 338-39, 447-48, 503-05 511-13, 520-21.) The Court resolves the instant motions without the necessity of resolving these additional, individual motions. If plaintiffs seek to amend, they should take into account the arguments raised regarding lack

of specificity as to particular entities.  Should any proposed amendment adequately

plead standing and a claim as to at least one or more defendants, the Court will

then reach these arguments (and with the benefit of any amended allegations

plaintiffs may then assert).

VIII.   LEAVE TO REPLEAD

Leave to amend should generally be granted freely.  Fed. R. Civ. P. 15(a)(2);

Foman v. Davis, 371 U.S. 178, 182 (1962).  If an amendment would be futile,

however, a court may properly deny leave to amend.  Foman, 371 U.S. at 182.  This

may occur when a proposed amendment would not cure any deficiencies and would

also fail to state a claim.  See Hayden v. Cnty. of Nassau, 180 F.3d 42, 53-54 (2d Cir.

1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to

amend his complaint in a manner that would survive dismissal, opportunity to

replead is rightfully denied.").  A court should judge the adequacy of a proposed

amended complaint using the same standards as those governing the adequacy of a

pleading.  Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991).

As set forth above, the Court's legal analysis indicates that the Consumer

End Users and Commercial End Users cannot plead sufficient facts in support of

antitrust standing.  There will always be others who are more directly injured than

them, as well as others who will be more efficient enforcers of federal antitrust laws.

That these plaintiffs only request injunctive relief does not, for the reasons stated,

eliminate this issue.  There is no need for this Court to unnecessarily add

complexity to the discovery and fact-finding in this case by permitting these

plaintiffs to pursue their claims when there are other, more efficient enforcers who can adequately pursue such relief.  Accordingly, leave to replead for these plaintiffs is denied and this Opinion & Order is final and appealable as to them.

It is unclear, however, whether the FLPs, Mag, and Agfa will be able to both adequately allege antitrust standing as well as address the other, more merits-based issues the Court has raised above.[38]  Accordingly, should these plaintiffs choose to attempt to replead, they must file any amendment, redlined against their complaint that is dismissed here, and any motion and memorandum in support, within 21 days.

IX.        CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are GRANTED, except for LME Ltd.'s motion to dismiss, which is DENIED AS MOOT. Leave to replead is denied as to the Consumer End Users and Commercial End Users.

---

[38] The Court notes that defendants made numerous arguments in support of dismissal. It is unnecessary for the Court to address every one as those which it has addressed are sufficient at the present to resolve the instant motions.  However, it should be noted that if plaintiffs present an amended complaint, the Court is not foreclosing defendants from raising any arguments in support of futility.  The Court will examine any proposed amended complaint and any arguments in response thereto.

The Clerk of Court is directed to close the motions at ECF Nos. 309, 312, 316, 327, 331, 333, 338, 341, 447, 503, 511, and 520.

SO ORDERED.

Dated:      New York, New York
            August 29, 2014

_____
KATHERINE B. FORREST
United States District Judge

# EXHIBIT 5

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/29/2014

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

13-md-2481 (KBF)

**JUDGMENT**

--------------------------------------------------------X

Before the Court are 13 motions to dismiss the antitrust and state law claims brought by purchasers of aluminum and aluminum products, and the matter having come before the Honorable Katherine B. Forrest, United States District Judge, and the Court, on August 29, 2014, having rendered its Opinion and Order granting defendants' motions to dismiss, except for LME Ltd's motion to dismiss, which is denied as moot, and denying the Consumer End Users (14 Civ. 3122) and Commercial End Users (14 Civ. 3121) leave to replead because doing so would be futile, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated August 29, 2014, defendants' motions to dismiss are granted, except for LME Ltd's motion to dismiss which is denied as moot; Consumer End Users (14) Civ. 3122) and Commercial End Users (14 Civ. 3121) lack antitrust standing, and their actions are therefore dismissed and leave to replead is denied as futile.

**Dated:** New York, New York
         August 29, 2014

RUBY J. KRAJICK
Clerk of Court

BY: _____
Deputy Clerk

**THIS DOCUMENT WAS ENTERED**
**ON THE DOCKET ON _____**

# EXHIBIT 6

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____    │
│ DATE FILED: SEP 15 2014     │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                           :
                           :

IN RE ALUMINUM WAREHOUSING     :      13-md-2481 (KBF)
ANTITRUST LITIGATION            :    and all related cases
                           :
                           :      MEMORANDUM
                           :   DECISION & ORDER
------------------------------------------------------------------ X
KATHERINE B. FORREST, District Judge:

      On August 29, 2014, this Court issued an Opinion & Order (the "Opinion")

granting defendants' motions to dismiss p laintiffs' federal antitrust and state law

claims.[1]  (ECF No. 571 ("Op.").)  The Court issues the instant Memorandum

Decision & Order to provide further detail on its rationale for dismissing plaintiffs'

state law claims.

      The following plaintiffs have filed complaints requesting relief under state

law: the First Level Purchasers ("FLPs") (ECF No. 271 ("FLP Compl."));

Commercial End Users (ECF No. 242 ("Comm. Compl.")); Consumer End Users

(ECF No. 227 ("Cons. Compl.")); Mag Instrument, Inc. ("Mag") (ECF No. 226 ("Mag

Compl."); Agfa Corp. & Agfa Graphics, N.V. ("Agfa") (ECF No. 272 ("Agfa Compl.")).[2]

---

[1] On August 25, 2014, the Court granted defendant LME Ltd.'s motion to dismiss on sovereign
immunity grounds. (ECF No. 564.) For this reason, the Court's Opinion denied LME Ltd.'s motion
to dismiss as moot. (Op. at 15-16 n.13.) The Court also denied as moot motions to dismiss for lack of
personal jurisdiction by defendants Henry Bath & Son Limited, Hong Kong Exchanges and Clearing
Limited, Glencore Xstrata plc, and LME Holdings Limited. (Op. at 81.)

[2] Because defendants had not yet moved as to the complaint recently filed by Eastman Kodak Co.
(Eastman Kodak Co. v. The Goldman Sachs Grp., Inc., No. 14-cv-6849 ECF No. 1 ("Kodak Compl.")),
the Opinion did not address that complaint directly. (Op. at 2 n.2.) Accordingly, the instant opinion
also does not address that complaint directly, although any future Court ruling on the state law
claim asserted in that complaint (see Kodak Compl. ¶¶ 142-48) would follow the rationale and
determinations herein.

I.      CONSUMER PROTECTION AND UNFAIR COMPETITION CLAIMS

Together, the Commercial End Users' fourth claim for relief, the Consumer End Users' ninth claim for relief, and the FLPs' eighth claim for relief allege that defendants violated the consumer protection, unfair competition, and unfair trade practices laws of 29 states and the District of Columbia. (Comm. Compl. ¶¶ 272-96; Cons. Compl. ¶¶ 268-92; FLP Compl. ¶¶ 429-31.)

A complaint that merely offers "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Yet plaintiffs' complaints do not even get that far—with the exception of Mag's complaint, they simply provide lists of state consumer protection statutes, without even listing the elements of these statutes, let alone explaining how their factual allegations establish valid claims for relief under them. "Several courts have held that merely listing statutes that could provide possible causes of action without explaining even the broadest contours of how those statutes were violated 'is insufficient to state a claim.'" In re Trilegiant Corp., No. 3:12–CV–00396 (VLB), 2014 WL 1315244, at *35 (D. Conn. Mar. 28, 2014) (quoting McGarvey v. Penske Auto. Grp., 639 F. Supp. 2d 450, 465-66 (D.N.J. 2009), vacated in part on other grounds on reconsideration, No. 08–5610 (JBS/AMD), 2010 WL 1379967 (D.N.J. Mar. 29, 2010)) (collecting cases); see also McGarvey, 639 F. Supp. 2d at 452 (granting motion to dismiss state consumer fraud acts claim for relief because "[p]laintiffs do not even set forth the elements of the fifteen causes of action they assert . . . or explain how the fifteen listed statutes apply to the facts of this case").

This deficiency is a significant problem here because there is considerable variation in the elements of the state consumer protection statutes under which plaintiffs seek relief.  Further, as stated in the Court's Opinion, every state statute requires a direct or indirect allegation supporting proximate cause, and these plaintiffs have failed to include such allegations.  (Op. at 81 (citing Lexmark Int'l Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1390 (2014)).)  Accordingly, plaintiffs have failed to state a claim under any state's consumer protection, unfair competition, or unfair trade practices law.[3]

The Consumer End Users' seventh claim for relief and Mag's sixth claim for relief more specifically allege that defendants' conduct violated California's unfair competition law, codified at Cal. Bus. & Prof. Code §§ 17200 et seq.  (Cons. Compl. ¶¶ 238-43; Mag Compl. ¶¶ 146-49.)  Each of these claims for relief is predicated on defendants' having engaged in anticompetitive behavior that caused plaintiffs to pay supra-competitive prices for aluminum products.  (See Cons. Comp. ¶¶ 239-42 (defendants' conduct is unlawful because it violates federal and state antitrust laws); Mag. Compl. ¶ 148 (claim predicated on defendants' "caus[ing] [Mag] to pay supra-competitive and artificially-inflated prices for aluminum.").)  Because defendants failed to plausibly establish these underlying allegations of anticompetitive behavior (see Op. at 72-73, 80), the Court also rejects these claims.

---

[3] The Court need not address whether these claims fail for additional reasons.

## II.   ANTITRUST CLAIMS

Together, the Commercial End Users' third claim for relief, the Consumer
End Users' eighth and tenth claims for relief, and the FLPs' seventh claim for relief
allege violations of the antitrust laws of 29 states and the District of Columbia.
(Comm. Compl. ¶¶ 236-71; Cons. Compl. ¶¶ 244-67, 293-322; FLP Compl. ¶¶ 426-
28.)  These allegations are deficient for the same reasons as plaintiffs' state law
consumer protection, unfair competition, and unfair trade practices claims, and are
dismissed for this reason.  Additionally, to the extent that these states' antitrust
laws are similar to the Sherman Act and the Clayton Act, these allegations are
deficient for the same reasons as plaintiffs' federal antitrust allegations.  (See Op.
at 52-80.)

Agfa's second claim for relief, the Commercial End Users' third claim for
relief, the Consumer End Users' eighth claim for relief, and the FLPs' sixth claim
for relief allege that defendants violated New York's Donnelly Act, codified at N.Y.
Gen. Bus. Law §§ 340 et seq.  (Agfa Compl. ¶¶ 130-36; Comm. Compl. ¶ 257; Cons.
Compl. ¶ 257; FLP Compl. ¶¶ 420-25.)  The Donnelly Act is "essentially similar" to
Section 1 of the Sherman Act, and to state a claim under it, plaintiff "must allege
both concerted action by two or more entities and a consequent restraint of trade
within an identified relevant product market." Global Reins. Corp. U.S. Branch v.
Equitas Ltd., 969 N.E.2d 187, 192 (N.Y. 2012).  For the reasons stated in the Court's
Opinion, these plaintiffs have failed to plausibly allege either element.  (See Op. at
62-73, 77-80.)

4

The Commercial End Users' fifth claim for relief, the Consumer End Users' fourth and fifth claims for relief, and the FLPs' fifth claim for relief allege that defendants violated the Michigan Antitrust Reform Act ("MARA"), codified at M.C.L.A. §§ 445.771 et seq. (Comm. Compl. ¶¶ 297-309; Cons. Compl. ¶¶ 217-29; FLP Compl. ¶¶ 414-19.) Like the Donnelly Act, MARA is modeled on the Sherman Act. B&S Telcom, Inc. v. Mich. Bell Tel. Co., No. 304030, 2013 WL 1632006, at *3 (Mich. Ct. App. 2013) ("MARA was based on the uniform state antitrust act, which was modeled on federal antitrust statutes, primarily the Sherman Act . . . ." (citation omitted)); Bristol Window & Door, Inc. v. Hoogenstyn, 650 N.W.2d 670 (Mich. Ct. App. 2002) ("§ 2 of the MARA was derived from the Uniform State Antitrust Act, which adopted Sherman Act language and standards of legality . . . ."). For this reason, the requirements for establishing a claim under MARA are essentially the same as those for doing so under the Sherman Act. See Salmon v. City of Cadillac, No. 263586, 2005 WL 3416119, at *5 (Mich. 2005) (per curiam) ("[B]ecause Michigan's antitrust legislation is patterned after federal antitrust legislation, federal court decisions applying the Sherman Act are persuasive authority in interpreting the MARA."); Blair v. Checker Cab Co., 558 N.W.2d 439, 442 (Mich. Ct. App. 1996) ("Because the MARA and the Sherman Act require similar evidence of concerted action or combination, this Court will consider federal precedent interpreting the Sherman Act's prohibition on combination in restraint of trade."). Plaintiffs' claims under MARA are dismissed for the same reasons as their Donnelly Act and Sherman Act claims.

The Commercial End Users' third claim for relief, the Consumer End Users' sixth claim for relief, and Mag's second claim for relief allege violations of California's Cartwright Act, codified at California Business and Professions Code §§ 16700 et seq.  (Comm. Compl. ¶ 245; Cons. Compl. ¶¶ 230-37; Mag. Compl. ¶¶ 120-26.)  The Cartwright Act is "modeled after Section 1 of the Sherman Act," and to state a claim under the Cartwright Act, plaintiffs "must allege that (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." Free FreeHand Corp. v. Adobe Sys. Inc., 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012) (quoting In re Late Fee & Over-Limit Fee Litig., 528 F. Supp. 2d 953, 961, 965 (N.D. Cal. 2007)).  Because the Consumer End Users and Mag have failed to plausibly allege the existence of an unlawful agreement, conspiracy, or combination among defendants (see Op. at 62-73), the Court dismisses their Cartwright Act claims.

Additionally, plaintiffs cannot make out claims under the Cartwright Act, MARA, or the Donnelly Act because they fail to plausibly plead antitrust standing. Courts in California, Michigan,[4] and New York will preclude suits under their respective state's antitrust laws where the alleged injuries are too remote or speculative, or where there is a risk of duplicative recovery.  See, e.g., Clayworth v.

---

[4] While Michigan appellate courts have not explicitly adopted Associated General Contractors or a test for whether a plaintiff's injury is too remote to permit suit under MARA, MARA does require courts to give "due deference to interpretations given by the federal courts to comparable antitrust statutes," Mich Compl. Laws § 445.784, and "courts in other states that have repealed the [direct purchaser] rule have continued to apply antitrust standing requirements to dismiss the claims of plaintiffs who assert only derivative or remote injuries." Stark v. Visa U.S.A. Inc., No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004).

<u>Pfizer</u>, 233 P.3d 1066, 1086 (Cal. 2010); <u>Cont'l Guest Servs. Corp. v. Int'l Bus.</u>

<u>Servs., Inc.</u>, 92 A.D.3d 570, 571-72 (N.Y. App. Div. 2012); <u>In re Wholesale Elec.</u>

<u>Anti-Trust Cases I & II</u>, 147 Cal. App. 4th 1293, 1309 (Cal. Ct. App. 2007); <u>Ho v.</u>

<u>Visa U.S.A., Inc.</u>, 16 A.D.3d 256, 257 (N.Y. App. Div. 2005); <u>Kolling v. Dow Jones &</u>

<u>Co.</u>, 137 Cal. App. 3d 709, 723-24 (Cal. Ct. App. 1982); <u>Van Dussen-Storto Motor</u>

<u>Inn, Inc. v. Rochester Tel. Corp.</u>, 63 A.D.2d 244, 251-52 (N.Y. App. Div. 1978);

<u>Stark</u>, 2004 WL 1879003, at *4.  These states therefore require plaintiffs to

demonstrate antitrust standing under a standard analogous to those courts have

derived from the Supreme Court's opinion in <u>Associated General Contractors of</u>

<u>California, Inc. v. California State Council of Carpenters</u> ("<u>AGC</u>"), 459 U.S. 519

(1983), as discussed in the Opinion (Op. at 35-37).  Accordingly, for the same

reasons that plaintiffs failed to plausibly plead antitrust standing under an <u>AGC</u>

analysis (see Op. at 47-52), they have failed to do so under the Cartwright Act,

MARA, or the Donnelly Act.  Further, as explained in the Opinion, the Commercial

End Users and Consumer End Users are far enough down the supply/distribution

chain that they cannot plead around the issues created by the remoteness of their

injury and the fact that they are seeking duplicative relief.  (<u>See</u> Op. at 47-50.)

These plaintiffs are therefore denied leave to replead these claims.[5]

---

[5] For the same reason, the Commercial End Users and Consumer End Users could not plead around the deficiencies in their claims for relief under state consumer protection, unfair competition and unfair trade practices statutes, each of which requires a direct or indirect allegation supporting proximate cause.  Because the proximate cause inquiry focuses on "whether the cause is too remotely or insignificantly related to the harm to be a legal basis for liability," <u>Poventud v. City of New York</u>, 750 F.3d 121, 159 (2d Cir. 2014) (quoting <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 278-79 (2d Cir. 2003)), the end users' position on the supply/distribution chain attenuates their ability to connect the prices they paid for aluminum to defendants' allegedly anticompetitive conduct, as opposed to other potential causes such as "labor costs, transportation costs or bottling costs" (Op. at 49).  Accordingly,

III.   UNJUST ENRICHMENT CLAIM

The Consumer End Users' Eleventh Claim for relief is an unjust enrichment claim. (Cons. Compl. ¶¶ 323-26.) This claim is predicated on defendants' alleged violations of antitrust or consumer protection laws (see Cons. Compl. ¶¶ 324), which the Court has dismissed without leave to replead (Op. at 84). Accordingly, this claim warrants dismissal without leave to replead. See, e.g., Yong Ki Hong v. KBS Am., Inc., 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) (barring "all litigants who lack antitrust standing from bringing identical claims under a common law theory of unjust enrichment); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231-33 (S.D.N.Y. 2012) (dismissing unjust enrichment claims in antitrust suit where underlying antitrust claims were dismissed for lack of antitrust standing); In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 412-14 (S.D.N.Y. 2011) (same); In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010) ("[W]here an antitrust defendant's conduct cannot give rise to liability under state antitrust and consumer protection laws, [p]laintiffs should be prohibited from recovery under a claim for unjust enrichment.").

IV.   INTERFERENCE CLAIMS

Mag assets three claims under California law for interference with contractual relations: "intentional interference with contract,"[6] "intentional

---

the Court denied these plaintiffs leave to replead their consumer protection, unfair competition and unfair trade practices claims.

[6] This tort is known in many states as "tortious interference" with contract, or some variation on that name. E.g., 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 232-34 (La. 1989) (Louisiana); Lee S. Kreindler et al., 14 New York Practice, New York Law of Torts § 3:12 (2014) (New York); Christopher M. Ernst, Baldwin's Ohio Practice, Ohio Tort Law § 46:21 (2d ed. 2013) (Ohio).

interference with economic relationship," and "negligent interference with economic relationship." (Mag Compl. ¶¶ 127-45).  Each claim is subject to dismissal based on the fact that Mag has failed plausibly to allege that defendants had knowledge of its supply contracts.

A.   Intentional Interference with Contract

Mag's third claim for relief is for intentional interference with contract under California law.  Under California law, the elements of intentional interference are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Pac. Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 589-90 (Cal. 1990).  Notably, elements (2) and (3) require a defendant to have knowledge of the specific contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Little v. Amber Hotel Co., 202 Cal. App. 4th 280, 302 (Cal. Ct. App. 2011) (citing Restatement (Second) of Torts § 766 (1979)).

Mag, however, alleges only that "[a]s participants in the aluminum industry, [d]efendants were or should have been aware of [Mag's] long-standing supply contracts," and that defendants therefore "knew to a substantial certainty" that their actions would interfere with those contracts. (Mag. Compl. ¶¶ 129–30.) Under Mag's theory, all participants in an industry have constructive knowledge of all supply contracts in that industry.  Accepting this theory would essentially

9

render element (2) meaningless, and the Court declines to do so.  Mag's allegations
do not sufficiently allege that defendants had knowledge of Mag's supply contracts.
Accordingly, the Court dismisses Mag's intentional interference with contract claim,
with leave to replead.

B.     Intentional Interference with a Prospective Economic Advantage

Mag's fourth claim for relief is for "intentional interference with economic
relationship" (Mag Compl. ¶¶ 133-38).  Because no such cause of action exists under
California law, the Court construes this claim as one for intentional interference
with a prospective economic advantage.  Under California law, the elements of
intentional interference with a prospective economic advantage are: (1) an economic
relationship between plaintiff and a third party that probably would have resulted
in an economic benefit to plaintiff; (2) defendant had knowledge of the relationship;
(3) defendant engaged in wrongful conduct; (4) by engaging in this wrongful
conduct, defendant intended to disrupt the relationship, or knew that disruption of
the relationship was certain or substantially certain to occur; (5) the relationship
was disrupted; (7) plaintiff was harmed; and (7) defendant's conduct was a
substantial factor in causing plaintiff's harm.  Judicial Council of Cal., Judicial
Council of California Civil Jury Instructions § 2202 (2014) [hereinafter "CACI"].

Mag's allegations are insufficient because, as stated above, Mag does not
adequately allege that defendants had knowledge of its relationships with its
suppliers.  Further, regarding element (3), the conduct must be wrongful by some
legal measure other than the fact of the interference itself, Della Penna v. Toyota

10

Motor Sales, U.S.A., Inc., 902 P.2d 740, 751 (Cal. 1995), and Mag has failed to

plausibly allege that defendants have violated any federal or state antitrust,

consumer protection, or unfair competition law.  Accordingly, the Court dismisses

Mag's fourth claim for relief for "intentional interference with economic

relationship," with leave to replead.

      C.    Negligent Interference with a Prospective Economic Advantage

      Mag's fifth claim for relief is for "negligent interference with economic

relationship."  (Mag Compl. ¶¶ 139-45.)  Because no such cause of action exists

under California law, the Court construes this claim as one for negligent

interference with a prospective economic advantage.  Under California law, the

elements of negligent interference with a prospective economic advantage are (1)

the existence of an economic relationship between plaintiff and a third party that

probably would have resulted in a future economic benefit to plaintiff; (2) defendant

knew or should have known of this relationship; (3) defendant knew or should have

known that this relationship would be disrupted if defendant failed to act with

reasonable care; (4) defendant failed to act with reasonable care; (5) defendant

engaged in wrongful conduct; (6) the economic relationship was disrupted; (7)

plaintiff was harmed; and (8) defendant's wrongful conduct was a substantial factor

in causing plaintiff's harm.  CACI § 2204.

      To be liable for negligent interference with a prospective economic advantage,

defendant must owe plaintiff a specific duty of care.  E.g., Limandri v. Judkins, 52

Cal. App. 4th 326, 348 (Cal. Ct. App. 1997).  To determine whether defendant owes

plaintiff a specific duty of care, the Court must balance various factors, among which are "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." Biakanja v. Irving, 320 P.2d 16, 19 (Cal. 1958).

As stated above, Mag does not adequately allege that defendants had actual knowledge of its relationships with its suppliers, which means that Mag has failed to adequately allege elements (2) and (3) of this cause of action. Further, under the Biakanja factors, Mag has failed to adequately allege that defendants owed Mag a duty of care. Mag alleges that defendant has a duty of care to every "participant in the market for aluminum" under the Commodity Exchange Act, codified at 7 U.S.C.§§ 1 et seq. (Mag Compl. ¶ 143.) But Mag is one or more levels down the supply/distribution chain from defendants, and Mag does not clearly allege that defendants even knew of Mag's existence at the time of the conduct at issue. Mag also does not allege that defendants' conduct was intended to affect plaintiff, nor does Mag plausibly allege that defendants could have foreseen that they would harm Mag; and given the uncertainty about the supply/distribution chain, the closeness of the connection between defendants' conduct and Mag's alleged injury is unknown. Accordingly, the Court dismisses Mag's fifth claim for relief for "negligent interference with economic relationship," with leave to replead.

V.        CONCLUSION

For the foregoing reasons, the Court has dismissed plaintiffs' state law claims and denied leave to replead them as to the Commercial End Users and Consumer End Users.

SO ORDERED.

Dated:        New York, New York
              September 15, 2014

_____
KATHERINE B. FORREST
United States District Judge

13

# EXHIBIT 7

**From:** Kimberly A. Justice [mailto:kjustice@ktmc.com]
**Sent:** Friday, October 17, 2014 12:38 PM
**To:** Zwisler, Peggy (DC)
**Cc:** 'John A. Kehoe'; JonC@cuneolaw.com; Joseph H. Meltzer; Terence S. Ziegler
**Subject:** In re Aluminum Antitrust Litigation Appeals


Peggy,

By this email, Commercial End User Plaintiffs-Appellants consent to the  LME's Motion To Stay Appeals (attached).


Regards,
Kimberly
Co-Lead Counsel for Commercial End User Plaintiffs-Appellants.
Kimberly A. Justice, Esq.



280 King of Prussia Rd
Radnor, PA 19087
Direct Dial: (610) 822-2237
General Firm Phone: (610) 667-7706
Fax: (610) 667-7056
Email: kjustice@ktmc.com
Internet: www.ktmc.com
PRIVILEGED ATTORNEY/CLIENT, ATTORNEY WORK PRODUCT
The information in this transmittal may include privileged and confidential material and is intended for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution or copying of this transmittal is prohibited. If you have received this transmittal in error, please notify the sender immediately at Kessler Topaz Meltzer & Check, LLP at (610) 667-7706 or via return e-mail.

**From:** Douglas G. Thompson, Jr. [mailto:dthompson@finkelsteinthompson.com]
**Sent:** Friday, October 17, 2014 1:14 PM
**To:** Zwisler, Peggy (DC)
**Cc:** Giordano, Jennifer (DC); jmeltzer@ktmc.com; kjustice@ktmc.com; John A. Kehoe; Daniel Girard; Cuneo Law Group, P.C.; 'Brian Strange'; Keith Butler
**Subject:** LME Motion to Stay Appeals

## Dear Ms Zwisler,

As co-lead counsel for Plaintiffs/Appellants Consumer End Users, this is to inform you that Consumer End Users hereby consent to the attached motion of the LME requesting the Second Circuit to hold the appeals in abeyance pending a ruling by the United States Supreme Court on the *Libor* appeal.

## /s/ Douglas G. Thompson Jr, co-lead counsel for the Consumer End Users

Douglas G. Thompson Jr. Esq.

Finkelstein Thompson LLP

www.finkelsteinthompson.com <http://www.finkelsteinthompson.com>

(202) 337-8000

This e-mail message contains information belonging to the law firm of Finkelstein Thompson LLP, which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please e-mail the sender. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. This email is not intended to create an attorney-client relationship between you and Finkelstein Thompson LLP. If you communicate with us in connection with a matter for which we do not already represent you, your communication may not be treated as privileged or confidential. In some jurisdictions this e-mail may be considered advertising. The hiring of a lawyer is an important decision that should not be based solely upon written information about our qualifications and experience. Advertising disclaimers are required in several states when law firms or attorneys indicate practice limitations or areas of concentration.